UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MARY M. BREWER, individually and on
behalf of all others similarly situated,                    ECF Case

              Plaintiffs,                          COMPLAINT

          -against-                             CLASS ACTION

GENERAL MOTORS INVESTMENT                                   Case No.  07 CV 2928 (LAK)
MANAGEMENT CORPORATION and STATE
STREET BANK & TRUST COMPANY,

            Defendants.
-----------------------------------------------------------x

      Mary M. Brewer, a participant in the Delphi Savings-Stock Purchase Program for

Salaried Employees ("Salaried Plan"), alleges the following based on information and belief and

an investigation by Plaintiff's counsel, which included a review of plan and trust documents for

defined contribution plans sponsored by Delphi Corporation ("Delphi"), Forms 5500 for such

plans filed with the United States Department of Labor ("DOL"), filings by Delphi with the

Securities and Exchange Commission ("SEC"), including Forms 11-K and 10-K, prospectuses,

and interviews of current and former employees of Delphi:

## NATURE OF THE ACTION

      1.     This is a civil enforcement action under the Employee Retirement Income

Security Act, as amended ("ERISA"), 29 U.S.C. §1001, *et seq.*, and in particular under ERISA

§§404(a), 409, and 502(a)(2), 29 U.S.C. §§1104(a), 1109, and 1132(a)(2).

      2.     The lawsuit concerns four defined contribution plans sponsored by Delphi:  the

Salaried Plan; the Delphi Personal Savings Plan for Hourly-Rate Employees ("Hourly Plan"); the

ASEC Manufacturing Savings Plan ("ASEC Plan"); and the Delphi Mechatronic Systems

Savings-Stock Purchase Program ("Mechatronic Plan") (collectively the "Delphi Savings Plans"

or the "Plans").  The Delphi Savings Plans are retirement plans established and sponsored by

Delphi to provide retirement income for its employees.  The Delphi Savings Plans are defined

contribution plans, which are not insured by the Pension Benefit Guarantee Corporation.

3.      The defendants, General Motors Investment Management Company

("GMIMCo") and State Street Bank & Trust Company ("State Street"), were (and are)

fiduciaries under ERISA of the Delphi Savings Plans responsible for the Plans' investments.

GMIMCo was (and is) responsible for selecting, removing, managing, and monitoring the

investments of the Plans.  For the Plans' investments for which it serves as an investment

manager, State Street was (and is) responsible for managing and monitoring the investments of

the Plans, including the responsibility to divest the Plans' investments when it was prudent to do

so.  As investment fiduciaries for the Delphi Savings Plans, GMIMCo and State Street were

required to act solely in the interest of the participants and beneficiaries of the Plans and with

care, skill, prudence, and diligence in managing the Plans' investments.

4.      For many years, the Delphi Savings Plans have invested in several undiversified,

single equity stock funds:  the EDS Common Stock Fund ("EDS Fund"); the DIRECTV Group

Common Stock Fund ("DIRECTV Fund"); the News Corporation Non-Voting Common Stock

Fund ("News Corp. Fund"); the GM Common Stock Fund ("GM Fund"); and the Raytheon

Common Stock Fund ("Raytheon Fund") (collectively "Single Equity Funds").  Since 2000, the

Plans have lost hundreds of millions of dollars on their Single Equity Funds investments when

compared to what the Plans would have earned in prudent investment alternatives.  GMIMCo

and State Street knew or should have known that the Single Equity Funds were imprudent

investments for the Delphi Savings Plans.

5. As alleged in Count I, GMIMCo and State Street violated their fiduciary obligations to the Plans under section 404 of ERISA, 29 U.S.C. §1104, by failing to prudently manage the assets of the Plans when they allowed or caused the Plans to maintain investments in the Single Equity Funds, which were undiversified and imprudent as investments for retirement income savings. Defendants' breaches of duty caused the Plans hundreds of millions of dollars in losses, for which GMIMCo and State Street are liable to the Plans and their participants pursuant to sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2).

6. For many years, the Delphi Savings Plans have invested in mutual funds offered and managed by subsidiaries and affiliates of the FMR Corp. under the Fidelity family or brand of mutual funds ("Fidelity Funds"). As of December 31, 2004, the Delphi Savings Plans' investments in Fidelity Funds totaled approximately $1.6 billion. As the fiduciary responsible for selecting and monitoring the Plans' investments, GMIMCo had a duty to select prudent investments at reasonable cost, and to monitor the prudence and costs of the Plans' investments on an ongoing basis. The Fidelity Funds selected by GMIMCo were more expensive to the Plans than similar funds available from the investment management market place, which caused the Plans to lose millions of dollars a year in excess fees.

7. As alleged in Count II, GMIMCo violated its fiduciary obligations to the Plans under section 404 of ERISA, 29 U.S.C. §1104, by causing or allowing the Plans to maintain investments in Fidelity Funds when similar investment products were available at much lower cost. GMIMCo's breaches of duty caused the Plans to pay millions of dollars in excess fees, for which GMIMCo is liable to the Plans and their participants pursuant to sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2).

8.      Because Plaintiff's claims apply to the participants and beneficiaries as a whole, because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, and because the Delphi Savings Plans' investments were managed pursuant to the same basic terms, practices, and policies and by the same fiduciaries, Plaintiff brings this lawsuit as a class action on behalf of all participants and beneficiaries of the Plans.

## I. <u>JURISDICTION AND VENUE</u>

9.      ERISA provides for exclusive federal jurisdiction over these claims.  The Plans are "employee benefit plans" within the meaning of §3(3) of ERISA, 29 U.S.C. §1002(3), and the members of the class are "participants" within the meaning of §3(7) of ERISA, 29 U.S.C. §1002(7), who are authorized pursuant to §502(a)(2) and (3) of ERISA, 29 U.S.C. §1132(a)(2) and (3), to bring the present action on behalf of the participants and beneficiaries of the Salaried Plan to obtain appropriate relief under §§502 and 409 of ERISA, 29 U.S.C. §§1132 and 1109.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

11.      This Court has personal jurisdiction over the defendants because the Court has subject matter jurisdiction under ERISA.

12.      Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because GMIMCo's principal place of business is in this district.

## II. PARTIES

**A.    Plaintiff.**

13.    **Plaintiff Mary M. Brewer**.  Plaintiff Brewer is a resident of Saginaw, Michigan. She began work for General Motors Corporation (GM) in 1976.  She became employed by Delphi when it became independent of GM in 1999.  She is a participant in the Salaried Plan.

**B.    Defendants.**

14.    **Defendant General Motors Investment Management Corporation ("GMIMCo")**.  GMIMCo, a Delaware Corporation, is a registered investment advisor with the Securities and Exchange Commission.  GMIMCo is located at 767 Fifth Avenue, New York, NY 10153 and/or at 1 Liberty Plaza,165 Broadway, 36th Floor, New York, NY 10006.  GMIMCo is the Named Fiduciary for the Plans for purposes of investing the Plans' assets.  As an investment fiduciary for the Delphi Savings Plans, GMIMCo exercised discretionary authority and control over the assets of the Plans.

15.    **Defendant State Street Bank & Trust Company ("State Street").**  State Street is a subsidiary of State Street Corporation.  State Street was the Trustee for the Plans' Single Equity Fund investments.  State Street also served as the Investment Manager for the Single Equity Funds.  Pursuant to an Investment Manager Agreement drafted by State Street, GMIMCo appointed State Street "to act as an investment manager (as defined under Section 3(38) of ERISA, 29 U.S.C. §1002(38))" for the Single Equity Funds.  As an investment fiduciary for the Delphi Savings Plans, State Street exercised discretionary authority and control over the assets of the Plans.

### III. FACTUAL BACKGROUND

**A.     The Delphi Savings Plans**

16.     Delphi has established several pension plans for the benefit of its employees.

17.     On information and belief, the Salaried Plan is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Pursuant to ERISA, the relief requested in this action is for the benefit of the Salaried Plan.

18.     The Salaried Plan was established by Delphi for the benefit of its employees and has been amended from time to time.

19.     GMIMCo is the named fiduciary for purposes of investment of Salaried Plan assets.

20.     State Street is the Investment Manager and Trustee for the Single Equity Fund investments of the Salaried Plan.

21.     On information and belief, the Hourly Plan is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Pursuant to ERISA, the relief requested in this action is for the benefit of the Hourly Plan.

22.     The Hourly Plan was established by Delphi for the benefit of its employees and has been amended from time to time.

23.     GMIMCo is the named fiduciary for purposes of investment of Hourly Plan assets.

24.     State Street is the Investment Manager and Trustee for the Single Equity Fund investments of the Hourly Plan.

25.     On information and belief, the ASEC Plan is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Pursuant to ERISA, the relief requested in this action is for the benefit of the ASEC Plan.

26.     The ASEC Plan was established by Delphi for the benefit of its employees and has been amended from time to time.

27.     GMIMCo is the named fiduciary for purposes of investment of ASEC Plan assets.

28.     State Street is the Investment Manager and Trustee for the Single Equity Fund investments of the ASEC Plan.

29.     On information and belief, the Mechatronic Plan is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Pursuant to ERISA, the relief requested in this action is for the benefit of the Mechatronic Plan.

30.     The Mechatronic Plan was established by Delphi for the benefit of its employees and has been amended from time to time.

31.     GMIMCo is the named fiduciary for purposes of investment of Mechatronic Plan assets.

32.     State Street is the Investment Manager and Trustee for the Single Equity Fund investments of the Mechatronic Plan.

33.     The Delphi Savings Plans are defined contribution plans funded by a combination of employer and employee contributions.

34.     Employee and employer contributions are invested in one or more of over thirty funds, most of which are mutual funds—the Fidelity Funds.  The investment options available under the Plans are selected by GMIMCo.

**B.     The Delphi Master Trust.**

35.     According to Forms 5500 filed with the DOL and Forms 11-K filed with the SEC, the investments of the Delphi Savings Plans are (or have been) held collectively in the Delphi Automotive Systems Master Savings Trust ("Delphi Trust" or "Master Trust"), which is a master trust investment account ("MTIA") under ERISA.  An MTIA is a trust for which a regulated financial institution serves as trustee or custodian (regardless of whether such institution exercises discretionary authority or control respecting the management of assets held in the trust) and in which assets of more than one plan sponsored by a single employer or by a group of employers under common control are held.  29 C.F.R. §2520.103-1(e).  State Street is the Trustee for the Delphi Trust.  As of December 31, 2004, the Delphi Trust held assets of $4,153,058,000.

36.     The Plans' assets in the Master Trust are invested collectively in various funds, including the Single Equity Funds and the Fidelity Funds.

37.     MTIA fiduciaries and other fiduciaries can use the bulk purchasing power of aggregated plan assets to negotiate reduced fees from investment managers and other service providers to pension plans.  Investment managers are able to offer lower fees to fiduciaries of large plans because investment managers do not have responsibility for, and therefore the associated cost of, marketing to or managing retail investor accounts, that is the investment manager can focus on providing the value added services of investment research and portfolio management without concerning itself with administration, custody, and marketing.  Fiduciaries for large plans can either appoint a separate (or single client) account investment manager under an investment management agreement or invest in a pooled fund managed by the investment manager.  Pooled investment funds offered by insurance companies ("pooled separate accounts")

and banks ("collective trusts") offer the same investment products as the mutual fund industry at lower cost, that is by focusing on the core research and portfolio management functions. For that reason, large institutional investors, including many ERISA pension plans, prefer separate account or pooled investments over mutual funds.

38.    For example, Delphi's $2.2 billion defined benefit plan for salaried employees (the Delphi Retirement Program for Salaried Employees ("Retirement Program")), for which GMIMCo also is a fiduciary, does not invest any plan assets in mutual funds. Rather, according to Forms 5500 for the Salaried Pension Plan, 90% of the Retirement Program's assets are invested in low-fee collective trusts. Key differences between a defined benefit plan, like the Retirement Program, and a defined contribution plan, like the Delphi Savings Plans, may explain why GMIMCo has been more vigilant in mitigating expenses for the Retirement Program than for the Delphi Savings Plans. Because the plan sponsor is liable for the benefits promised by a defined benefit plan, the plan sponsor ultimately bears the investment risk and the expenses of investment management and plan administration. With a defined contribution plan, however, participants ultimately bear the investment risk and the investment fees and other plan expenses. In this case, when Delphi bears the investment risk and cost (as with Delphi's defined benefit plans), the plans invest in low-cost collective trusts. When Delphi plan participants bear the investment risk and cost (as with the Delphi Savings Plans), the plans invest billions of dollars in more expensive mutual funds.

## C.    Single Equity Fund Investments Of The Delphi Savings Plans.

39.    In May 1999, GM completed a spin-off of its Delphi Automotive Systems subsidiary, which included creating clone plans of existing GM plans for salaried and hourly workers of Delphi. The Delphi Savings Plans were initially funded in proportion to the

aggregate account values of Delphi salaried and hourly plan participants in each investment of the GM plans.

40.    As owners of GM common stock and pursuant to these transactions, the Plans received shares of GM common stock.  In conjunction with the Plans' receipt of GM stock, a unitized stock fund for GM stock was created within each plan and within the Master Trust to hold said stock:  the GM Common Stock Fund ("GM Fund").

41.    Through December 23, 2003, the Plans offered the GM Class H Stock Fund, which invested primarily in GM Class H stock, as an investment option.

42.    GM Class H stock was issued to owners of GM common stock in 1985 as a tracking stock intended to reflect the value of GM's Hughes Electronics subsidiary ("Hughes"). In 1997, GM sold the defense electronics business of Hughes to Raytheon Corp., and merged the Delco Electronics division of Hughes into GM's then Delphi Automotive Systems subsidiary (now Delphi), and recapitalized Class H stock into a new common stock to track Hughes' remaining telecommunications and space businesses.  On December 22, 2003, News Corp. acquired Hughes in exchange for American Depositary Shares ("ADSs") of News Corp.  News Corp. then changed Hughes' name to DIRECTV, which became an independent, publicly traded company.  As owners of GM common stock and pursuant to these transactions, the Plans received GM Class H stock in 1985 and 1997 (recapitalized), Raytheon common stock in 1997, and News Corp. ADSs and DIRECTV common stock in 2003 and 2004.  In conjunction with the Plans' receipt of these securities, unitized stock funds were created for each security within each of the Plans and within the Master Trust to hold said securities:  the Raytheon Common Stock Fund ("Raytheon Fund"); the DIRECTV Group Common Stock Fund ("DIRECTV Fund"); and

the News Corp. Non-Voting Common Stock Fund ("News Corp. Fund").  The GM Class H Stock Fund was closed effective December 23, 2003.

43.      GM Class E stock was issued to owners of GM common stock in 1984 as, on information and belief, a tracking stock intended to reflect the value of GM's Electronic Data Systems subsidiary ("EDS").  In June 1996, GM sold EDS, which became an independent, publicly traded company.  As owners of GM common stock and pursuant to these transactions, the Plans received Delphi Class E stock in 1984, which was exchanged for EDS common stock in 1996.  In conjunction with the Plans' receipt of EDS stock, a unitized stock fund for EDS stock was created within each plan and within the Master Trust to hold said stock:  the Electronic Data Systems Corporation Common Stock Fund ("EDS Fund").

44.      As of 1999, the Plans provided that:  the EDS Fund would close on July 31, 2001; the Raytheon Fund would close December 31, 2002; and the GM Fund would close May 28, 2002.  Effective March 1, 2001, the Plans' provisions requiring elimination of the GM Fund, the EDS Fund, and the Raytheon Fund as of certain phase-out dates were removed.  Had those phase-out dates been maintained, the Plans would have avoided hundreds of millions of dollars in losses.

45.      Since 2000, the Plans have maintained investments of hundreds of millions of dollars in the Single Equity Funds.  Since 2000, the Plans have lost hundreds of millions of dollars on investments in the Single Equity Funds.

46.      As the fiduciaries responsible for selecting, monitoring, and managing the Plans' investments, GMIMCo and State Street are liable for the losses in the Single Equity Fund investments suffered by the Plans because they failed to act with the requisite skill, diligence, and loyalty to the Plans and their participants.

**D.    The Fiduciaries of the Plans Named as Defendants.**

47.    ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1002(21)(A).

48.    GMIMCo and State Street were fiduciaries for the Delphi Savings Plans and owed fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

49.    GMIMCo was a Named Fiduciary of the Plans pursuant to ERISA §402(a)(2), 29 U.S.C. §1029(a)(2), and the Plan documents, for purposes of investment of Plan assets.  As Named Fiduciary for the Plans' investments, GMIMCo had discretionary control and authority to buy, sell, or hold assets of the Plans, including investments in the Single Equity Funds. GMIMCo also had discretionary control and authority to select or remove the Fidelity Funds as investments options for the Plans.

50.    State Street was Trustee for the Plans pursuant to the Trust Agreement and Investment Manager for the Single Equity Funds pursuant to the Investment Manager Agreement and ERISA §3(38), 29 U.S.C. §1002(38).  As Investment Manager for the Single Equity Funds, State Street had discretionary control and authority to buy, sell, or hold assets of the Plans, including investments in the Single Equity Funds.  Pursuant to the Investment Manager Agreement, State Street acknowledges that it is "a fiduciary, within the meaning of ERISA, with respect to the [Plans] and represents and warrants that it is familiar with and will comply with the fiduciary responsibility provisions" of ERISA.  State Street also acknowledges that it is 'an investment manager [for the Single Equity Funds] (as defined in Section 3(38) of ERISA')." The Investment Manager Agreement conferred broad discretionary authority on State Street and did not prohibit it from selling the various equities held by the Single Equity Funds if it was

prudent to do so.  Among other things, the Investment Manager Agreement provided that State Street "shall be responsible in its sole and exclusive judgment and discretion for the management and investment of the [Single Equity Funds]."

51.    State Street's specific "powers" included the power to "dispose of any securities or other property at any time held by it."

52.    State Street also had the power to sue, defend, represent, or settle any claim in connection with the Plans' investments in the Single Equity Funds.

53.    State Street is an independent fiduciary or discretionary asset manager for employee benefit plans.  According to a declaration filed by Susan Daniels, head of the CitiStreet Company Stock Management Group, State Street, by and through its affiliate CitiStreet, maintains a Company Stock Management Group.  CitiStreet is a joint venture between State Street and Citigroup.  The Company Stock Management Group provides Trustee and/or Discretionary Investment Manager services for various company sponsored employee benefit plans that hold employer securities.  In the particular case of the Delphi Savings Plans, such employer securities included the Single Equity Funds.  The Company Stock Management Group maintains committees and processes to monitor pension plan investments in employer stock (and in the case of the Plans, the Single Equity Funds) for its plan clients, including a Fiduciary Committee ("FC") and a Watchlist Committee ("WLC").  All of the voting members of the FC, including the Chairman, are State Street employees.

54.    The FC provides fiduciary guidance and oversight functions.  Its responsibilities include "analyzing, reviewing and performing appropriate due diligence regarding whether continuing to invest in Employer Securities is prudent ... [and] making appropriate decisions regarding whether continuing to follow plan provisions is prudent and consistent with ERISA ..."

55.    The FC maintains procedures for identifying, monitoring and managing "at-risk" securities.  At-risk securities are brought to the attention of the FC by the WLC.  Responsibilities of the FC with respect to at-risk securities include, but are not limited to:  review of ongoing events and transactions; discussions with company stock management regarding events, transactions, restrictions on trading, and suspensions on trading; review of analyst opinions, including those of the State Street affiliate State Street Global Advisors ("SSgA"); developing participant communications; retaining outside financial and/or legal advisors; and making decisions about the prudence of the employer stock investment.

56.    According to Ms. Daniels, "Regardless of whether State Street is serving as a discretionary trustee, directed trustee or investment manager, the Company Stock Management Group's processes for monitoring stock is the same."

**E.    Defendants Caused and Permitted the Plans to Invest in Undiversified Single Equity Funds.**

57.    The Single Equity Funds are undiversified, unitized collective trusts holding a small percentage of cash with the overwhelming balance invested in the common stock of a single company.  As undiversified funds, the Single Equity Funds are far more volatile and risky than a diverse portfolio of equities, bonds, real estate, and other instruments.

58.    As alleged above, the Plans invested in several Single Equity Funds, including the EDS Fund, the Raytheon Fund, the DIRECTV Fund, the News Corp. Fund, and the GM Fund. From January 1, 2000 to the present, the S&P 500 has performed substantially better than EDS and Delphi common stock (the latter has lost virtually all of its value in bankruptcy).  From January 1, 2004 to the present, the S&P 500 has performed substantially better than DirecTV and News Corp. common stock.  The failure of GMIMCo and State Street to allocate the Plans' investments in the Single Equity Funds to more suitable and diverse investment options caused

the Plans to forego hundreds of millions of dollars in investment returns in addition to substantial losses in absolute terms.

59.    GMIMCo is a financial institution and registered investment advisor with many and varied investment management businesses.  GMIMCo knew or should have known that a single stock equity fund was too risky and volatile an investment for a pension plan that is designed to provide retirement income.  GMIMCo is familiar with the principles of modern portfolio theory, which holds that diversification across and within assets classes is the optimum way to balance risk and return.  Nevertheless, GMIMCo caused and permitted the Plans to invest hundreds of millions of dollars in the Single Equity Funds, which investments were imprudent and undiversified and caused the Plans to lose hundreds of millions of dollars in retirement assets.

60.    State Street is a large financial institution with many and varied investment management businesses.  Through its Company Stock Management Group, it manages billions of dollars in ERISA plan investments in sponsoring company stock.  It represents that it is familiar with the fiduciary responsibility provisions of ERISA, which provisions include detailed rules on the management of plan investments in sponsoring company stock.  State Street has defended many lawsuits alleging imprudent management of sponsoring company stock on the grounds that, among other things, such stock investments are presumptively prudent and not subject to the diversification duty of ERISA §404(a)(1)(C), 29 U.S.C. §1104(a)(1)(C). Accordingly, State Street knows that the Single Equity Funds at issue here do not enjoy any presumption of prudence or exemption from the requirement that plan assets be diversified.

61.    Through its broader investment management business, that is SSgA, State Street manages billions of dollars across a broad array of investment funds, including passively (index)

and actively managed equity and bond funds of various assets classes.  SSgA and State Street are familiar with the principles of modern portfolio theory, which holds that diversification across and within assets classes is the optimum way to balance risk and return.  Accordingly, State Street knows that a single equity stock fund is an extremely risky and volatile investment as compared to a fund that invests in wide array of equities.  Nevertheless, State Street failed to exercise the diligence and skill in the management of these funds that is required under ERISA.  As a consequence, the Plans lost hundreds of millions of dollars on their investments in the Single Equity Funds.

62.    State Street's conduct as a fiduciary to other plans with single stock investments shows that it knew that it had discretion to sell the investments in the Single Equity Funds if its duties of prudence and loyalty required it to do so.

63.    For example, in its capacity as Investment Manager for the Grace Stock Fund ("Grace Fund") of the Grace Savings & Investment Plan ("Grace Plan"), State Street determined that its duties under ERISA required it to sell Grace stock held by the Grace Plan.  In a January 26, 2004 notice to participants in the Grace Plan, State Street explained that it had "the authority to determine at any time that all or a portion of the shares of Grace stock held in the Grace Stock Fund should be sold, but only if such sale is necessary in order to comply with the requirements of ERISA."

64.    Only a month later, State Street sent a second notice to participants in the Grace Plan explaining that it had decided to start selling Grace stock for the plan because "in light of all the relevant facts and circumstances, it is no longer consistent with ERISA for the Plan to continue to hold all of the shares of Grace stock currently in the Grace Stock Fund."

65.    In a set of "Participant Questions & Answers" that accompanied the second notice, State Street explained the grounds for its decision to sell Grace stock.  Among other things, State Street explained (1) it was not consistent with ERISA for the Grace Plan to continue to hold Grace stock, (2) State Street acted independently of the plan sponsor and trustee, (3) notwithstanding the low stock price, it was consistent with ERISA and in the interest of participants to sell now, (4) prudence required State Street to commence the sale of Grace stock, and (5) State Street did not act on inside information.  In answer to the all-important question "The Plan document says that the Grace Stock Fund should be invested in Grace stock, doesn't that prevent State Street from selling?," State Street said:  "Under ERISA, a plan document is controlling only to the extent that the plan document is consistent with ERISA.  Thus, the plan document cannot override the ERISA fiduciary and investment requirements.  The United States Department of Labor has stated very clearly that a plan document may not be relied upon to avoid other ERISA requirements."  State Street added that it also had the power to override participant investment decisions to invest in Grace stock.

**F.    GMIMCo Caused The Plans To Invest Billions Of Dollars In Fidelity Funds.**

66.    Pension plans pay fees for investment management and other services.  Some of these fees are paid indirectly by plans through investments in mutual funds such as the Fidelity Funds, which in turn pay fees to investment advisors, record-keepers, custodians, and other service providers to the mutual fund.  Other fees are paid directly by the plans to service providers such as actuaries, accountants, investment managers, record-keepers and trustees.

67.    Among other things, GMIMCo was (and is) responsible for selecting investments and service-providers for the Plans, which selections must be made prudently and solely in the interest of the Plans' participants and beneficiaries.

68.     GMIMCo had the sole discretion to select the investments available under the

Plans.  Over the years, GMIMCo used that discretion to select Fidelity Funds as investment

options for the Plans, which led to the Plans investing billions of dollars in Fidelity Funds.  From

2000 to the present, the Plans' total investments in Fidelity Funds have averaged approximately

$6.5 billion a year.

69.     The Fidelity Funds pay FMR Corp. subsidiaries and affiliates tens of millions of

dollars in fees annually for investment advisory, custodial, trust, administrative, distribution, and

other services, which fees are passed on to investors in the Fidelity Funds, including the Plans,

by deducting such fees from the Fidelity Funds.  Some of the fees paid by a mutual fund are

reported in the Management Expense Ratio ("MER").  Not reported in the MER are brokerage

fees paid to execute transactions in the securities that constitute a Fidelity Fund portfolio, the

costs of excessive trading of the portfolio, which is commonly referred to as "churning," or

revenue-sharing and shelf-space arrangements.  Although the fees are paid directly by a Fidelity

Fund to FMR Corp. subsidiaries or affiliates and other service providers to the funds, the fees are

nevertheless paid indirectly by the Plans and the payment of such fees have had a direct and

detrimental impact on the value of the Plans' assets as earnings for the Fidelity Funds were

passed on to investors net of fees and expenses.  As United States Department of Labor studies

have recognized, the

> [e]xpenses of operating and maintaining an investment portfolio that are debited
> against the participant's account constitute an opportunity cost in the form of
> foregone investments in every contribution period.  The laws of compound
> interest dictate that these small reductions in investment are magnified greatly
> over the decades in which many employees will be 401(k) plan participants. …
> The effect of … higher levels of expenses would be to reduce the value of
> potential future account balances for these participants.

*Study of 401(k) Plan Fees and Expenses* (Apr. 13, 1998) ("*Fee Study*") (available at

http://www.dol.gov/ebsa/pdf/401krept.pdf.)  Applied to a multi-billion dollar portfolio over

several years, like the aggregated portfolios of the Delphi Savings Plans in the Master Trust, the compounded opportunity cost of excessive fees substantially reduces the Plans' returns.

70.    Large plans like the Delphi Savings Plans can achieve substantial savings by negotiating single client or separate account investments at rates below those charged by even the lowest cost providers in the mutual fund industry. "Very large plans can achieve even greater investment management savings by establishing separate accounts for their 401(k) assets." (*Fee Study*.) This is especially true of the Delphi Savings Plans because their assets are aggregated in the very large Master Trust for the purpose of achieving economies of scale. But GMIMCo failed to take advantage of the economies of scale, the Plans' bargaining power, and GMIMCo's expertise for the benefit of the Plans.

71.    As explained above, mutual funds pay a variety of investment advisory, administrative, record-keeping, custodial, accounting, and distribution fees, which fees are passed on to investors in the fund. For example, according to the fund's prospectus, the Fidelity Diversified International Fund paid 1.01% in fees, of which .26% (or 26 basis points, a basis point is .0001 or .01%) were attributable to fees other than investment advisory fees, such as trustee and record-keeping fees. As of December 31, 2003, the Plans had invested $40.9 million in the Diversified International Fund. Given that the Delphi Savings Plans have existing arrangements with record-keepers, accountants, actuaries, and trustees to whom the Plans pay fees, the Plans have no need to pay similar fees indirectly through a mutual fund. Thus, by negotiating directly with an investment manager for investment advisory services similar to those provided to the Diversified International Fund, the Delphi Savings Plans could have saved 26 basis points of the annual fees on the investment—approximately $100,000 a year for the Diversified International Fund alone, even assuming the investment advisory fee itself was

reasonable. Applied to the Plans' aggregate investments in Fidelity Funds, a savings of 26 basis points in fund fees would have yielded the Plans approximately $3.6 million a year. Further savings likely could have been achieved by negotiating lower investment advisory fees for a separately managed account than are available from mutual funds.

72.     Compare, for example, State Street's S&P 500 Flagship Fund, a collective trust, with Fidelity's Spartan 500 Index Fund, a mutual fund. Both funds are index funds intended to duplicate the performance of the S&P 500. According to recent prospectuses, the State Street fund charges 2 basis points a year in expenses whereas the Fidelity fund charges 7 basis points. As of year end 2003, the Plans maintained an investment of $338,700,982 in the State Street fund. Had that money been invested in the comparable Fidelity fund, the Plans would have paid almost a $170,000 more in fees in 2003 alone. Consider also the example of two balanced funds—a balanced fund invests in a wide mix of equities and debt securities. In 2003, the Plans maintained an investment of approximately $16.2 million in a Fidelity Balanced Fund, which had a total expense ratio of 64 basis points (42 basis points for investment advisory fees and 22 for other fees). A similar State Street fund, the SSgA Life Solutions Balanced Fund, had an expense ratio of 31 basis points—less than half the expenses charged by the Fidelity Balanced Fund. Had the Plans been invested in the State Street Balanced Fund over the past six years instead of the Fidelity Balanced Fund, the Plans would have paid approximately $300,000 less in fund management expenses. These kinds of fee disparities between mutual funds and collective trusts for the same or similar products are the norm rather than the exception. Losses in the form of excess fees add up tens of millions of dollars for a large portfolio over an extended time period.

73. GMIMCo knew or should have known that fees and expenses for Fidelity Funds were excessive as compared to alternative investments. GMIMCo knew or should have known that similar investment products were available with substantially lower fees and expenses.

## IV. ERISA'S FIDUCIARY STANDARDS

74. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. ERISA §404(a), 29 U.S.C.§1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A) for the exclusive purpose of
>
>> (i) providing benefits to participants and their beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

75. Under ERISA, fiduciaries that exercise discretionary authority or control over management of the Plans or disposition of the Plans' assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

Defendants, therefore, were responsible for ensuring that the Plans' investments in the Single

Equity Funds were prudent, and are liable for losses incurred as a result of such investments.

76.     A fiduciary's duty of loyalty and prudence require it to disregard plan documents

or directives that it knows or reasonably should know would lead to an imprudent result, or

would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D), 29 U.S.C.

§1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that

would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow

others, including those whom they direct or who are directed by the Plans, to do so.

77.     Although ERISA provides that that the diversification requirement of

§404(a)(1)(C), 29 U.S.C. §1104(a)(1)(C), is not violated when an eligible individual account

plan acquires or holds employer securities, ERISA §404(a)(2), 29 U.S.C. §1104(a)(2), no

provision of ERISA exempts the Plans' investments in the Single Equity Funds from the

diversification rule because the Single Equity Funds do not hold employer securities.

78.     Under ERISA, fiduciaries that exercise discretionary authority or control over the

selection of plan investments and the selection of plan service providers must act prudently and

solely in the interest of participants in the plan when selecting investments and retaining service

providers.  Thus, "the duty to conduct an independent investigation into the merits of a particular

investment" is "the most basic of ERISA's investment fiduciary duties."  *In re Unisys Savings

Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).  As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the
> availability, riskiness, and potential return of alternative investments for his or her
> plan. [Where an investment], if implemented, causes the Plan to forego other
> investment opportunities, such investments would not be prudent if they provided
> a plan with less return, in comparison to risk, than comparable investments
> available to the plan, or if they involved a greater risk to the security of plan
> assets than other investments offering a similar return.

DoL Ad. Op. No. 88-16A.

79.    Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding … which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable … .

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A

80.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries.  As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

81.    Department of Labor counsels that fiduciaries are responsible for ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

> In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the

estimate includes services you did not specify or want. Remember, all services have costs.

Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.

*Meeting Your Fiduciary Responsibilities* (May 2004) (available at

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html).

In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

*                    *                    *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses* (May 2004) (available at

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.)

82.    ERISA §404(c) does not provide a safe harbor for the Plans' investments in the

Single Equity Funds.  Participant investments in the Single Equity Funds were not at the election

of participants, ERISA §404(c) does not provide a safe harbor from imprudent selection and monitoring of a fund, and ERISA §404(c) does not provide a safe harbor for undiversified investment funds.

## V. **CLASS ACTION ALLEGATIONS**

83.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure in his representative capacity on behalf of himself and a class ("Class") of all persons similarly situated, defined as follows:

> All participants in the Delphi Savings Plans and their beneficiaries for whose accounts the fiduciaries of the Plans made or maintained investments in the Single Equity Funds or the Fidelity Funds.

84.    Plaintiff meets the prerequisites to bring this action on behalf of the Class because:

*Numerosity*.  The Class consists of over 20,000 individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

*Commonality*.  There are questions of law and fact common to the Class.  Such common questions include, but are not limited to:

> a.    Whether defendants had a duty to consider the prudence of the Plans' investments in the Single Equity Funds;
>
> b.    Whether defendants considered the prudence of the Plans' investments in the Single Equity Funds;
>
> c.    Whether a prudent fiduciary would have maintained the Plans' investments in the Single Equity Funds;
>
> d.    Whether the Plans suffered losses on their investments in the Single Equity Funds and the amount of such losses;
>
> e.    Whether GMIMCo had a duty to consider the fees associated with the Plans' investments;
>
> f.    Whether GMIMCo considered the fees associated with the Plans' investments in Fidelity Funds;

g.      Whether the fees associated with the Plans' investments in Fidelity Funds were excessive;

h.      Whether a prudent fiduciary would have caused or allowed the Plans to invest billions of dollars in Fidelity Funds when similar investment products were available at lower cost;

i.      Whether as a result of fiduciary breaches engaged in by Defendants, the Plans and their participants and their beneficiaries suffered losses.

*Typicality*.  Plaintiff's claims are typical of the claims of the Class.

*Adequacy*.  Plaintiff will fairly and adequately protect the interests of the Class.  They have no interests that are antagonistic to or in conflict with the interest of the Class as a whole, and they have engaged competent counsel experienced in ERISA class actions and complex litigation.

85.     This action is maintainable as a class action for the following independent reasons:

a.      Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, the prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations under the Plans.  Fed. R. Civ. P. 23(b)(1)(A).

b.      The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1)(B).

c.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

86.     Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

# VI. CLAIMS FOR RELIEF

## COUNT I

### Failure to Prudently and Loyally Manage The Plans' Investments in the Single Equity Funds

**(Breaches of Fiduciary Duties in Violation of ERISA §404(a)(1)(A)-(D), 29 U.S.C. §1104(a)(1)(A)-(D), by GMIMCo and State Street)**

87.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

88.    At all relevant times, GMIMCo and State Street acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), by exercising authority and control with respect to the management of the Plans and the Plans' assets.

89.    GMIMCo and State Street knew or should have known that the Plans' investments in the Single Equity Funds exposed the Plans to undue risk.  The Plans' investments in the Single Equity Funds were not diversified and not suitable retirement plan investments. Despite the lack of diversification and the risk posed by the Single Equity Funds, GMIMCo and State Street caused the Plans to maintain investments in the Single Equity Funds and failed to take steps to prevent the Plans from suffering losses as a result of their investments in those funds.

90.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost millions of dollars.

91.    Pursuant to ERISA §502(a)(2) and 409(a), 29 U.S.C. §1132(a)(2) and 29 U.S.C. §1109(a), Defendants are liable to restore the losses to the Plans caused by the Defendants' breaches of their fiduciary duties.

## COUNT II

**Failure to Prudently and Loyally Select Investments for the Plans**

**(Breaches of Fiduciary Duties in Violation of ERISA 404(a)(1)(A)-(D),
29 U.S.C. §1104(a)(1)(A)-(D), by GMIMCo)**

92.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

93.     At all relevant times, GMIMCo acted as a fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), by exercising authority and control with respect to the management of the Plans and the Plans' assets.

94.     GMIMCo knew or should have known that the Plans' investments in the Fidelity Funds exposed the Plans to excessive fees.  The Plans' investments in the Fidelity Funds carried fees in excess of similar investment products available to large, institutional investors like the Plans.  Despite the excessive fees charged by the Fidelity Funds, GMIMCo caused the Plans to make or maintain investments in Fidelity Funds and failed to take steps to prevent the Plans from suffering losses as a result of the Plans' investments in Fidelity Funds.

95.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost millions of dollars.

96.     Pursuant to ERISA §502(a)(2) and 409(a), 29 U.S.C. §1132(a)(2) and 29 U.S.C. §1109(a), GMIMCo is liable to restore the losses to the Plans caused by the Defendants' breaches of their fiduciary duties.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

2.      Declare that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and their participants and beneficiaries;

3.      Issue an order compelling Defendants to make good to the Plans all losses to the Plans resulting from breaches of fiduciary duty, including lost return on investments that would have resulted from prudent and loyal investment of the Plans' assets;

4.      Order equitable restitution and other appropriate equitable monetary relief against Defendants;

5.      Award such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to administer the Plans;

6.      Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

7.      Award Plaintiff her attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

8.      Award such other and further relief as the Court deems equitable and just.

Dated:      New York, NY                    Respectfully submitted,
            April 12, 2007                  ROSEN PREMINGER & BLOOM LLP


                              By: /s/  David S. Preminger
                                  David S. Preminger (DP 1057)
                                  708 Third Avenue, Suite 1600
                                  New York, NY 10017
                                  (212) 682-1900

                                  J. Brian McTigue (BM 2422)
                                  Gregory Y. Porter (GP 9605)
                                  McTIGUE & PORTER LLP
                                  5301 Wisconsin Avenue, NW
                                  Suite 350
                                  Washington, DC 20015
                                  (202) 364-6900

                                  *Attorneys for Plaintiffs*