DELPHI MECHATRONIC SYSTEMS
SAVINGS-STOCK PURCHASE PROGRAM

Effective: JUNE 1, 2001



# TABLE OF CONTENTS

|  |  | PAGE NO. |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | BENEFICIARY DESIGNATION | 9 |
| ARTICLE III | ELIGIBILITY/PARTICIPATION REQUIREMENTS |  |
| Section 1. | Eligibility | 10 |
| Section 2. | Participation | 10 |
| Section 3. | Transfers of Employment | 10 |
| Section 4. | Leaves of Absence | 10 |
| Section 5. | Suspended Participation | 11 |
| Section 6. | Eligibility After Reemployment | 11 |
| ARTICLE IV | EMPLOYEE CONTRIBUTIONS |  |
| Section 1. | Employee Pre-Tax Contributions | 12 |
| Section 2. | Employee After-Tax Contributions | 12 |
| Section 3. | Transmittal to Trustee | 12 |
| ARTICLE V | SALARY REDUCTION AGREEMENT |  |
| Section 1. | Agreement to Contribute | 13 |
| Section 2. | Amount of Elective Deferrals | 13 |
| Section 3. | Change or Discontinuance of Elective Deferrals | 13 |
| ARTICLE VI | LIMITATIONS ON ELECTIVE DEFERRALS |  |
| Section 1. | Maximum Amount of Elective Deferrals | 14 |
| Section 2. | Distribution of Excess Elective Deferrals | 14 |
| Section 3. | Nondiscrimination Test Under 401(k) | 14 |
| Section 4. | Excess Contributions by Highly Compensated Employees | 16 |
| ARTICLE VII | EMPLOYER CONTRIBUTIONS |  |
| Section 1. | General | 18 |
| Section 2. | Matching Contributions | 18 |
| Section 3. | Employer Nonmatching Contributions | 19 |
| Section 4. | Forfeitures | 19 |
| Section 5. | Contributions for Returning Veterans | 19 |



ARTICLE VIII     LIMITATIONS ON EMPLOYER MATCHING CONTRIBUTIONS
                 AND EMPLOYEE AFTER-TAX CONTRIBUTIONS

Section 1.       Special Nondiscrimination Test Under 401(m)                          20
Section 2.       Excess Aggregate Contributions by Highly Compensated Employees       21

ARTICLE IX       MAXIMUM LIMITATION UNDER CODE SECTION 415

Section 1.       Limitations for Defined Contribution Plans Under Code Section 415     23

ARTICLE X        PARTICIPANT ACCOUNTS

Section 1.       Establishment of Individual Participant Accounts                      25
Section 2.       Rollover Contributions Account                                        25
Section 3.       Adjustment of Participant Accounts                                    26
Section 4.       Adjustment of Accounts for Terminated Participants                    26
Section 5.       Forfeiture Amounts                                                    26

ARTICLE XI       PARTICIPANT INVESTMENT ELECTION

Section 1.       Initial Elections                                                     27
Section 2.       Change of Investment Election                                         27
Section 3.       Reallocation of Existing Account Balances                             27
Section 4.       Duration of Investment Election                                       27

ARTICLE XII      LOANS

Section 1.       Standards for Granting Loans                                          28
Section 2.       Terms of the Loan                                                     29
Section 3.       Loan Application Procedure                                            29
Section 4.       Loan Repayment                                                        29
Section 5.       Loans as Plan Investments                                             30
Section 6.       Default                                                               30



ARTICLE XIII        WITHDRAWALS PRIOR TO TERMINATION OF EMPLOYMENT

Section 1.          Withdrawals of Employee After-Tax and Rollover Contributions     32
Section 2.          Withdrawals of Employer Matching and Nonmatching
                    Contributions                                                    32
Section 3.          Hardship Withdrawals                                             32
Section 4.          Other Withdrawals                                                33
Section 5.          Post Age 59-1/2 Withdrawal                                       33
Section 6.          Direct Rollovers of Withdrawals                                  33

ARTICLE XIV         DISBURSEMENT OF BENEFITS

Section 1.          General Distribution Rules                                       34
Section 2.          Retirement                                                       34
Section 3.          Death                                                            34
Section 4.          Distributions Prior to Retirement and Death                      35
Section 5.          Forms of Payment                                                 36
Section 6.          Direct Rollovers of Distributions                                36
Section 7.          Benefit Payment Deadlines                                        37
Section 8.          Distributions to Alternate Payees                                37

ARTICLE XV          EFFECT OF REEMPLOYMENT

Section 1.          Effect of Reemployment Prior to Retirement                       38
Section 2.          Effect of Reemployment After Retirement                          38

ARTICLE XVI         THE TRUST FUND

Section 1.          Trust Agreement                                                  39
Section 2.          Investment Funds                                                 39
Section 3.          Investment of Funds                                              43
Section 4.          Expenses                                                         43
Section 5.          Return of Contributions                                          43

ARTICLE XVII        ADMINISTRATION

Section 1.          Named Fiduciary and Administration                               44
Section 2.          Submission of Requests                                           44
Section 3.          Limitation of Liability                                          45
Section 4.          Claims Procedure                                                 45
Section 5.          QDRO Procedure                                                   46
Section 6.          Transitional Administration                                      47
Section 7.          Transfer from Eaton Plan                                         47
Section 8.          Investment Decisions                                             48
Section 9.          Service of Legal Process                                         48



ARTICLE XVIII    AMENDMENTS

Section 1.    Right to Amend                        49
Section 2.    Restrictions on Amendments            49
Section 3.    Merger of Plan                        49

ARTICLE XIX    TOP HEAVY PROVISIONS

Section 1.    Top-Heavy Determination               50
Section 2.    Minimum Benefit Requirement           50
Section 3.    Vesting                               50

ARTICLE XX    MISCELLANEOUS PROVISIONS

Section 1.    Facility of Payment                   51
Section 2.    Nonalienation of Benefits             51
Section 3.    Right of Employer                     51
Section 4.    Leased Employees                      51
Section 5.    Drafting Errors                       52
Section 6.    Usage of Terms and Headings           52

ARTICLE XXI    TERMINATION OF PLAN                  53

ARTICLE XXII    GOVERNING LAW AND ADOPTION          54





ARTICLE I
DEFINITIONS

1.      "ACCOUNT" means the individual Participant Account established pursuant to Article X.

2.      "ACTUAL CONTRIBUTION PERCENTAGE TEST" means a nondiscrimination test set forth in Code Section 401(m) as explained in Article VIII.

3.      "ACTUAL DEFERRAL PERCENTAGE TEST" means a nondiscrimination test set forth in Code Section 401(k) as explained in Article VI.

4.      "AFFILIATED EMPLOYER" means any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to regulations under Code Section 414(o).

5.      "AGGREGATION GROUP" means this Plan, any other qualified plan of an Affiliated Employer in which a Key Employee is a participant (or was during any of the four preceding Plan Years, including any plans that have terminated during that period of time), and any other qualified plan which the Employer aggregates with this Plan for the purposes of Code Sections 401(a)(4) or 410.

6.      "ALTERNATE PAYEE" means any Spouse, former Spouse, child or other dependent of a Participant who is recognized by a Qualified Domestic Relations Order as having a right to receive all, or a portion of, the Participant's benefits payable under the Plan. For the purpose of Article XVII, Section 5, the term "Alternate Payee" shall also include those individuals who would meet the above definition except that the order is not a Qualified Domestic Relations Order.

7.      "AS ADJUSTED," when used to modify a dollar amount, means the dollar amount as adjusted (including any rounding) by the Secretary of Treasury for changes in the cost of living under Code Sections 401(a)(17), 414(q)(1), and 415(d), as applied to those items and in the manner as the Secretary shall provide.

8.      "BENEFICIARY" means any person (natural or otherwise) designated by a Participant in accordance with Article II to receive any death benefit payable under this Plan.

9.      "BREAK IN SERVICE" means a Plan Year in which an Employee does not complete more than 375 Hours of Service. Solely for determining whether a Break in Service has occurred, the Plan shall credit Hours of Service for the first 376 Hours of Service that normally



- 1 -



would have been credited except for an absence from work for maternity or paternity reasons. For purposes of this definition, an absence from work for maternity or paternity reasons means an absence: (a) by reason of pregnancy of the individual; (b) by reason of birth of a child of the individual; (c) by reason of the placement of a child with the individual in connection with the adoption of the child by the Employee; or, (d) for purposes of caring for the child for a period beginning immediately following the birth or placement.

10.     "CODE" means the Internal Revenue Code of 1986, as amended.

11.     "COMMITTEE" means the Benefits committee established in accordance with Article XVII of the Plan.

12.     "COMPENSATION" means, except for those portions of the Plan where a different definition expressly applies, regular base salary during periods for which an Employee is eligible to participate and shall also include compensation not otherwise includible in the Employee's regular base salary by reason of any reductions for contributions in the form of voluntary salary reductions due to a qualified cash or deferred arrangement of the Employer or due to a cafeteria plan of the Employer maintained pursuant to Code Section 125. Compensation does not include commissions, drawing accounts, bonuses, overtime and night shift payments, seven-day operation premiums, or any other special payments, fees, awards, and allowances.

For Employees compensated wholly or in part on a commission basis, base salary shall also include an annual earnings base determined under rules established from time to time by Delphi Mechatronic Systems, Inc. For Employees on an Employer-approved disability leave of absence, base salary includes eligible salary continuation payments.

This Plan shall not take into consideration a Participant's Compensation to the extent it exceeds $150,000 As Adjusted.

13.     "DETERMINATION DATE" means, with respect to any Plan Year, the last day of the preceding Plan Year, except that in the case of the first Plan Year the Determination Date shall be the last day of that Plan Year. An employee's status as a Key Employee for any Plan Year will be based on the Determination Date for that Plan Year.

14.     "EFFECTIVE DATE" means June 1, 2001.

15.     "ELECTIVE DEFERRALS" means contributions to the Plan with respect to any Plan Year which are made by the Employer at the election of the Participant instead of cash compensation pursuant to a salary reduction agreement entered into by the Participant in accordance with Article V.

16.     "ELIGIBLE PARTICIPANT" means any Employee of the Employer who is eligible to participate in accordance with Article III.

17.     "EMPLOYEE" means regular employees of the Employer compensated by salary or by commission or partly by salary and partly by commission who are (i) working in the United States, or (ii) citizens of or domiciled in the United States and who have been or may hereafter be





hired in the United States by the Employer and who are set out of the United States by the Employer to work in foreign operations, and whose services, if discontinued, would be discontinued by recalling said employees to the United States and terminating their services in the United States. "Employee" excludes: (i) any employees in a unit covered by a collective bargaining agreement unless the collective bargaining agreement expressly provides that those employees are eligible for this Plan; (ii) employees classified by the Employer as cooperative student employees; (iii) Leased Employees; (iv) persons employed by any Affiliated Employer unless specific approval for inclusion of such persons is granted by the board of directors of the Employer, or its delegate; and (v) any individuals who are contract employees, bundled service employees, consultants, individuals who have represented themselves to be independent contractors, persons who the Employer does not consider to be employees, or other similarly situated individuals regardless of whether the individual is a common law employee of the Employer (the purpose being to exclude from participation persons who may actually be common law employees of the Employer but who are not paid as though they are employees regardless of whether that exclusion is correct).

18.    "EMPLOYEE AFTER-TAX CONTRIBUTIONS" means contributions to the Plan made by a Participant with respect to any Plan Year as set forth in Article IV.

19.    "EMPLOYER" means Delphi Mechatronic Systems, Inc. and any other Affiliated Employer to whom the Plan has been extended by the Board of Directors of Delphi Mechatronic Systems, Inc.



20.    "EMPLOYER CONTRIBUTIONS" means contributions to the Plan made directly by the Employer with respect to any Plan Year, excluding Elective Deferrals, as set forth in Article VII.

21.    "EMPLOYER MATCHING CONTRIBUTIONS" means any contribution to the Plan made by the Employer with respect to any Plan Year to be allocated to a Participant's Account by reason of the Participant's Elective Deferrals or Employee After-Tax Contributions, as set forth in Article VII.

22.    "EMPLOYER NONMATCHING CONTRIBUTIONS" means any discretionary contribution to the Plan made by the Employer with respect to any Plan Year to be allocated to Eligible Participants' Accounts pursuant to Article VII.

23.    "ENROLLMENT DATE" means the Effective Date and the first day of each month after that date and any other times the Employer may designate.

24.    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

25.    "EXCESS AGGREGATE CONTRIBUTIONS" means, with respect to any Plan Year, the excess of the aggregate amount of the Employer Matching Contributions and any Employee After-Tax Contributions made on behalf of Highly Compensated Participants for the Plan Year over the maximum amount of the contributions permitted under the limitations of the Actual Contribution Percentage Test, as set forth in Article VIII.



- 3 -



26.    "EXCESS CONTRIBUTIONS" means, with respect to any Plan Year, the excess of the amount of Elective Deferrals made on behalf of Highly Compensated Participants for the Plan Year over the maximum amount of the contributions permitted under the limitations of the Actual Deferral Percentage Test as set forth in Article VI.

27.    "EXCESS ELECTIVE DEFERRALS" means the amount of Elective Deferrals for a Participant's taxable year, exceeding the limit described in Article VI. The amount of Excess Elective Deferrals is reduced or eliminated to the extent that a Participant has elective deferrals under another plan and elects (as provided in Article VI, Section 2(B)) to treat the elective deferrals in the other plan as excess amounts.

28.    "FORFEITURES" means non-vested amounts allocated pursuant to Article VII.

29.    "HIGHLY COMPENSATED EMPLOYEE" means an employee who: (a) was a 5% owner of an Affiliated Employer at any time during the Plan Year or the 12-month period immediately preceding the Plan Year; (b) received more than $80,000 As Adjusted in annual compensation from an Affiliated Employer for the 12-month period immediately preceding the Plan Year if the Committee does not elect to use the top 20% rule; or (c) received more than $80,000 As Adjusted in annual compensation from an Affiliated Employer for the 12-month period immediately preceding the Plan Year and was among the top 20% of employees by compensation during the same 12-month period. The Employer does not elect to use the top 20% rule.



    (A)    For purposes of determining the number of employees in the top 20%, the following employees may be excluded:
        (i)    employees who have not completed 6 months of service;
        (ii)    employees who normally work less than 17-1/2 hours per week;
        (iii)    employees who normally work not more than 6 months during any year;
        (iv)    employees who have not attained age 21;
        (v)    if 90% or more of the Employer's and Affiliated Employers' employees are covered by collective bargaining agreements but this Plan only covers nonunion employees, employees who are included in a unit of employees covered by a collective bargaining agreement between an Affiliated Employer and a union; and,
        (vi)    employees who are nonresident aliens and who receive no earned income from an Affiliated Employer that constitutes income from services within the United States.
    The Employer may elect to substitute a shorter period of service, time, or age than that specified under (i), (ii), (iii), or (iv) above.
    (B)    A former employee shall be treated as a Highly Compensated Employee if
        (i)    the former employee was a Highly Compensated Employee when he separated from service, or
        (ii)    the former employee was a Highly Compensated Employee at any time after attaining age 55.
    (C)    For purposes of the definition of Highly Compensated Employee, the term "compensation" means compensation for service performed by an employee of an Affiliated



Employer that is currently includible in gross income as described in Code Section 414(q)(4) and the regulations thereunder.

(D) Any questions regarding the determination of a Highly Compensated Employee shall be made in accordance with Code Section 414(q) and regulations thereunder. Any alternative methods of determining Highly Compensated Employees under applicable law shall also be permitted under this Plan.

30. "HIGHLY COMPENSATED PARTICIPANT" means a Participant of the Plan who is also a Highly Compensated Employee.

31. "HOUR OF SERVICE" means an hour paid by the Employer for working or for having been entitled to work. Any hours for which an Employee receives pay for having been entitled to work, irrespective of mitigation of damages, including back pay, shall be credited to the period or periods so entitled, rather than to the period in which such pay is received. There shall be no duplication of any hours of service under this definition. Each hour for which an Employee is paid, or entitled to payment, by the Employer due to vacation, holiday, illness, disability, layoff, jury duty, military duty or leave of absence shall be included.

Notwithstanding any of the foregoing provisions of this definition, an Employee will be credited with 95 Hours of Service for each semi-monthly pay period in which the Employee works and is compensated at any time during each such semi-monthly pay period.

32. "INVESTMENT FUNDS" means the various funds within the Trust Fund, as set forth in Article XVI.

33. "KEY EMPLOYEE" means any employee or former employee of an Affiliated Employer (and the beneficiary of any deceased employee) who at any time during the Plan Year or the preceding 4 Plan Years, (construed to be the determination period) was: (i) an officer of an Affiliated Employer who had annual Compensation for the Plan Year greater than 50% of the maximum dollar limitation under Code Section 415(b)(1)(A) as in effect for the calendar year in which the Determination Date falls; (ii) an owner (or considered an owner under Code Section 318) of one of the ten largest interests in an Affiliated Employer if the employee's annual compensation equals or exceeds the maximum dollar limitation under Code Section 415(c)(1)(A) as in effect for the calendar year in which the Determination Date falls); (iii) a 5% owner of an Affiliated Employer, or (iv) a 1% owner of an Affiliated Employer who has a W-2 Compensation from an Affiliated Employer of more than $150,000. Any questions regarding the determination of who is a Key Employee shall be made in accordance with Code Section 416(i)(1) and the regulations thereunder.

34. "LEASED EMPLOYEE" means an individual treated as an employee due to the requirements of Code Section 414(n). In particular, a Leased Employee means a person who is not otherwise an employee but provides services to an Affiliated Employer if

(A) the person's services are provided pursuant to an agreement with an Affiliated Employer;

(B) the person has performed services for an Affiliated Employer on a substantially full-time basis for at least 1 year; and



- 5 -

(C)    the person is under the primary direction or control of an Affiliated Employer.

35.    "LIMITATION YEAR" means the Plan Year.

36.    "NAMED FIDUCIARY" means the Employer's Board of Directors and any other persons or entities designated a "named fiduciary" as defined in Section 402(a)(2) of ERISA by the Employer.

37.    "NONHIGHLY COMPENSATED EMPLOYEE" means an Employee of the Employer who is not a Highly Compensated Employee.

38.    "PARTICIPANT" means an Employee who has met the eligibility conditions of Article III and who has made or received a contribution under this Plan. This includes an active, inactive, former, suspended or retired Participant unless the context in which the term is used indicates otherwise. If an Employee who does not otherwise meet the definition of "Participant" is permitted to make a rollover contribution under Article X, Section 2, the Employee shall not be considered a Participant for the purposes of Article III, Article IV, Article V, Article VI, Article VII, Article VIII, Article IX, and Sections 1 and 2 of Article X. For Article XIII, a Participant includes only those who are actively employed by an Affiliated Employer.

39.    "PLAN" means the Delphi Mechatronic Systems Savings-Stock Purchase Program.

40.    "PLAN YEAR" means the 12 consecutive month period ending each December 31, except that the initial Plan Year shall be shorter than 12 months because it begins on the Effective Date.

41.    "QUALIFIED DOMESTIC RELATIONS ORDER" means any judgment decree or order (including approval of a property settlement agreement) which meets the standards and specifications of Code Section 414(p) and which creates or recognizes the existence of an Alternate Payee's right to, or assigns to an Alternate Payee, the right to receive all or a portion of the Participant's benefits under the Plan.

42.    "QUALIFIED MATCHING CONTRIBUTIONS" means contributions to the Plan made by the Employer with respect to any Plan Year pursuant to Code Section 401(m) that satisfy the vesting and withdrawal restrictions applicable to Elective Deferrals when the contributions are made.

43.    "QUALIFIED NONELECTIVE CONTRIBUTIONS" means contributions made by the Employer with respect to any Plan Year other than matching contributions that satisfy the vesting and withdrawal restrictions applicable to Elective Deferrals when the contributions are made

44.    "RECORDKEEPER" means the party designated by the Employer to maintain each Participant's Account records and to perform other services as agreed to by the Employer and the Recordkeeper.



- 6 -



45.     "SPOUSE" or "SURVIVING SPOUSE" means the Participant's legal spouse at the time the Participant dies or the Participant's benefit payments commence.  A former spouse will be treated as the Spouse or Surviving Spouse to the extent provided under a Qualified Domestic Relations Order, as described in Code Section 414(p).

46.     "TOP-HEAVY RATIO" for the Aggregation Group means a fraction, the numerator of which is the sum of the present values of the accrued benefits under the defined benefit plan(s) maintained by an Affiliated Employer and the sum of the Account balances under the defined contribution plan(s) maintained by an Affiliated Employer (including any Simplified Employee Pension Plan) for all Key Employees as of the Determination Date (including any part of any accrued benefits or Account balances distributed in the 5 year period ending on the Determination Date), and the denominator of which is the sum of all accrued benefits or Account balances (including any part of any accrued benefit or Account balance distributed in the 5 year period ending on the Determination Date) of all employees as of the Determination Date.  The accrued benefit or Account balance of any employee who has not performed any Hours of Service with an Affiliated Employer at any time during the 5 year period ending on the Determination Date shall not be taken into account in the determination of the fraction.
        (A)     The present value of accrued benefits will be determined as of the most recent actuarial valuation, or anniversary date thereof, that falls within the 12 month period ending on the Determination Date.
        (B)     For purposes of establishing present value to compute the Top-Heavy Ratio, any benefit shall be discounted only for mortality and interest on the basis of the UP 1984 Mortality Table and an assumed compound rate of interest of 5%.
        (C)     The calculation of the Top-Heavy Ratio, and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Code Section 416 and the regulations thereunder.
        (D)     If the Aggregation Group includes more than just this Plan, the value of Account balances and accrued benefits will be calculated with reference to the Determination Dates that fall within the same calendar year.
        (E)     Solely for the purpose of determining if this Plan is top-heavy, the accrued benefit of an employee other than a Key Employee shall be determined under (1) the method, if any, that uniformly applies for accrual purposes under all plans maintained by an Affiliated Employer, or (2) if there is no such method, as if the benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Code Section 411(b)(1)(C).

47.     "TRUST FUND" means the Investment Fund(s) as authorized pursuant to Article XVI.

48.     "TRUSTEE(S)" means the person(s) or financial institution(s) named in the Trust Agreement referenced in Article XVI, or their successors in office, whether natural or corporate.

49.     " VALUATION DATE" means generally each business day and any other times as the Committee may designate on which an accounting of all assets and liabilities of the Trust Fund is to be made.  If the Employer or the Recordkeeper is notified by a Participant on a non-business day or after 4:00 p.m. eastern time (or other uniform time deadline announced to participants) on a business day, it means the next business day.  Due to unusual circumstances including



- 7 -



malfunctioning computer systems, the Employer may delay transactions normally scheduled to occur on a Valuation Date to the next Valuation Date for which there are not unusual circumstances.

50.     "W-2 COMPENSATION," for the purposes of Article XIX only, means compensation that would be stated on an employee's Form W-2 for the calendar year that ends with or within the Plan Year.

51.     "YEARS OF SERVICE" means the number of 12-month periods in which the Employee has earned 750 or more Hours of Service.  The 12-month periods shall begin on the Employee's hire date and each anniversary of that hire date.

An Employee's Years of Service shall be based on an Employee's total employment relationship with the Employer or any Affiliated Employer, whether or not as an Employee, including any period of time during which the Employee:

(A)     was employed by the Employer in a category of employees excluded from the Plan;

(B)     was a Leased Employee who performed services for the Employer, to the extent provided by Code Section 414(n) and the regulations thereunder;

(C)     was employed by a predecessor employer of the Employer;



(D)     was employed by a predecessor employer of the Employer, even though the Plan is not the plan maintained by the predecessor employer, but only if service with the predecessor employer is required to be included in the individual's Years of Service by regulations under Code Section 414(a)(2);

(E)     was employed by Eaton Corp. but only if the individual became an employee of the Employer due to the acquisition of the Visual Switch / Electronics Division of Eaton Corp. on March 30, 2001.

For Years of Service that began while the individual was an Eaton Corp. employee under clause (E) above, the requirement that at least 750 Hours of Service be earned during the 12-month periods will not apply.



ARTICLE II
BENEFICIARY DESIGNATION

      Each Participant shall designate, on forms provided by the Employer, a Beneficiary or Beneficiaries for purposes of the Plan. Any designation of Beneficiary may be changed or revoked at any time by the Participant by filing a written notice to the Employer on the Employer's form. The Participant may revoke a designation at any time by filing a new written notice.

      If a Participant has a Spouse, the Participant may designate a Beneficiary other than the Spouse only if the election form is signed by the Participant and the Participant's Spouse clearly indicating the Spouse's consent to the alternate Beneficiary. A representative of the Plan or a Notary Public must witness the Spouse's signature. The Spouse's consent shall not be required if it is established to the satisfaction of the Employer that the Spouse cannot reasonably be located. The Participant may revoke a designation of Beneficiary without the consent of the Spouse, although the Participant may not designate a different Beneficiary other than the Spouse without the Spouse's consent.

      If a Participant does not validly designate a Beneficiary who is living when the Participant dies, any death benefits payable under the Plan shall be paid to the Participant's Spouse. If the Participant has no Spouse or the Spouse cannot reasonably be located, any death benefits shall be payable to the person or persons designated to receive basic life insurance proceeds upon the death of the Participant under Employer-provided life insurance, unless the Participant shall have assigned the basic life insurance. If the preceding sentences still fail to identify to whom the death benefits are payable, then they shall be payable to the Participant's Estate.







ARTICLE III
ELIGIBILITY/PARTICIPATION REQUIREMENTS

Section 1. Eligibility

An Employee will be eligible to become a Participant in the Plan on any Enrollment Date following the completion of six months of service with the Employer or Affiliated Employers if the Employee is actively employed by the Employer on the Enrollment Date.

An individual who was already eligible to become a Participant in the Eaton Corporation Share Purchase and Investment Plan on March 30, 2001 and became an Employee due to the Employer's acquisition of the Vehicle Switch / Electronics Division of Eaton Corp. on that date will be automatically eligible to become a Participant as of the Effective Date even if the six months of service requirement is not met.

Section 2. Participation

An eligible Employee may become a Plan Participant upon entering into an agreement in accordance with Article V or by receiving an allocation of an Employer Nonmatching Contribution in accordance with Article VII. Unless a provision expressly states otherwise, only Participants who are Employees are eligible to make or receive any contributions and forfeitures under this Plan.

If an employee not eligible to become a Participant erroneously is permitted to make contributions, then as soon as administratively feasible after the error is discovered any Elective Deferrals and Employee After-Tax Contributions including investment gains and losses on those contributions will be returned to the employee and any other contributions will be forfeited.

Section 3. Transfers of Employment

An Employee who transfers employment from an Affiliated Employer not covered by the Plan or from a classification not eligible for coverage under this Plan will be eligible to become a Participant as of the Enrollment Date next following the date of transfer or reclassification, if the Employee fulfills the requirements of Section 1 of this Article.

Section 4. Leaves of Absence

A Participant on an uncompensated leave of absence will continue to be a Participant, but will be prohibited from making further contributions provided by Article IV while on the leave of absence. Upon the return to active employment, the Participant may again elect to contribute under the Plan as of any Enrollment Date subsequent to the Participant's date of return to active service.

Employees on an Employer-approved disability leave of absence, or certain special leaves of absence, shall continue to be eligible to make contributions while continuing to receive Compensation continuation payments for a period not in excess of six months while on such leave. Employees on layoff status shall cease to be eligible to make contributions with respect to the period so classified.



- 10 -



### Section 5. Suspended Participation

Any person continuing in the employment of the Employer who had been a Participant but who is no longer classified as an Employee for purposes of this Plan shall be an inactive Participant for the period of ineligibility and no contributions shall be made to this Participant's Accounts.

### Section 6. Eligibility After Reemployment

If an Employee terminates employment and subsequently is reemployed, the Employee's rights under the Plan shall be determined in accordance with Article XV.



ARTICLE IV
EMPLOYEE CONTRIBUTIONS

Section 1.  Employee Pre-Tax Contributions
        Employee pre-tax contributions are deemed to be Elective Deferrals. The provisions of
Article V shall govern the manner in which Eligible Participants may enter into salary reduction
agreements with the Employer in order that Elective Deferrals may be made by the Employer to
the Trust Fund on their behalf. The amount of Elective Deferrals shall be limited, however, by
the provisions set forth in Article VI.

Section 2.  Employee After-Tax Contributions
(A)    Agreement to Contribute
        Each Employee eligible to participate in accordance with the provisions of Article III may
enter into an agreement with the Employer to make Employee After-Tax Contributions. The
agreement shall be effective as soon as administratively feasible. The Participant's Employee
After-Tax Contribution may be in addition to the Participant's Elective Deferrals, or may be
made in lieu of the Elective Deferrals, except that the combined contribution percentage for
Elective Deferrals and After-Tax Contributions cannot exceed the limit in subsection (B) below.
(B)    Amount of Employee After-Tax Contributions
        Each Participant, by entering into an agreement pursuant to Section 2 of this Article, may
request that the Participant's Employee After-Tax Contributions be made to the Trust Fund
through payroll deductions. The amount shall be in whole percentages of not less than 1% but
not more than 20% of the Participant's Compensation, rounded to the nearest dollar. The
Employer retains discretion to change the amount or percentage of Employee After-Tax
Contributions accepted by the Plan on a non-discriminatory basis.
(C)    Change or Discontinuance of Employee After-Tax Contributions
        A Participant may change the contribution percentage for Employee After-Tax
Contributions, suspend contributions, or resume making contributions under the same conditions
as apply in Article V, Section 3 for Elective Deferrals.
(D)    Excess Employee After-Tax Contributions for Highly Compensated Employees
        For each Plan Year the Employee After-Tax Contributions must be aggregated with any
Employer Matching Contributions for purposes of performing the Actual Contribution Test. If
the Actual Contribution Test demonstrates that there are Employee After-Tax Contribution
amounts in excess of the allowable percentages, the amounts shall be administered in accordance
with Article VIII.

Section 3.  Transmittal to Trustee
        Elective Deferrals and Employee After-Tax Contributions shall be deposited with the
Trustee as of the earliest date the contributions can reasonably be segregated from the Employer's
general assets. In no event shall those amounts be deposited later 15 business days (plus any
extension permitted by final Department of Labor regulation) after the end of the month during
which the amounts would otherwise have been payable to the Participant in cash.



- 12 -



ARTICLE V
SALARY REDUCTION AGREEMENT

Section 1.  Agreement to Contribute

Each Employee eligible to participate in accordance with the provisions of Article III may enter into a salary reduction agreement with the Employer to make Elective Deferrals to this Plan.  Thereafter, an Employee desiring to participate shall enter into an agreement effective as soon as administratively feasible.

If an eligible Employee does not make an affirmative election whether or not to participate, then the Employee shall automatically be enrolled to participate.  If the Employee was eligible to participate on the Effective Date, the Employee's Elective Deferrals contribution percentage for this automatic enrollment shall be the same percentage as it was under the Eaton Corporation Share Purchase and Investment Plan, based on the best available information supplied to the Employer by Eaton Corporation.  If the Employee became eligible to participate after the Effective Date, the Employee's Elective Deferrals contribution percentage for this automatic enrollment shall be 3%.  The Employer may establish additional administrative procedures as needed to administer this automatic enrollment feature.

Section 2.  Amount of Elective Deferrals

Each Participant, by entering into a salary reduction agreement pursuant to Section 1 of this Article, shall request that the Participant's Elective Deferral be made to the Trust Fund through payroll deductions.  The amount shall be in whole percentages of not less than 1%, but not more than 20% of the Participant's Compensation, rounded to the nearest dollar.  The Employer retains discretion to change the amount or percentage of Elective Deferrals accepted by the Plan on a non-discriminatory basis.

The Employer may limit these additional Elective Deferrals as needed to assure compliance with the limits of Article IX (in addition to the authority to limit them under Section 4(A) of Article VI).

Section 3.  Change or Discontinuance of Elective Deferrals

A Participant may change the percentage of Elective Deferrals by notifying the Recordkeeper.  The change shall be effective as soon as administratively feasible.

A Participant may suspend Elective Deferrals as of any future payroll date by notifying the Recordkeeper.  The suspension shall be effective as soon as administratively feasible.

A Participant who has suspended contributions may resume contributions by notifying the Recordkeeper.  The change shall be effective as soon as administratively feasible.

The Participant's Employer Matching Contributions with respect to the Participant's Elective Deferrals shall be suspended while the Participant's Elective Deferrals are suspended.



- 13 -



ARTICLE VI
LIMITATIONS ON ELECTIVE DEFERRALS

Section 1   Maximum Amount of Elective Deferrals
       No Participant shall be permitted to have Elective Deferrals made under this Plan during any Participant's taxable year in excess of $7,000 As Adjusted.

Section 2   Distribution of Excess Elective Deferrals
(A)      If in any Participant's taxable year the amount of Elective Deferrals made by a Participant exceeds the maximum amount set forth in Section 1 above, the Excess Elective Deferrals, plus income attributable to the Excess Elective Deferrals, shall be distributed no later than April 15th of the year following the Participant's taxable year in which the Excess Elective Deferrals occurred.  Excess Elective Deferrals that are not distributed by the April 15 date shall remain in the Plan and be subject to the general withdrawal restrictions applicable to Elective Deferrals as specified in Article XIV.  Excess Elective Deferrals, even if distributed prior to the April 15th date, shall be treated as Annual Additions with respect to the maximum limitations under Code Section 415, as described in Article IX, to the extent required by the Secretary of the Treasury.
(B)      In the event a Participant enters into two or more salary reduction agreements with respect to the Participant's taxable year, and the Participant's Elective Deferrals to this Plan and another plan qualified under Code Sections 401(a) and 401(k), exceed the maximum Elective Deferral amount set forth in Section 1 of this Article for this taxable year, the Participant may notify the Recordkeeper in writing no later than March 1st of the next taxable year of the portion of the excess attributable to Elective Deferrals made to this Plan.  The portion of the excess made to this Plan becomes Excess Elective Deferrals and must be handled as provided in subsection (A) above.
(C)      The amount of Excess Elective Deferrals for a Participant's taxable year that must be distributed to a Participant is reduced by any Excess Contributions attributable to the Plan Year beginning with or within the Participant's taxable year that have previously been distributed.

Section 3   Nondiscrimination Test Under 401(k)
(A)      Nondiscrimination Test
       For each Plan Year the Plan must satisfy a special nondiscrimination test to be referred to as the Actual Deferral Percentage Test (ADP Test).
       The Actual Deferral Percentage Test for a Plan Year shall be satisfied if one of the following two limits is met in the Plan Year:
       (i)      Primary Limitation
       The Actual Deferral Percentage for all Eligible Participants who are Highly Compensated Employees for the current Plan Year must not exceed the Actual Deferral Percentage for all Eligible Participants who are Nonhighly Compensated Employees for the Plan Year multiplied by 1.25; or
       (ii)      Alternative Limitation
       The Actual Deferral Percentage for all Eligible Participants who are Highly Compensated Employees for the current Plan Year must not exceed the lesser of (a) the Actual Deferral Percentage for all Eligible Participants who are Nonhighly Compensated Employees



- 14 -



multiplied by 2.0; or (b) the Actual Deferral Percentage of the Eligible Participants who are Nonhighly Compensated Employees plus 2.0 percentage points. The amounts may be further limited as the Secretary of Treasury shall prescribe in order to prevent the multiple use of this alternative limitation for both the Actual Deferral Percentage Test and the Actual Contribution Percentage Test, as specified in Treas. Reg. 1.401(m)-2(b) and Section 1(C)(v) of Article VIII.

      The Employer hereby elects to use the prior Plan Year's Actual Deferral Percentage for all Eligible Participants who are Nonhighly Compensated Employees. Hence, when applying the primary and alternative limitations above, the Employer will use the Actual Deferral Percentage of the Eligible Participants who are Nonhighly Compensated Employees for the prior Plan Year. This election may be changed only as permitted by the Secretary of Treasury.

(B)    Special Definitions for 401(k) Test

    (i)    Definition of Actual Deferral Percentage

      Actual Deferral Percentage means for a specified group of Eligible Participants for a Plan Year, the average of the ratios (calculated separately for each Eligible Participant in the group) of: (i) the amount of contributions made on behalf of the Eligible Participant for the Plan Year to (ii) the Eligible Participant's Compensation for the Plan Year. Contributions made on behalf of any Eligible Participant may include: (i) Elective Deferrals (including Excess Elective Deferrals made on behalf of Highly Compensated Employees but excluding the amount of Elective Deferrals that are taken into account in the Actual Contribution Percentage Test), (ii) Qualified Nonelective Contributions, and (iii) Qualified Matching Contributions. Qualified Nonelective Contributions and Qualified Matching Contributions may be included only under the rules as the Secretary of the Treasury may prescribe. Elective Deferrals are taken into account for a Plan Year only if they are allocated to the Eligible Participant's Account as of a date within the Plan Year, the Elective Deferrals are actually paid to the trust no later than 12 months after the end of that Plan Year, and the Elective Deferrals relate to Compensation that either would have been received by the Eligible Participant in the Plan Year but for the salary reduction agreement or is attributable to services performed by the Eligible Participant in the Plan Year and, but for the salary reduction agreement, would have been received by the Eligible Participant within 2-1/2 months after the end of the Plan Year.

    (ii)    Definition of Compensation



      Compensation means total compensation paid by the Employer to an Employee during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Form W-2, and may also include compensation not otherwise includible in the Employee's gross income by reason of any reductions for contributions in the form of voluntary salary reductions due to a qualified cash or deferred arrangement of the Employer or due to a cafeteria plan of the Employer maintained pursuant to Code Section 125. Alternatively, Compensation may mean any other definition of compensation that satisfies Code Section 414(s) and final or proposed regulations issued under that Code section. This Plan shall not take into consideration a Participant's Compensation to the extent it exceeds $150,000 As Adjusted.

      Instead of using Compensation for the Plan Year to calculate the ratios described in Section 3(B)(i) of this Article, the ratios may be computed for all Eligible Participants using (i) Compensation for that portion of the Plan Year in which each Employee was an Eligible Participant, (ii) Compensation for the calendar year ending within the Plan Year, or (iii)

- 15 -



Compensation for that portion of the calendar year ending within the Plan Year in which each Employee was an Eligible Participant.

(C)     Special Rules for 401(k) Test

        (i)     For purposes of this Section 3, the individual Actual Deferral Percentage for any Eligible Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to have Elective Deferrals, Qualified Nonelective Contributions, and Qualified Matching Contributions allocated to the Eligible Participant's Accounts under this Plan and any other cash or deferred arrangement qualified under Code Section 401(k) that are maintained by an Affiliated Employer shall be computed as if all the amounts had been made to this Plan.

        (ii)    In the event that this Plan is combined with one or more plans for purposes of satisfying Code Section 410(b) for any of the combined plans, then those plans shall also be combined for purposes of computing the Actual Deferral Percentages of Eligible Participants.

        (iii)   The Plan may be disaggregated to test separately those employees who meet this Plan's eligibility requirements but have not met the maximum age and service requirements permitted by law, provided that the Plan must be similarly disaggregated for purposes of satisfying the Actual Contribution Percentage Test and Code Section 410(b).  Alternatively, Nonhighly Compensated Employees who meet this Plan's eligibility requirements but have not met the maximum age and service requirements permitted by law may be ignored for purposes of the Actual Deferral Percentage Test and the Actual Contribution Test if that group of employees separately satisfies Code Section 410(b).

        (iv)    The portion of the plan that constitutes an employee stock ownership plan as defined in Code Section 4975(e)(7) must be tested separately for the purpose of the ADP Test, the ACP Test, and its own multiple use limit.

        (v)     This Section 3 shall apply separately to Employees not in collective bargaining units and Employees in collective bargaining units.  Article VIII and the multiple use limitation referred to in Section 3(A)(ii) of this Article shall not apply to Employees in collective bargaining units.  The Employer may choose to apply the Actual Deferral Percentage Test to all Employees in collective bargaining units together, apply it separately to each collective bargaining unit, or apply the Actual Deferral Percentage Test to two or more groups of collective bargaining units (with each unit in one group) provided that the combinations of units are determined on a basis that is reasonable and reasonably consistent from year to year.

Section 4.  Excess Contributions by Highly Compensated Employees

(A)     If before or during the Plan Year the Committee anticipates that the acceptable limits set forth in Section 3(A) above will be exceeded as of the end of the Plan Year, the Committee may order the suspension and/or the reduction of Highly Compensated Participants' Elective Deferrals.  The Committee shall reasonably project which Participants will be Highly Compensated Participants and are subject to this suspension and/or reduction.

(B)     If the Actual Deferral Percentage for Eligible Participants who are Highly Compensated Employees exceeds the limitation as of the close of the applicable Plan Year, the excess Elective Deferrals or Employer Contributions, if applicable (referred to as Excess Contributions), shall be initially determined using the following "leveling" process:  Elective Deferrals or Employer Contributions, if applicable, will be subtracted from the Highly Compensated Employee's Accounts with the highest ratio (as calculated under Section 3(B)(i) of this Article) and considered Excess Contributions until this Employee's ratio equals the next highest ratio of a





Highly Compensated Employee or until the limitation is no longer exceeded. This process is repeated until the limitation is no longer exceeded.

The amount of the Excess Contributions is determined as if the previous paragraph applied, but the Excess Contributions are actually subtracted using the following "leveling" process: Elective Deferrals or Employer Contributions, if applicable, will be subtracted from the Highly Compensated Employee's Accounts with the greatest amount of Elective Deferrals (and any Employer Contributions used in computing the Actual Deferral Percentage) and considered Excess Contributions until this Employee's Elective Deferrals (and those Employer Contributions) amount equals the next highest Highly Compensated Employee's Elective Deferrals (and those Employer Contributions) amount or until the total amount of Excess Contributions has been subtracted from Employees' Accounts. This process is repeated until the total amount of Excess Contributions has been subtracted from Employees' Accounts.

The Excess Contributions with earnings thereon shall be distributed no later than the close of the Plan Year following the Plan Year to which the Excess Contributions relate. The Employer must pay any excise tax required by Code Section 4979 on any Excess Contributions not distributed within 2-1/2 months after the close of the Plan Year to which the Excess Contributions relate.

(C)     Excess Contributions shall be distributed from the Highly Compensated Participant's Elective Deferral Account and Qualified Matching Contributions Account (if applicable) in proportion to the Highly Compensated Participant's Elective Deferrals and Qualified Matching Contributions for the Plan Year. Excess Contributions may be distributed from the Qualified Nonelective Contributions Account only to the extent that the Excess Contributions exceed the balance in the Participant's Elective Deferral Account and Qualified Matching Contributions Account. The Excess Contributions shall be considered taxable income to the affected Participant(s). Notwithstanding the fact that the Excess Contributions were returned to the Highly Compensated Participants prior to 2-1/2 months after the close of the Plan Year to which the Excess Contributions relate, the Excess Contributions shall be treated as Annual Additions with respect to the maximum limitations under Code Section 415, as described in Article IX, to the extent required by the Secretary of the Treasury.

(D)     The amount of Excess Contributions for a Plan Year that must be distributed to a Participant is reduced by any Excess Elective Deferrals attributable to the Participant's taxable year ending with or within the same Plan Year that have previously been distributed.





## ARTICLE VII
## EMPLOYER CONTRIBUTIONS

### Section 1.  General
Employer Contributions, as that term is used in this Plan, are those contributions that are made directly by the Employer, as set forth below, and are not the result of a salary reduction agreement between the Employer and an Employee.

### Section 2.  Matching Contributions
(A)    **Employer Matching Contribution**
The Employer shall make a matching contribution to the Trust Fund for each month of an amount equal to 25% of a Participant's Elective Deferrals or Employee After-Tax Contributions. The Employer shall not match contributions in excess of 6% of Compensation.  (Hence, the maximum matching contribution for any Participant is 1.5% of Compensation.)  The 25% figure may be raised or lowered (including lowered to 0%) at any time by the Employer, except that an increase in that figure must be approved in the same manner as an amendment under Article XVIII, Section 1 or by simply amending the Plan.

(B)    **Qualified Matching Contributions**



Employer Matching Contributions described in the above Section 2(A) may be deemed to be Qualified Matching Contributions pursuant to a resolution adopted by the Board of Directors only to the extent that the amounts are 100% vested and not forfeitable to the Participant when made and further provided that the amounts may not be distributed until the earlier of:

      (i)      separation from service, death, or disability of the Participant;

      (ii)     attainment of the age 59 1/2 by the Participant;

      (iii)    termination of the Plan without establishment of a successor plan; or

      (iv)     the disposition of substantially all of the assets of the Employer, or the disposition of a subsidiary of the Employer in which the Participant is employed if the transferor continues to maintain the Plan.

The Employer also may make Qualified Matching Contributions meeting the above conditions in addition to the Employer Matching Contributions described in Section 2(A) of this Article.  Any additional Qualified Matching Contributions will be allocated in proportion to the Employer Matching Contributions described in Section 2(A) except that they will be allocated only to Nonhighly Compensated Employees.

(C)    **Reduction of Matching Contributions**
If a Participant's Elective Deferrals or Employee After-Tax Contributions are distributed under Section 2 or Section 4 of Article VI or Section 2 of Article VIII and the Participant received an Employer Matching Contribution because of the Elective Deferrals that were distributed, then the Employer Matching Contribution attributable to those Elective Deferrals must be forfeited (regardless of whether they are vested) and shall be used to offset future Employer Contributions.  Employer Matching Contributions forfeited under this provision shall not be included in the ACP test under Article VIII.  This provision may be enforced before, during, or after the enforcement of the ADP test, the ACP test, and the multiple use limit as long as this provision is satisfied upon the completion of those tests.

- 18 -



Section 3.  Employer Nonmatching Contributions
(A)     Discretionary Employer Contribution
        Except for Qualified Nonelective Contributions, if any, described below, no Employer
Nonmatching Contributions shall be made to this Plan.
(B)     Discretionary Qualified Nonelective Contributions
        The Employer may make Qualified Nonelective Contributions.  These amounts are 100%
vested and not forfeitable to the Eligible Participant, when made.  Furthermore, these amounts
may not be distributed until the earlier of:
        (i)     separation from service, death, or disability of the Eligible Participant;
        (ii)    attainment of the age 59 1/2 by the Eligible Participant;
        (iii)   termination of the Plan without establishment of a successor plan; or
        (iv)    the disposition of substantially all of the assets of the Employer, or the disposition
of a subsidiary of the Employer in which the Eligible Participant is employed if the transferor
continues to maintain the Plan.
        Qualified Nonelective Contributions will be allocated only to Eligible Participants who
are Nonhighly Compensated Employees in proportion to their Compensation.  The Employer
may elect that the amounts of Qualified Nonelective Contributions be evenly distributed to the
Eligible Participants who are Nonhighly Compensated Employees.  Alternatively, the Employer
may elect to allocate Qualified Nonelective Contributions to the Eligible Participants who are
Nonhighly Compensated Employees, in order of Compensation beginning with the Employee
with the lowest Compensation, with each Employee receiving the maximum amount of Qualified
Nonelective Contributions allowed under Article IX until sufficient Qualified Nonelective
Contributions have been contributed to satisfy the Actual Deferral Percentage Test and the
Actual Contribution Percentage Test.



Section 4.  Forfeitures
        Forfeitures shall be used to reduce subsequent Employer Contributions payable pursuant
to this Article and to restore a Participant's nonvested Employer Contributions Account(s) in
accordance with Article XV.
        If the Employer must restore a Participant's nonvested Employer Contributions
Account(s), and if the amount of current Forfeitures is less than the amount needed to restore the
nonvested Account(s), the Employer shall make an additional contribution to the Plan in
accordance with this Article, but only for the purpose of restoring the Participant's nonvested
Employer Contributions Account(s).

Section 5.  Contributions for Returning Veterans
        In general, notwithstanding any provision of this Plan to the contrary, contributions,
benefits and service credit with respect to qualified military service will be provided in
accordance with Code Section 414(u).  More specifically, the Employer must make additional
contributions to the Plan if an Employee returns to active employment after serving in the U.S.
armed forces and meets the other requirements specified in the Uniformed Services Employment
and Reemployment Rights Act of 1994.  The amount and timing for making those contributions
must be determined in accordance with Code Section 414(u).  These contributions are ignored for
purposes of Article VI, Article VIII, and Article XIX.



- 19 -



ARTICLE VIII
LIMITATIONS ON EMPLOYER MATCHING CONTRIBUTIONS
AND EMPLOYEE AFTER-TAX CONTRIBUTIONS


Section 1. Special Nondiscrimination Test Under 401(m)

(A)    Nondiscrimination Test

In addition to meeting the Actual Deferral Percentage Test as defined in Article VI, the Plan must satisfy for each Plan Year a nondiscrimination test to be referred to as the Actual Contribution Percentage Test (ACP Test).

The Actual Contribution Percentage Test for a Plan Year shall be satisfied if one of the following two limits is met in the Plan Year:

(i)    Primary Limitation

The Actual Contribution Percentage for all Eligible Participants who are Highly Compensated Employees for the current Plan Year must not exceed the Actual Contribution Percentage for all Eligible Participants who are Nonhighly Compensated Employees for the Plan Year multiplied by 1.25;

(ii)    Alternative Limitation

The Actual Contribution Percentage for all Eligible Participants who are Highly Compensated Employees for the current Plan Year does not exceed the lesser of (a) Actual Contribution Percentage for Eligible Participants who are Nonhighly Compensated Employees multiplied by 2.0; or (b) the Actual Contribution Percentage of the Eligible Participants who are Nonhighly Compensated Employees plus 2.0 percentage points. The amounts may be further limited as the Secretary of Treasury shall prescribe in order to prevent the multiple use of this alternative limitation for both the Actual Deferral Percentage Test and the Actual Contribution Percentage Test, as specified in Treas. Reg. 1.401(m)-2(b) and Section 1(C)(v) of this Article.

The Employer hereby elects to use the prior Plan Year's Actual Contribution Percentage for all Eligible Participants who are Nonhighly Compensated Employees. Hence, when applying the primary and alternative limitations above, the Employer will use the Actual Contribution Percentage of the Eligible Participants who are Nonhighly Compensated Employees for the prior Plan Year. This election may be changed only as permitted by the Secretary of Treasury.

(B)    Special Definitions for 401(m) Test

(i)    Definition of Contribution Percentage

For purposes of this Section 1, the Contribution Percentage for any Plan Year means the ratio (expressed as a percentage) of the Eligible Participant's Contribution Percentage Amounts to the Eligible Participant's Compensation for the Plan Year.

(ii)    Definition of Contribution Percentage Amounts

Contribution Percentage Amounts means the sum of the Employee After-Tax Contributions and Employer Matching Contributions under the Plan on behalf of the Eligible Participant for the Plan Year. The Employer may elect to include (to the extent not taken into account for purposes of the Actual Deferral Percentage Test) Qualified Matching Contributions, Elective Deferrals, and/or Qualified Nonelective Contributions as provided by regulations of the Secretary of the Treasury. The Actual Deferral Percentage Test as set forth in Article VI also



- 20 -



must pass prior to excluding any Elective Deferrals used in this Actual Contribution Percentage Test.

    (iii)   <u>Definition of Actual Contribution Percentage</u>

       The Actual Contribution Percentage means the average (expressed as a percentage) of the Contribution Percentages of the Eligible Participants in a group.

    (iv)   <u>Definition of Compensation</u>

       Compensation shall have the same meaning as in Article VI, Section 3(B)(ii).

(C)   <u>Special Rules for 401(m) Test</u>

    (i)    For purposes of this Section 1, the Contribution Percentage for any Eligible Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to have Contribution Percentage Amounts under this Plan and any other arrangements qualified under Code Sections 401(k) or 401(m) that are maintained by an Affiliated Employer shall be computed as if all the amounts had been made to this Plan.

    (ii)    In the event that this Plan is combined with one or more plans for purposes of satisfying Code Section 410(b) for any of the combined plans, then the plans shall also be combined for purposes of computing the Contribution Percentages of Eligible Participants.

    (iii)   The Plan may be disaggregated to test separately those employees who meet this Plan's eligibility requirements but have not met the maximum age and service requirements permitted by law, provided that the Plan must be similarly disaggregated for purposes of satisfying the Actual Deferral Percentage Test and Code Section 410(b). Alternatively, Nonhighly Compensated Employees who meet this Plan's eligibility requirements but have not met the maximum age and service requirements permitted by law may be ignored for purposes of the Actual Deferral Percentage Test and the Actual Contribution Percentage Test if that group of employees separately satisfies Code Section 410(b).

    (iv)   The portion of the plan that constitutes an employee stock ownership plan as defined in Code Section 4975(e)(7) must be tested separately for the purpose of the ADP Test, the ACP Test, and its own multiple use limit.

    (v)    If the Actual Deferral Percentage or the Actual Contribution Percentage for all Eligible Participants who are Highly Compensated Employees must be reduced to prevent multiple use of the alternative limitation, then the Actual Contribution Percentage shall be reduced. This percentage shall be reduced in accordance with this Plan's other provisions without considering whether an Employee was eligible to make or receive contributions subject to both the Actual Deferral Percentage Test and the Actual Contribution Percentage Test.

<u>Section 2    Excess Aggregate Contributions by Highly Compensated Employees</u>

(A)    If during the Plan Year the Committee anticipates that the acceptable limits set forth in Section 1 above will be exceeded as of the end of the Plan Year, the Committee may order the suspension and/or reduction of Highly Compensated Participants' Contribution Percentage Amounts as may be necessary. The Committee shall reasonably project which Participants will be Highly Compensated Participants and are subject to this suspension and/or reduction.

(B)    If the Actual Contribution Percentage for Eligible Participants who are Highly Compensated Employees exceeds the limitation as of the close of the applicable Plan Year, the excess Contribution Percentage Amounts (referred to as Excess Aggregate Contributions) shall be determined using the following "leveling" process: Contribution Percentage Amounts will be subtracted from the Highly Compensated Employee's Accounts with the highest Contribution





Percentage (and considered Excess Aggregate Contributions) until this Employee's Contribution Percentage equals the next highest Contribution Percentage of a Highly Compensated Employee or until the limitation is no longer exceeded. This process is repeated until the limitation is no longer exceeded.

The amount of the Excess Aggregate Contributions is determined as if the previous paragraph applied, but the Excess Aggregate Contributions are actually subtracted using the following "leveling" process: Contribution Percentage Amounts will be subtracted from the Highly Compensated Employee's Accounts with the greatest amount of Contribution Percentage Amounts until this Employee's Contribution Percentage Amounts equals the next greatest Highly Compensated Employee's Contribution Percentage Amounts or until the total amount of Excess Aggregate Contributions has been subtracted from Employees' Accounts. This process is repeated until the total amount of Excess Aggregate Contributions has been subtracted from Employees' Accounts.

The Excess Aggregate Contributions with earnings thereon shall be forfeited and/or distributed from the Highly Compensated Participant's Accounts no later than the close of the Plan Year following the Plan Year to which the Excess Aggregate Contributions relate. The Employer must pay any excise tax required by Code Section 4979 on any Excess Aggregate Contributions not forfeited and/or distributed within 2-1/2 months after the close of the Plan Year to which the Excess Aggregate Contributions relate.

(C)    Excess Aggregate Contributions shall be distributed first from the Highly Compensated Participant's Employee After-Tax Contributions Account (except that if the Participant received an Employer Matching Contribution because of the Employee After-Tax Contribution, then those two Accounts shall be reduced proportionately) and then, if needed, the Excess Aggregate Contributions shall be distributed from the Participant's Employer Matching Contributions Account (or, if applicable, Qualified Nonelective Contributions Account and Elective Deferral Account). However, to the extent that Excess Aggregate Contributions consist of the nonvested portion of the Employer Matching Contributions Account, then they shall be forfeited. The amount of Excess Aggregate Contributions to be forfeited may be applied to reduce Employer Contributions as set forth in Section 3 of Article VII. Notwithstanding the fact that the Excess Aggregate Contributions were forfeited or distributed, the amount of the Excess Aggregate Contributions shall be an Annual Addition with respect to the maximum limitations of Code Section 415, as described in Article IX, to the extent required by the Secretary of the Treasury.







ARTICLE IX
MAXIMUM LIMITATION UNDER CODE SECTION 415

Section 1.  Limitations for Defined Contribution Plans Under Code Section 415
(A)    Maximum Annual Addition
        (i)    The amount of Annual Additions (as defined below) which may be credited to a
Participant's Accounts for any Limitation Year may not exceed the lesser of:
                (a)    $30,000 As Adjusted; or,
                (b)    25% of the Participant's compensation for the Limitation Year.
"Compensation" for this Article only is defined as wages and all other payments of compensation
reportable on Form W-2, determined without regard to any rules under Code Section 3401(a) that
limit compensation based on the nature or location of the employment or the services performed.
Effective for Limitation Years beginning after December 31, 1997, "Compensation for this
Article also includes compensation not otherwise includible in the Employee's gross income by
reason of any reductions for contributions in the form of voluntary salary reductions due to a
qualified cash or deferred arrangement of the Employer or due to a cafeteria plan of the Employer
maintained pursuant to Code Section 125. Alternatively, Compensation may mean any definition
of compensation that satisfies Code Section 415(c)(3) and final or proposed regulations issued
under that Code section.
        (ii)    For purposes of the limitations of this Section 1, if contributions are made to two
or more defined contribution plans, the various plans shall be considered a single defined
contribution plan.
        (iii)    The compensation limitation in (b) above, however, shall not apply to:
                (a)    Any contribution for medical benefits (within the meaning of Code
Section 419A(f)(2)) after separation from service which is otherwise treated as an Annual
Addition; or,
                (b)    Any amount otherwise treated as an Annual Addition under Code Section
415(l).
(B)    Definition of Annual Additions
        For purposes of this Plan, Annual Additions means the sum of the following amounts
credited to the Participant's Accounts during the Limitation Year:
                (i)    Elective Deferrals;
                (ii)    Employee After-Tax Contributions;
                (iii)    Employer Contributions;
                (iv)    Forfeitures; and,
                (v)    Any other amounts required to be included by Code Section 415(c)(2).
        Any contributions made on behalf of veterans returning to employment that are required
by the Uniformed Services Employment and Reemployment Rights Act of 1994 are credited for
the purpose of this Article to the Limitation Year to which relate, not the Limitation Year in
which they were paid.
(C)    Excess Annual Additions
        If, as a result of the allocation of Forfeitures, a reasonable error in estimating a
Participant's compensation, a reasonable error in determining the amount of Elective Deferrals
that may be made by an individual under the limits on Annual Additions, or because of other



- 23 -



facts and circumstances which the Commissioner of the Internal Revenue Service finds justifies the availability of the rules under Treas. Reg. 1.415-6(b)(6), the Annual Additions under this Plan for a particular Participant would cause the limitations of Code Section 415 applicable to that Participant for the Limitation Year in question to be exceeded, the excess amounts shall not be deemed Annual Additions in that Limitation Year if the following procedures shall be followed for that Limitation Year:

(i)    Employee After-Tax Contributions and Elective Deferrals withheld by the Employer and not yet paid over to the Trust Fund shall be paid over to the Participant in which event Employer Matching Contributions shall not be made with regard to those amounts.

(ii)    If an excess still exists, Employee After-Tax Contributions or Elective Deferrals shall be returned to the Participant. Earnings to be returned to the Participant, if any, shall be computed as provided in the regulations.

(iii)    If an excess still exists, the excess amount will be used to reduce Employer Contributions for the Participant in the next, and succeeding, Limitation Years. If the Participant was not covered by the Plan at the end of the Limitation Year, the excess will be applied to reduce Employer Contributions for all remaining Participants in the next, and succeeding, Limitation Years.

(iv)    The excess amounts shall be held unallocated in a suspense account. If a suspense account is in existence from a prior Limitation Year, all amounts in the suspense account must be allocated to the Participant's Accounts in succeeding Plan Years before any Employer contributions and Employee contributions, which would constitute Annual Additions, may be made to the Plan for that Plan Year for that Participant. At the discretion of the Committee, investment gains or investment losses may be allocated to the suspense account.





ARTICLE X
PARTICIPANT ACCOUNTS

Section 1. Establishment of Individual Participant Accounts

The Recordkeeper shall create and maintain adequate records to disclose the interest in the Trust Fund of each Participant. The records shall be in a form of individual Accounts and shall be adjusted in the manner described in this Article.

At the discretion of the Recordkeeper, the following separate Accounts may be established and maintained on behalf of each Participant:

(A)     A separate Participant's Elective Deferral Account credited with Elective Deferrals and net earnings;

(B)     A separate Participant's Employer Matching Contributions Account credited with Employer Matching Contributions and net earnings;

(C)     A separate Participant's Qualified Matching Contributions Account credited with Qualified Matching Contributions and net earnings;

(D)     A separate Eligible Participant's Qualified Nonelective Contributions Account credited with Qualified Nonelective Contributions and net earnings;

(E)     A separate Participant's or Employee's rollover contribution Account credited with rollover contributions and net earnings pursuant to Section 2 below; and

(F)     A separate Participant's Employee After-Tax Contributions Account credited with Employee After-Tax Contributions and net earnings. The Employee After-Tax Contributions Account shall be treated as a separate Code Section 72(e)(9) contract, and any distributions (or portions of distributions) of Employee After-Tax Contributions or net earnings on those contributions shall be treated as distributed from this contract. Furthermore, Employee After-Tax Contributions made before January 1, 1987 (transferred from the Eaton Corporation Share Purchase and Investment Plan) will be distributed first before remaining Employee After-Tax Contributions or net earnings on those contributions are distributed.

Separate subaccounts shall be established as needed to administer the Plan's vesting and withdrawal provisions. In addition, separate subaccounts shall be established as needed for amounts transferred from the Eaton Corporation Share Purchase and Investment Plan and net earnings on the transferred amounts to the extent needed to preserve Code Section 411(d)(6) protected benefits for those assets.

The Recordkeeper may establish a set of Accounts for Alternate Payees pursuant to a Qualified Domestic Relations Order, as defined in Code Section 414(p).

Section 2. Rollover Contributions Account

With the permission of the Employer, the Trustee may accept, other than employee after-tax contributions, amounts deemed to be rollovers from another plan or trust qualified under Code Sections 401(a) and 501(a) on behalf of an Employee or Participant. The amounts may be accepted through a rollover Individual Retirement Account known as a conduit IRA, a qualified distribution made directly to a Participant, or a direct rollover transferred from another plan's trustee pursuant to Code Section 401(a)(31). Any amounts to be transferred must be acceptable to the Trustee, and will not, in the opinion of the Employer, endanger the tax qualification of the Plan or Trust Fund. The amounts may be commingled with other assets of the Trust Fund.





        If the Employer reasonably concluded that an amount could be accepted as a rollover
contribution without endangering the qualification of the Plan or Trust Fund but later determines
that the amount should not have been accepted as a rollover contribution, the improper amount
must be distributed as soon as administratively feasible.

Section 3.  Adjustment of Participant Accounts
        As of each Valuation Date, the Recordkeeper shall adjust the Accounts of each
Participant to reflect net income as well as net realized and net unrealized appreciation in the
market value of each Investment Fund for the period then ended.  All assets shall be valued in
accordance with their then fair market value.  The Recordkeeper retains discretion to modify on a
nondiscriminatory basis the mechanical procedures for allocating investment experience among
Participants' Accounts.

Section 4.  Adjustment of Accounts for Terminated Participants
(A)     Accounts Which Have Not Experienced Distributions
        If a Participant does not receive a distribution of the Participant's total vested Accounts at
the Participant's prior termination of employment in accordance with Article XIV, and the
Participant is reemployed prior to 5 consecutive one-year Breaks in Service, any nonvested
amounts should still be in the Participant's Account(s).
(B)     Accounts Which Have Experienced Distributions
        If a Participant elected to receive a distribution of the Participant's total vested Accounts
at the Participant's prior termination of employment in accordance with Article XIV, and the
Participant is reemployed, the Participant's nonvested Account(s), if reinstated pursuant to Article
XV, shall not be adjusted by any later gains or losses which occur during the period of absence.

Section 5.  Forfeiture Amounts
        Upon a forfeiture event pursuant to Article XIV, Forfeitures shall be used as provided in
Article VII, Section 4.





ARTICLE XI
PARTICIPANT INVESTMENT ELECTION

Section 1. Initial Elections
    Half of the first 6% of Compensation contributed as Elective Deferrals and/or Employee After-Tax Contributions and all Employer Contributions must be invested in the Delphi Common Stock Fund and, along with net earnings on those amounts, must remain invested in the fund until the later of the last day of the Plan Year in which the contributions were made or until the Participant chooses new investments under Section 3 of this Article.
    As authorized in Article XVI, each Participant shall designate one or more of the Investment Funds into which Elective Deferrals and/or Employee After-Tax Contributions not covered by the preceding paragraph are invested. The investment election shall be made in multiples of 10%.
    For the purpose of this investment restriction, Elective Deferrals elected under the second paragraph of Article V, Section 2 are not considered to be part of the first 6% of Compensation contributed.
    If a Participant has no investment election in effect, any contributions initially shall be invested in the Promark Income Fund (or if that fund is not one of the Plan's Investment Funds, a fund with low expected short-term volatility).

Section 2. Change of Investment Election
    A Participant may change an investment election for future contributions in excess of the first 6% of Compensation in multiples of 10% by notifying the Recordkeeper. The change shall be effective as soon as administratively feasible.

Section 3. Reallocation of Existing Account Balances
    A Participant may reallocate existing Account balances as of any Valuation Date (after investment gains or losses are allocated) in multiples of 1% by notifying the Recordkeeper.
    If a Participant moves assets out of the Delphi common stock fund (as described in Article XVI, Section 2(B)) that were held less than 30 days (on a first in, first out basis), the Investment Fund imposes a 1.0% redemption fee. This redemption fee is deducted from the assets redeemed. The redemption fee is paid to the Delphi common stock fund and helps protect the fund's performance and shareholders by discouraging frequent trading in response to short-term market fluctuations.

Section 4. Duration of Investment Election
    The new investment election thereby specified shall remain in effect until a subsequent investment election is made. A reallocation of existing Account balances will not be repeated unless a Participant elects another reallocation.



- 27 -

# ARTICLE XII
## LOANS

### Section 1. Standards For Granting Loans

**(A)     Eligible Loan Applicants**

Loans are available to Plan Participants on a reasonably equivalent basis and must be made without regard to a Participant's race, color, religion, sex, age or national origin. Loans may be made to Participants who are Plan fiduciaries on the same terms as they are made available to other Participants. The Employer reserves the right to declare moratoriums on the granting of new loans to Participants, but any moratoriums shall not affect a Participant's obligation to repay any outstanding loan.

Participants with vested Account balances of $2,000 or more are eligible for loans without regard to whether they are employees of the Employer.

**(B)     Maximum Loan Amount**

The amount of a loan is limited to the lesser of:

(i)     1/2 of the Participant's vested Account balances (except Employer contributions made in the current Plan Year and investment gains or losses on those contributions) determined as of the most recently completed valuation minus the outstanding balance of all other loans; or

(ii)     $50,000 reduced by the highest outstanding balance of the Participant's previous loans from the Plan during the 1-year period ending on the day before the effective date of the new loan.

For the purpose of computing the above amounts, all loans from all plans of all Affiliated Employers are treated as if made under this Plan.

**(C)     Minimum Loan Amount; Increments**

The minimum loan amount is $1,000. Loans may be made in whole dollar amounts.

**(D)     Loan Purpose**

Loans may be made for any lawful purpose of the Participant. The Participant must intend to repay the loan.

**(E)     Persons Administering Loan Program**

The Trustee may invest Plan assets to establish the loan program. The Recordkeeper is authorized to administer the loan program.

**(F)     Basis for Denial**

The Recordkeeper may deny a loan application for any of the following reasons:

(i)     The Participant may not borrow the requested amount because the transaction does not meet the standards and eligibility requirements expressed in this Article;

(ii)     The Recordkeeper believes that the proposed loan would be inconsistent with the basic fiduciary rules governing Plan assets; and

(iii)     The Recordkeeper decides to suspend for any period the making of loans.

Decisions by the Recordkeeper regarding loan applications shall be final, and shall be timely communicated to the Participant. The loan standards must be met as of the date a loan is granted, renewed, or modified.



Section 2.  Terms of the Loan

Each loan will be evidenced by a promissory note (or a legally enforceable loan agreement) containing the following terms.  By endorsing the check representing the loan, the Participant acknowledges receipt of the promissory note and agrees to its terms and conditions.

(A)    Security

The loan must be secured by 1/2 of the value of the Participant's vested Account balances. This is the same portion of the Accounts from which the Participant is borrowing funds.

(B)    Interest Rate

The loan will bear a reasonable rate of interest.  The Recordkeeper will use the same interest rate as the prime rate in effect on the last business day of the quarter before the date the Participant applies for the loan.  The "prime rate" is the interest rate reported as the "Prime Rate" in the Eastern Edition of the *Wall Street Journal* in its general guide to money rates.  The interest rate shall be fixed, and not adjusted, during the term of the loan (until a renewal or modification of the loan).

(C)    Amortization

The loan must be repaid with interest in level amortized payments made quarterly or on a more frequent basis.  Loans shall be granted for a minimum term of six months, with additional increments of six months as the Participant may elect.  The maximum loan term is five years, except the maximum is ten years if the loan is used for the purchase or construction of the principal residence of the Participant.  The Participant may not elect a term that will result in monthly repayments of less than $50.

(D)    Date of Loan

The loan funds will be advanced to the Participant as soon as administratively feasible after the Participant applies for the loan by notifying the Recordkeeper).  A loan application shall be irrevocable as of the close of Business, normally 4:00 p.m. E.T. on the business day on or after the application is made.

(E)    Former Employees

A Participant who terminates employment with the Employer may continue to make loan repayments on any outstanding loans from the Plan until the Participant receives a distribution under Article XIV.

(F)    Loans Transferred from Eaton Plan

Notwithstanding any other provisions of this Article, Participants' contractual rights regarding loans transferred to this Plan from the Eaton Corporation Share Purchase and Investment Plan must be preserved unless Participants consent to waive their rights.

Section 3.  Loan Application Procedure

The Recordkeeper may require on an uniform basis each Participant applying for a loan to submit a reasonable loan application fee or administrative fee.

A Participant may be granted a loan no more frequently than one time each calendar year, or such longer period of time as the Employer in its sole discretion may, from time to time, establish applicable to all Participants.  A Participant may not be granted another loan if the Participant already has five or more loans outstanding.





Section 4.  Loan Repayment

If the Participant is employed by the Employer, the loan must be repaid by amounts deducted from the Participant's payroll check.

If the Participant does not receive a payroll check from the Employer sufficient for deducting a payment, the Participant must make monthly payment on or before the date payment is due.  The Recordkeeper may require that it be notified of, and receive photocopies of, these payments.  The Recordkeeper may require Participants who repay their loans by check to pay a check handling and processing fee to compensate the Plan for estimated time and expenses incurred in excess of those incurred for repayment by payroll check deduction.

A Participant may repay all or any part of an outstanding loan balance including accrued but unpaid interest without penalty at any time.

Section 5.  Loans as Plan Investments

(A)    Accounting

On the date of a Participant's loan, the amount of the loan shall be taken from the Investment Funds holding the Participant's vested Account(s) balance and segregated into a separate investment account known as the Participant's Loan account.  The Participant may elect from which Investment Funds the loan amount is taken from and the Recordkeeper shall establish a default procedure if the Participant does not make this election.  This amount then is exchanged for the promissory note.  As of any Valuation Date, the Participant's Loan account shall be equal to the outstanding principal loan balance payable on the promissory note.

(B)    Loan Fund



Notwithstanding the Investment Funds established pursuant to Article XVI, there shall be established a Loan Fund to accept the promissory note executed by the Participant to evidence the debt created.  This Loan Fund will receive the interest and principal payments as paid.  As of each Valuation Date, these will be transferred to the Investment Funds currently accepting contributions pursuant to the Participant's current investment elections.  If no investment elections exist, then the interest and principal payments shall be made to the Investment Fund as any Named Fiduciary designates.

(C)    Effect on QDRO's

An amount of an outstanding loan is officially included in a Participant's vested account balances.  Participants who submit Qualified Domestic Relations Orders to the Plan should consider their obligations to repay these loans as they decide how to allocate their Account balances between themselves and Alternate Payees.  If an Alternate Payee will become liable for the repayment of all or part of the outstanding loan balance, this will be treated as a loan modification.

(D)    Promissory Notes are Plan Assets

Because the promissory notes evidencing loans are assets of the Plan, the Trustee must hold them, unless an ancillary Trustee, Investment Fund Manager, or other lawfully designated fiduciary is named for the limited purpose of holding the notes.  To the extent required by ERISA, a fiduciary bond must cover the holder of the notes.

Section 6.  Default

A loan will be considered in default and the outstanding loan amount is due immediately if one or more payments are made after the longest grace period permitted by Code Section 72(p)



and final or proposed regulations issued under that Code section. The grace period shall include the first 12 months of an Employee's unpaid leave of absence. If a payment is made late, but does not exceed the grace period, the loan will not be in default. Any grace periods cannot extend the five or ten year deadline for repaying loans from Section 2(C) of this Article. The Recordkeeper may establish and collect late fees for late payments in an amount considered reasonable by commercial lending institutions, and failure to timely pay these fees will be considered a default of the entire loan. Additionally, a loan will be considered in default if it is accelerated under Section 2(E) of this Article.

The Recordkeeper may also suspend the obligation to repay loans during any leave of absence or other period for which loan payments do not have to be made as permitted by Code Section 414(u) or Code Section 72(p) and final or proposed regulations issued thereunder without the loan being treated as a taxable distribution for tax purposes. Any such suspension shall be made on an uniform basis to all similarly situated Participants.

If the portion of the Participant's vested Account balances securing the loan is, or becomes, insufficient to protect the Plan from a loss of principal or interest, the Committee will enforce its security interest as soon as practicable after default (while maintaining the Plan's qualified status). However, if the security is adequate, it is within the Recordkeeper's discretion whether it is prudent to enforce the security interest as soon as practicable, to delay this enforcement, or to accept late payments after a default occurs.

To enforce a security interest in the Participant's vested Account balances, the Recordkeeper will deduct the amount of the loan (or part of it)



(A)     from any payment or distribution under the Plan from the Participant's Accounts or

(B)     from the Participant's vested Account balances.

These deductions in aggregate may not exceed the value of the portion of the vested Account balances in which the Plan holds a security interest. The amount deducted shall be treated as a distribution to the Participant and a repayment of the loan (or that part of it).



ARTICLE XIII
WITHDRAWALS PRIOR TO TERMINATION OF EMPLOYMENT

Section 1.   Withdrawals of Employee After-Tax and Rollover Contributions

A Participant who is an Employee may request upon notifying the Recordkeeper the cash withdrawal of all or any portion of the Participant's net Employee After-Tax Contributions Account and rollover contribution Account (except for contributions made during the current Plan Year and investment gains or losses on those contributions) to be determined as of the most recent Valuation Date preceding the date of withdrawal.

Section 2.       Withdrawals of Employer Matching Contributions

A Participant who is an Employee may request upon notifying the Recordkeeper a cash withdrawal of all or any of the vested portion of the Participant's net Employer Matching Contributions Account except that contributions made during the current Plan Year and investment gains or losses on those contributions.  Furthermore, a Participant under age 65 with less than 5 Years of Service may not withdraw Employer Matching Contributions and investment earnings on those contributions if the contributions were made by the Employer to the Trust within the 24 months preceding the month of withdrawal.

The amount requested for withdrawal shall be obtained (1) from the Investment Funds in which the Participant has assets, as the Participant may elect, or (2) if the Participant has not elected, pro rata from each Investment Fund in the Participant's Account paying first assets available under Section 1 of this Article.

Section 3.  Hardship Withdrawals

Upon the application of a Participant who is an Employee, the Recordkeeper will direct the Trustee to distribute all or any portion of the Participant's Elective Deferrals (but no more than the value of the Elective Deferrals Account) and any income credited to the Participant's Account as of December 31, 1988 allocable to the Elective Deferrals (applicable only for assets transferred from the Eaton Corporation Share Purchase and Investment Plan), if the following conditions are met.

(A)     The Participant needs the withdrawal for the following (which are deemed immediate and heavy financial needs):

(i)     Medical expenses for the Participant's immediate family if the expenses are previously incurred or necessary to obtain medical care;

(ii)     Costs directly related to the purchase or construction of a principal residence for the Participant (excluding mortgage payments);

(iii)     Tuition, related educational fees, and room and board expenses for the next 12 months of post-secondary education for the Participant's immediate family;

(iv)     Payments necessary to prevent eviction from or foreclosure on the Participant's principal residence; and

(v)     Other needs announced by the appropriate governmental authority in a document of general applicability to constitute immediate and heavy needs.



- 32 -



(B)     The amount of the distribution does not exceed the amount needed to satisfy the Participant's need. The amount may include any amounts necessary to pay any federal, state, or local income taxes or penalties reasonably anticipated to result from the distribution.

(C)     The Participant has obtained all other types of distributions and all nontaxable loans currently available under this Plan and all other plans maintained by the Employer.

(D)     The Plan must suspend Employee After-Tax Contributions and Elective Deferrals by the Participant for 12 months. Any other plans maintained by the Employer also must suspend employee contributions, including elective deferrals, by the Participant for 12 months. For this purpose only, the phrase "all other plans maintained by the Employer" is defined in Treas. Reg. 1.401(k)-1(d)(2)(iv)(B)(4).

(E)     The Participant's Elective Deferrals limit in Section 1 of Article VI of the Plan for the Participant's taxable year following the date of the distribution under this Section is reduced by the Elective Deferrals made by the Participant in the taxable year that includes the distribution under this Section. If the Participant participates in any other plans maintained by the Employer permitting Elective Deferrals, the limits in those plans will be similarly reduced.

### Section 4.  Other Withdrawals

All of a Participant's Accounts may be distributed (i) on the disposition of substantially all of the assets of the Employer if the Employer maintains an ownership interest, if any, in the transferor corporation of less than 15%, the transferor corporation continues to maintain the Plan and the Participant continues employment with the corporation acquiring the assets, or (ii) on the disposition of a subsidiary of the Employer if the transferor corporation continues to maintain the Plan and the Participant continues employment with the subsidiary. Any distributions under this section must be made by the end of the second calendar year after the calendar year in which the sale or disposition occurred.

### Section 5.  Post Age 59-1/2 Withdrawal



A Participant who is an Employee and who has attained the age of 59-1/2 may request upon notifying the Recordkeeper a cash withdrawal of all or any portion of the Participant's Elective Deferral Account except that contributions made during the current Plan Year and investment gains or losses on those contributions may not be withdrawn.

The amount requested for withdrawal shall be obtained (1) from the Investment Funds in which the Participant has assets, as the Participant may elect, or (2) if the Participant has not elected, pro rata from each Investment Fund in the Participant's Account paying first assets available under Section 1 of this Article.

### Section 6.  General Rules for Withdrawals

Withdrawals are subject to the provisions of Section 6 of Article XIV. However, withdrawals of Elective Deferrals under Section 3 of this Article are not subject to the provisions of Section 6 of Article XIV.

Withdrawals are also subject to the provisions of Section 1 of Article XIV.



## ARTICLE XIV
### DISBURSEMENT OF BENEFITS

### Section 1. General Distribution Rules

Distribution requests, unless invalid, will be granted and paid as soon as administratively feasible after the Participant requests the withdrawal by notifying the Recordkeeper. A distribution request shall be irrevocable as of the close of business, normally 4:00 p.m. E.T. on the business day on or after the request is made.

Payments of the Participant's Accounts will be valued on the Valuation Date on or as soon as administratively feasible after the distribution request is made. Note that this is not necessarily the same day as the distribution request. Furthermore, there may be some processing delay between the Valuation Date as of which the distribution is processed and the date the check is cut or the date the check is mailed, but there shall be no investment gains or losses allocated after the Valuation Date. Installment payments will begin no sooner than the first of the month following the month in which the Recordkeeper receives the Participant's request and will be valued on the Valuation Date on or immediately before the first day of the installment payment period.

All distributions shall be paid in cash except that the Participant (or Beneficiary) may elect to receive cash-in-lieu of shares equivalent to the value of their assets invested in the Delphi Common Stock Fund, the Eaton Common Stock Fund, or the Axcelis Common Stock Fund.

### Section 2. Retirement



Upon the attainment of any of the following Retirement Dates of Subsection 2(A), a Participant's Accounts shall be 100% vested, except that termination of employment is not required.

(A)    Retirement Dates

Retirement Date means any of the following:

(i)    The Normal Retirement Date of a Participant shall be the date the Participant attained age 65 and terminated employment.

(ii)    The Late Retirement Date of a Participant who remains employed after Normal Retirement Date shall be the date the Participant terminated employment.

(B)    Payment of Retirement Benefits

In the event of the Normal or Late Retirement Date of a Participant, the Recordkeeper shall direct the Trustee to distribute to the Participant, in accordance with Section 5 of this Article, the full value of the Participant's Accounts. The Participant's Accounts shall be distributed at the Participant's discretion as of any Valuation Date following the Participant's retirement date to the extent permitted by Section 4(D) of this Article.

### Section 3. Death

If a Participant dies while employed by the Employer, the Participant's Accounts shall be 100% vested. Upon the death of a Participant, the Recordkeeper shall direct the Trustee to distribute as early as the next succeeding Valuation Date, in accordance with Section 5 of this Article, the full value of the Participant's Accounts to the designated Beneficiary as indicated in Article II.

- 34 -



If a Participant dies after the Participant's employment is terminated, but while any balance remains in the Participant's Accounts, the balance shall be payable in accordance with this Section 3, but no additional amounts shall become vested.

Section 4.  Distributions Prior to Retirement and Death

(A)    Before Termination of Employment

Distributions are permitted before termination of employment only to the extent provided in Articles XII and XIII and Section 7(B) of Article XIV of this Plan.

(B)    After Termination of Employment

A Participant shall be 100% vested in the value of the Participant's (i) Employee After-Tax Contributions Account (if any), (ii) Elective Deferral Account, (iii) Qualified Nonelective Contributions Account (if any), (iv) Qualified Matching Contributions Account (if any), and (v) Rollover Contributions Account (if any).  The value of a Participant's other Employer Contribution Account(s) shall be vested according to the following schedule:

| Number of Years of Service | Vesting Percentage |
| --- | --- |
| Less than 5 | 0% (except as modified below) |
| 5 or More | 100% |

Also, if a Participant is actively employed by the Employer on the last day of the Plan Year, the Participant's Employer Matching Contributions made during that Plan Year and net earnings on them shall become fully vested.

Amounts transferred from the Eaton Corporation Share Purchase and Investment Plan and net earnings on those amounts shall be fully vested, regardless of the number of Years of Service that a Participant has.

(C)    Distribution of Vested Amounts

If a Participant elects to receive a distribution of the Participant's vested Accounts upon termination of employment for any reason other than retirement, death, or termination of the Plan, the vested portion of the Participant's Accounts will be distributed to the terminated Participant, in accordance with Section 5 of this Article, no later than 60 days following the later of the first available Valuation Date subsequent to the later of the date of termination of employment or the Participant's election.

(D)    Nondistribution at Termination of Employment

If a Participant elects not to receive a distribution of the Participant's Accounts within 90 days after the Participant received a distribution request form and notice of tax consequences, the Participant may still elect to receive a distribution as of any Valuation Date by timely filing a distribution request form.  The terminated Participant, however, shall receive the Accounts no later than 60 days following the first available Valuation Date following the close of the Plan Year during which the Participant attained age 65, unless the Participant otherwise elects.

If a Participant had not elected to receive a distribution at termination of employment, the Accounts shall be maintained by the Employer in accordance with Article X, and the Accounts shall continue to be invested in their current Investment Funds unless the Participant elects otherwise in accordance with Article XI. The Participant may be eligible to borrow from the Plan under the same conditions as active Employees, pursuant to Article XII.

(E)    Cash-Out

If a Participant's vested Account balances upon termination of employment for any reason other than retirement, death, or termination of the Plan is not more $5,000, the Recordkeeper



- 35 -



must direct the Trustee to distribute the vested Accounts in accordance with Subsection (C) of this Section. If the balance is zero, the distribution of the vested Accounts is deemed to occur. The Participant's consent or election is not required for this "cash-out" distribution except that the direct rollover election as provided in Section 6 of this Article is required.

For the purpose of this Subsection (E) only, the Participant's vested Account balances shall be considered as exceeding $5,000 if it exceeded $5,000 at the time of any prior distribution.

(F)     Forfeiture Event

The Participant's nonvested portion of Employer Contributions Account(s) shall be forfeited on the effective date of the Participant's termination of employment.

Section 5.   Forms of Payment

Upon a Participant's retirement, death, or termination of employment prior to retirement, the value of the Participant's Accounts to be distributed shall be paid in a single lump sum or in installment payments. The Participant also may elect to receive a distribution of only a portion of the Participant's Accounts.

Installment payments will be made on a calendar month, calendar quarter, semi-annual, or annual basis, as elected by the Participant. Installments shall be in whole dollar amounts, with $1,200 established as the minimum annual installment amount. Installments shall be paid pro rata from each Investment Fund, paying first assets in the Participant's Employee After-Tax Contributions Account, if any. Except as required by Section 7(B) of this Article, the Participant may change the timing and amount of any installment elected or discontinue installment payments.



Section 6.   Direct Rollovers of Distributions

Prior to making any eligible distribution (which does not include installment distributions longer than 10 years, distributions to the extent required by Section 7(B) of this Article or to the extent they consist of Employee After-Tax Contributions), the Recordkeeper shall provide notice to the individual about to receive the distribution of the right to elect a direct rollover and certain other tax information. The content and timing of this notice shall comply with Code Section 402(f) and regulations. The Recordkeeper may also provide a form for the individual to elect whether to have all or part of the distribution paid directly to an eligible retirement plan and to specify the plan to which the distribution is to be paid. If the individual so elects, the Recordkeeper shall cause the distribution (or the portion designated by the individual) to be made in the form of a direct rollover transferred to the trustee (or IRA custodian or annuity contract issuer) of the specified eligible retirement plan.

For the purposes of this Section, an "eligible retirement plan" means an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 403(a), an annuity plan described in Code Section 403(a), or a qualified trust described in Code Section 401(a) if it is a defined contribution plan.

The Recordkeeper may determine rules for processing direct rollovers as long as they comply with Code Section 401(a)(31) and regulations and they are applied on a consistent basis. In particular, the Recordkeeper may determine the reasonable means of direct payment, reasonable election procedures, whether to process direct rollovers of distributions of $200 or



- 36 -



less, and whether to allow an individual to make a direct rollover of less than $500 of only a portion of the distribution.

Section 7.  Benefit Payment Deadlines
(A)    Later of 65 or Termination

Notwithstanding any other provisions of the Plan, unless the Participant elects otherwise the payment of benefits under this Plan shall begin not later than the 60th day after the close of the Plan Year in which:  (A) the Participant attains age 65; or, (B) the Participant terminates employment, whichever is later, provided that if, at that date, the amount of the benefit cannot be ascertained, payment shall commence no later than the 60th day after the earliest date the amount of the benefit can be ascertained under the Plan.  However, the Plan may require that a Participant make a distribution request before payment of benefits will commence.

(B)    Required Beginning Date

If a Participant is no longer employed or is a 5% owner (as described under Code Section 416(i)), benefit payments must commence no later than the first day of April following the calendar year in which the individual attains age 70-1/2.  The minimum amount to be distributed each year will be determined by the Committee in accordance with any proposed or final regulations issued under Code Section 401(a)(9), including any regulations regarding the incidental death benefit requirements.

While still employed, the Participant will accrue additional contributions in accordance with the provisions of this Plan without regard to the Participant's age.

Section 8.  Distributions to Alternate Payees



If separate Accounts are created for an Alternate Payee pursuant to a court order that the Committee has accepted as a Qualified Domestic Relations Order, the vested portion of the Accounts may be distributed to the Alternate Payee as of the Valuation Date on or next following the later of the date (i) the Recordkeeper accepts the order as a Qualified Domestic Relations Order, or (ii) the effective date of when funds are transferred into the Alternate Payee's Accounts.

- 37 -



ARTICLE XV
EFFECT OF REEMPLOYMENT

Section 1.  Effect of Reemployment Prior to Retirement
(A)    Reemployment Within 5 Consecutive One-Year Breaks in Service
       If the Employee was a Participant, the Employee will be eligible to make contributions again in accordance with Article IV immediately upon the Participant's resumption of employment.  Years of Service shall include any Years earned prior to any Breaks in Service.
       If a Participant was not 100% vested as of the Participant's prior date of termination of employment and the Participant repays the full amount of any payment from the Participant's Employer Contributions Account(s) to the Trust before the earlier of five years after the Participant's rehire date or the date the Participant incurs 5 consecutive one-year Breaks in Service, the Participant shall have the nonvested Employer Contributions Account(s) as of the prior date of termination fully restored first from Forfeitures, and then from Employer Contributions made specifically for that purpose.  The Participant's nonvested Employer Contributions Account(s) as of the prior date of termination shall similarly be restored if the Participant did not receive a distribution (and was rehired prior to 5 consecutive one-year Breaks in Service).  Any Forfeitures restored to a rehired Employee's Accounts shall not be credited with any investment gains or losses from the Valuation Date used for the distribution or other forfeiture event under Article XIV, Section 4(F) until the Valuation Date coincident with or next following the date the nonvested portion of the Accounts is restored.  The amount that the Participant repays shall be credited to the Participant's Employee After-Tax Contributions Account but not be considered as Employee After-Tax Contributions for the purposes of limits or tests in Articles IV, VIII and IX.
(B)    Reemployment After 5 Consecutive One Year Breaks in Service
       If the Employee was a Participant, the Employee will be eligible to make contributions again in accordance with Article IV immediately upon the Participant's resumption of employment.  Years of Service shall include any Years earned prior to any Breaks in Service.
       A Participant who is reemployed after 5 consecutive one-year Breaks in Service shall not have restored to his or her Accounts the nonvested Employer Contributions Account(s) that were previously forfeited.
(C)    Reemployment by an Affiliate
       If a Participant is reemployed by an Affiliated Employer in a category of employees excluded from the Plan, and if the employee had at prior termination of employment vested rights in accordance with Article XIV, the employee shall be deemed to be a transferred employee and Years of Service at the prior date of termination of employment shall be reinstated.  In no event, however, shall the employee have any nonvested Employer Contributions Account(s) as of any prior termination restored.

Section 2.  Effect of Reemployment After Retirement
       A former Participant who received a benefit under Section 2 of Article XIV and is rehired may elect again to contribute under the Plan as of the first Enrollment Date subsequent to the Participant's rehire date.



- 38 -



ARTICLE XVI
THE TRUST FUND

Section 1.  Trust Agreement
        A Named Fiduciary shall execute a Trust Agreement with a Trustee or Trustees to manage and operate the Trust Fund and to receive, hold, and disburse the corpus of the Trust Fund as may be necessary to carry out the provisions of the Plan.  The Trust Agreement may be a master trust agreement with assets from the Employer's or Affiliated Employer's other qualified plans.
        The Trust Agreement shall provide for designation of the fiduciary or fiduciaries of the Plan that shall have discretion as to the securities in which the Trust Fund shall be invested or reinvested, provided that the investments shall be limited to those which are legal investments under ERISA, which investment fiduciaries may include one or more Investment Managers as defined in ERISA.  The Trust Agreement shall include a provision for commingled investments of the Trust Fund in a single joint trust fund with the assets of other qualified employee pension benefit plans maintained by the Employer or by an Affiliated Employer for the purpose of pooling investment experience.
        The Employer may, from time to time, change the Trustee then serving under the Trust Agreement for another Trustee.  If a bank or trust company is designated as Trustee, the bank or trust company shall be a bank or trust company incorporated under the laws of the United States or of any state and qualified to operate thereunder as trustee.
        The Board of Directors may modify any Trust Agreement to accomplish the purposes of the Plan, and the Board of Directors or Named Fiduciary may remove any Trustee and appoint any successor or successors with or without cause.

Section 2.  Investment Funds
(A)     Multiple Investment Funds
        The Employer at its discretion may instruct the Trustee to establish one or more Investment Funds, or prospectively modify the permissible investments or investment objectives of existing Investment Funds.  The Investment Funds may include investment funds maintained by the Trustee.  The Committee may direct the Trustee to discontinue an Investment Fund or to continue an Investment Fund but cease accepting any additional contributions to the fund.
        The Investment Funds shall be:
                (1)  Delphi Common Stock Fund
                (2)  Promark Funds as listed below:
                        Balanced Fund
                        Emerging Markets Equity Fund
                        High Quality Bond Fund
                        High Yield Bond Fund
                        Income Fund
                        International Equity Fund
                        Large Cap Blend Fund
                        Large Cap Growth Fund
                        Large Cap Index Fund



- 39 -



Large Cap Value Fund
Mid-Cap Blend Fund
Real Estate Securities Fund
Small Cap Growth Fund
Small Cap Value Fund
Target Portfolio: Conservative
Target Portfolio: Dynamic Growth
Target Portfolio: Income
Target Portfolio: Moderate

(3) Mutual Funds as listed below:

FIDELITY MUTUAL FUNDS
Aggressive Growth Fund
Asset Manager
Asset Manager: Income
Asset Manager: Growth
Balanced Fund
Blue Chip Growth Fund
Canada Fund
Capital Appreciation Fund
Capital & Income Fund
Contrafund
Convertible Securities Fund
Disciplined Equity Fund
Dividend Growth Fund
Diversified International
Emerging Markets Fund
Europe Fund
Equity Income Fund
Equity Income II Fund
Export and Multinational Fund
Fifty Fund
Fidelity Fund
Freedom Income Fund
Freedom 2000 Fund
Freedom 2010 Fund
Freedom 2020 Fund
Freedom 2030 Fund
Global Balanced Fund
Growth & Income Portfolios
Government Income Fund
Growth Company Fund
International Bond Fund
International Growth & Income Fund
Investment Grade Bond Fund
Low-Priced Stock Fund



Magellan Fund
Mid-Cap Stock Fund
New Markets Income Fund
OTC Portfolio
Overseas Fund
Pacific Basin Fund
Puritan Fund
Real Estate Investment Portfolio
Retirement Growth Fund
Small Cap Selector Fund
Stock Selector Fund
Trend Fund
Utilities Fund
Value Fund
Worldwide Fund

(4) Eaton Common Stock Fund and Axcelis Common Stock, subject to the following restrictions

Unless the Named Fiduciary affirmatively decides otherwise, assets may not be contributed or transferred to the Eaton Common Stock Fund and the Axcelis Common Stock Fund, except pursuant to Article XVII, Section 7. Also unless the Named Fiduciary affirmatively decides otherwise, the Eaton and Axcelis Common Stock Funds shall be discontinued as of April 1, 2003 and any assets remaining in them will be transferred to the Promark Income Fund (or if that fund is not one of the Plan's Investment Funds, a fund with low expected short-term volatility).

(B)    Delphi Common Stock Fund

The Investment Funds shall include a fund designed to be principally invested in common stock, $0.01 par value, issued by Delphi Automotive Systems Corporation. A portion of this Investment Fund, called the Delphi Common Stock Fund, may be invested in short-term fixed income investments and money market investments. The Trustee or designee is authorized to acquire, hold, and dispose of employer stock. As provided for in ERISA Section 404(a)(2), the fiduciary duty of diversifying plan investments is not violated by the establishment and maintenance of an Employer stock fund.

Contributions to the Delphi Common Stock Fund may be paid in shares of Delphi common stock. Contributions to other Investment Funds must be paid in cash.

Shares of Delphi common stock, $0.01 par value, Eaton common stock and Axcelis common stock acquired by the Trustee under the terms of this Plan shall be registered in the name of the Trustee or its nominee who shall, to the extent it is permissible under applicable law, vote or tender the shares representing the equivalent market value credited any of the Investment Funds that primarily invest in those stocks in a Participant's Accounts as instructed by the Participant (or Beneficiary). Shares that are held in the Delphi Common Stock Fund for which no Participant (or beneficiary) instructions are received will be voted, to the extent it is permissible under applicable law, by the Trustee in the same ratio as the shares with respect to which instructions are received from the Participants (or beneficiaries).



(C)    <u>Diversification Rights</u>

A Participant who is age 55 or over and has participated in the employee stock ownership plan, which is the portion of the plan invested in the Delphi Common Stock Fund, for at least 10 years may elect, by notifying the Recordkeeper within a 90-day period following the close of the first six Plan Years for which the Participant met the preceding age and years of participation requirements, to transfer to other Investment Funds 25% (50% in the case of the final 90-day election period) of the value of the portion of the Participant's Accounts invested in the Delphi Common Stock Fund.

The amount eligible for transfer under this subsection (C) shall be determined by the Recordkeeper. No transfer election otherwise permitted by this Section 4 will be permitted for *de minimis* amounts. For this purpose, an amount allocated to a Participant's Accounts shall be deemed to be *de minimis* if the fair market value of the Delphi common stock, $0.01 par value, acquired by or contributed to the ESOP portion of the Plan and allocated to the Participant's Delphi Common Stock Fund is $500 or less. For purposes of this determination, Delphi common stock, $0.01 par value, or units in the Delphi Common Stock Fund held in the Participants' Accounts under the employee stock ownership plans maintained by an Affiliated Employer shall be considered as held by the same plan.

(D)    <u>Put Option if Delphi Stock Ceases to be Publicly Traded</u>

This subsection (D) applies only if Delphi common stock, $0.01 par value, acquired by the Trustee with the proceeds of an exempt loan is not readily tradable on an established securities market at the time of distribution. The Participant shall have the right (a "put option") to require that the Employer repurchase the stock under a fair valuation formula in accordance with Code Section 409(h). The put option shall be provided to the Participant for 60 days following the date of distribution and, if not exercised during that period, for an additional period of 60 days during the following Plan Year. If the Participant exercises the put option, and if the Participant's entire Accounts balances are distributable within one taxable year, the amount to be paid for the Delphi common stock, $0.01 par value, shall be paid in substantially equal periodic payments (not less frequently than annually) over a period beginning not later than 30 days after the exercise of the put option and not exceeding 5 years, with adequate security provided and interest payable at a reasonable rate (as determined by the Employer) on any unpaid balance. If the Employer is required to repurchase Delphi common stock, $0.01 par value, as part of an installment distribution, the amount to be paid for the Delphi common stock, $0.01 par value, shall be paid not later than 30 days after exercise of the put option.

This subsection (D) shall continue to apply to stock even if the employee stock ownership plan portion of the Plan ceases to be an employee stock ownership plan under Code Section 4975(e)(7) and even after any and all exempt loans have been repaid.

(E)    <u>Cash Dividends on Delphi Stock</u>

Cash dividends paid on shares of Delphi common stock, $0.01 par value, corresponding to the units in the Delphi Common Stock Fund in a Participant's Accounts, regardless of the type of contributions to which the units relate, shall be distributed directly to the Participant rather than being reinvested in the respective funds, provided the Participant timely notifies the Recordkeeper. A Participant may elect to receive a distribution of either (1) 100% of the cash dividends, or (2) 50% of the cash dividends and reinvest the remainder in the respective funds. Dividends paid directly to a Participant pursuant to this subsection shall be paid not later than 90 days after the end of the Plan Year.





Section 3.  Investment of Funds

The Investment Funds provided under Section 2 of this Article will be established by the Trustee based on instructions from a Named Fiduciary, subject to the provisions of the Trust Agreement.

The Trustee may cause any part or all of the assets of the Trust Fund to be commingled with the funds of other qualified trusts, to the extent allowed by law, and invested in one or more collective investment funds.  The Trust Fund assets so invested shall be subject to all of the terms of the declaration(s) of trust creating the collective investment fund(s), which shall constitute part of the Trust Agreement.

Section 4.  Expenses

The Trust Fund shall pay all reasonable expenses of administering the Plan or the Trust Fund.  However, the Employer may, at its own discretion, pay any of these expenses directly or reimburse the Trust Fund for the payment of any of these expenses.  In addition, the Employer may, upon request, reimburse the Trustee for expenses incurred by the Trustee in maintaining the Trust Fund, including brokerage commissions and transfer taxes on the purchase and sale of Delphi common stock, certain Trustee fees, and certain other administration expenses.  Any expense paid for from the Trust Fund (or an Investment Fund within the Trust Fund) shall reduce the net income for the Trust Fund (or the Investment Fund) as of the Valuation Date on or next following the date the expense was paid, unless the Recordkeeper decides on a nondiscriminatory basis that a different mechanical procedure for allocating the expenses among Participants' Accounts is more appropriate.



Except as provided in the following Section, at no time prior to the satisfaction of all liabilities with respect to Participants and their beneficiaries under the trust may any part of the Trust Fund be used for, or diverted to, purposes other than for the exclusive benefit of providing benefits to Participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

Section 5.  Return of Contributions

Contributions by the Employer are conditioned on deductibility under Code Section 404(a).  The Employer will have no right, title or interest in the contributions made by it to the Trust Fund, and no part of the Trust Fund will revert to the Employer; provided, however:

(A)    If a contribution made by the Employer is disallowed as a tax deduction, the contribution will be returned to the Employer within 1 year of the date of disallowance.

(B)    If a contribution by the Employer or the Participant in any calendar year is made by mistake of fact, the contribution will be returned to the Employer or the Participant within 1 year of payment of the contribution.

(C)    Contributions are also conditioned on the initial qualification of this Plan under Code Section 401.  If the Plan receives an adverse determination with respect to its initial qualification on a timely application for determination, those contributions may be returned to the Employer within 1 year after the determination.

- 43 -



ARTICLE XVII
ADMINISTRATION

Section 1   Named Fiduciary and Administration

(A) The Employer's Board of Directors is the Named Fiduciary for the Plan, except as set forth under Section 8 of this Article XVII. The Board of Directors may delegate authority to carry out such of its responsibilities as it deems proper to the extent permitted by ERISA.

(B) Except as set forth in Section 8 of this Article XVII, General Motors Investment Management Corporation ("GMIMCo") is the Named Fiduciary of this Plan for purposes of investment of Plan assets. GMIMCo may delegate authority to carry out such of its responsibilities, as it deems proper, to the extent permitted by ERISA.

(C) The Employer is the Plan Administrator for purposes of ERISA, responsible for general administration of the Plan. The Employer has discretionary authority to construe, interpret, apply, and administer the Plan. The Employer may delegate various aspects of its responsibilities as Plan Administrator as it deems appropriate.

(D) Various aspects of Plan administration have been delegated to the Recordkeeper. In carrying out its delegated responsibilities, the Recordkeeper will have discretionary authority to construe, interpret, apply, and administer the Plan. The discretionary authority delegated to the Recordkeeper will, however, be limited to Plan terms relevant to its delegated responsibilities and will not permit the Recordkeeper to render a determination or make any representation concerning benefits which are not provided by the express terms of the Plan. The Recordkeeper's actions will be given full force and effect unless determined by the Employer to be contrary to Plan provisions or arbitrary and capricious.

(E) The Committee has final discretionary authority to construe, interpret, apply, and administer the Plan and serves as the final step of the Plan's appeal procedure. Any interpretation or determination regarding the Plan made by the Committee will be given full force and effect, unless it is proven that the interpretation or determination was arbitrary and capricious.

Section 2       Submission of Requests

Unless a provision expressly states otherwise, if an Employee, Participant, or Beneficiary makes a request, a written statement must be filed with Recordkeeper. As used in this Section, a request includes any agreement, election, designation, notification, or any other official action taken by an Employee, Participant, or Beneficiary under this Plan.

The Recordkeeper may require that the request be made (i) through a voice response touch-tone telephone system, an Internet web site, or other interactive communication system, (ii) on a form prepared by the Recordkeeper, or (iii) by either of the preceding methods.

The Recordkeeper may specify (and modify) the deadlines for submitting various types of requests, provided that the administrative deadlines are uniformly enforced. The Recordkeeper may refuse to accept Participants' loan requests, withdrawal requests, elections to change the percentage of Elective Deferrals, investment elections, or requests to reallocate existing Account balances during any period in which it is not administratively feasible to complete those transactions due to administrative changes in the Plan's procedures provided that this refusal is uniformly enforced.



- 44 -



Section 3.  Limitation of Liability

The Employer, the Committee, the Board of Directors, any Named Fiduciary, and any of their delegates will be entitled to rely upon all tables, certificates, and reports furnished by any Recordkeeper, actuary, accountant, servicing organization, or the Trustee and upon the opinions given by any legal counsel, in each case duly selected by the Employer.

Each fiduciary will assume no obligation or responsibility with respect to any act or action required under the provisions of the Plan or Trust Agreement on the part of any other fiduciary unless the fiduciary knowingly participates in or undertakes to conceal a breach of duty committed by any other fiduciary.  If any fiduciary has knowledge of any breach of duty by another fiduciary, the fiduciary must take reasonable steps under the circumstances then prevailing to remedy the breach.

Section 4.  Claims Procedure

(A)    In the case of a claim under the Plan, the Employer will provide a written determination granting or denying the claim to the person making the claim ("Claimant") within 90 days of the date on which the claim is filed.  If special circumstances (including, but not limited to, the advisability of a hearing) require a longer period, the Claimant will be notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time; provided, however, that no extensions will be permitted beyond 90 days after expiration of the initial 90-day period. Any denial or partial denial of a claim will be dated and signed by the Employer and will clearly set forth:

      (i)       the specific reason or reasons for the denial;

            (ii)       specific reference to pertinent Plan provisions on which the denial is based;

      (iii)      a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary; and

      (iv)      an explanation of the review procedure set forth below.

If no written determination is furnished to the Claimant, then the claim will be deemed denied and the review procedure described below will become available to the Claimant.

(B)    A Claimant may obtain review of an adverse benefit determination by filing a written notice of appeal with the Committee within sixty (60) days after the determination date or, if later, within sixty (60) days after the receipt of a written notice denying the claim.  The Committee has been delegated final discretionary authority to construe, interpret, apply, and administer the Plan, including the authority to consider and decide all questions (of fact or otherwise) in connection with claims arising under the Plan.  The Benefits Committee will conduct a full and fair review, which will provide for the Claimant's right:

      (i)       to be represented by an individual whom the Employer determines has been properly authorized to act on Claimant's behalf;

      (ii)      to present written comments, documents, records, and any other information relating to the Claimant's claim for benefits under the Plan;

      (iii)     to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

      (iv)      to have all comments, documents, records, and other information submitted by the Claimant relating to the claim reviewed.



- 45 -



The Committee's decision will be rendered no more than sixty (60) days after the request for review, except that such period may be extended for an additional sixty (60) days if the Committee determines that special circumstances (including, but not limited to, the advisability of a hearing) require such extension. The Committee or its delegate, will promptly provide a Claimant with a written decision in a manner calculated to be understood by the Claimant setting forth:

      (i)     the findings of fact;

      (ii)    the specific reason or reasons for the denial;

           (iii)    specific reference to pertinent Plan provisions on which the denial is based;

      (iv)    a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

      (v)     a statement of the Claimant's right to bring an action under ERISA.

(C)     A Claimant must follow the claims and appeal procedures described in this Section 4 of Article XVII before taking action in any other forum regarding a claim for benefits under the Plan. Any suit or legal action initiated by a Claimant under the Plan must be brought no later than one year following a final decision on the claim by the Committee. This one-year limitation period on suits for benefits applies in any forum where a Claimant initiates such suit or legal action.

### Section 5. QDRO Procedure

The following procedures apply unless modified by the Employer.

Within 90 days after receiving any domestic relations order purporting to affect a Participant's Accounts in this Plan, the Recordkeeper will determine whether the order is a Qualified Domestic Relations Order and notify the Participant and each Alternate Payee. If the Recordkeeper determines that the order does not constitute a Qualified Domestic Relations Order, then it shall explain why the order fails to be a Qualified Domestic Relations Order.

If the above action is not accomplished within 30 days after receiving any domestic relations order, then the Recordkeeper will first notify the same individuals that it received the order and that it will determine whether the order is a Qualified Domestic Relations Order within 90 days after the order was received.

Each Alternate Payee may designate a representative for receipt of copies of notices sent pursuant to this Section.



As soon as administratively feasible after receiving a domestic relations order, the Recordkeeper may refuse to honor any loan, withdrawal, or distribution requests affecting the Participant's Accounts. This refusal will last until the order is determined to be a Qualified Domestic Relations Order (in which case the Accounts will be subject to the terms of the order) or the Alternate Payee(s) notify the Recordkeeper that the parties no longer intend to submit a Qualified Domestic Relations Order affecting the Participant's Accounts. This provision is intended solely to simplify the Plan's administration, and the Employer does not hereby assume any duty toward the Alternate Payee prior to the date the order is determined to be a Qualified Domestic Relations Order.



Section 6.  Transitional Administration
        Due to the Employer's desire to set up this Plan as soon as possible the following
provisions may apply temporarily (in addition to the last paragraph of Section 2 of this Article)
until it is administratively feasible to enforce the provisions of this Plan outside of this Section.
These temporary provisions may last until the Recordkeeper chosen by the Employer completes
its plan implementation or Eaton Corp. ceases to provide payroll services for the Employer.
(A)    Until the Recordkeeper's implementation is completed, eligible Employees may be
restricted to deferring and contributing the same percentages that they contributed under the
Eaton Corporation Share Purchase and Investment Plan or choosing not to defer and contribute at
all.
(B)    The frequency with which contributions may be changed, suspended, or resumed may not
be allowed until the Recordkeeper's implementation is completed or may be limited based on
what Eaton Corp. generally permits under the Eaton Corporation Share Purchase and Investment
Plan until the payroll can handle these changes.
(C)    Only one Investment Fund will be available for all contributions and assets may not be
transferred or reallocated to other Investment Funds until the Recordkeeper is set up to
administer other funds and accept Participants' investment elections.  Unless the Named
Fiduciary affirmatively decides otherwise, this fund shall be the Promark Income Fund (or if that
fund is not one of the Plan's Investment Funds, a fund with low expected short-term volatility).

Section 7.  Transfer from Eaton Plan
        The Plan is authorized to accept a one-time trust-to-trust transfer of assets from the Eaton
Corporation Stock Purchase and Investment Plan for those who were employed by Eaton Corp.
and became an employee of the Employer due to the acquisition of the Visual Switch /
Electronics Division of Eaton Corp. on March 30, 2001.
        These assets shall be credited to subaccounts under Article X, Section 1 based on records
Eaton Corporation supplies to the Employer.
        Participants have the discretion to determine how their Accounts transferred from the
Eaton Corporation Stock Purchase and Investment Plan will be invested in the Trust Accounts;
provided, however, that Eaton common stock, Axcelis common stock, and Participant loans will
be accepted as transfers in kind.  Account balances transferring from the Eaton Corporation
Stock Purchase and Investment Plan (other than investments in Eaton common stock and Axcelis
common stock) will be invested in the Promark Income Fund and, absent an election by the
Participant, will remain in the Promark Income Fund.  As soon as administratively feasible after
the asset transfer (but subject to Section 6 of this Article XVII), Participants may reallocate these
assets among the Plan's Investment Funds.
        Transferred Participant loans shall be honored in accordance with the terms when the
loans were taken, unless participants waive their rights.  After the transfer, these loans shall count
against any limits in Article XII on the amount or number of additional loans Participants may
receive.
        Notwithstanding any other provisions of this Plan, this Plan shall preserve any benefits
protected by Code Section 411(d)(6) relating to the transferred assets and net investment earnings
on those assets.  If any Participants held assets subject to Article XXIII (regarding Savings Plan
Individual Retirement Accounts) or Article XXV (regarding former participants in the Winterset
and Industrial Data Terminals plans) of the Eaton Corporation Stock Purchase and Investment





Plan, then Participants will continue to have any protected benefits under those provisions apply to those assets even after they are transferred to this Plan, except to the extent that Code Section 411(d)(6) and regulations issued thereunder allow the Employer to eliminate those protected benefits, subject to any conditions in Code Section 411(d)(6) and those regulations.

Section 8. Investment Decisions.

Any Participant or Beneficiary who makes an investment election permitted under the Plan, or otherwise exercises control permitted under the Plan over the Accounts, will be deemed a Named Fiduciary under ERISA responsible for such decisions to the extent that such designation is permissible under applicable law and that the investment election, or other exercise of control, is not protected by Section 404(c) of ERISA, as amended.

Section 9. Service of Legal Process.

Service of legal process on the Employer may be made at any office of the CT Corporation. The CT Corporation, which maintains offices in all 50 states, is the statutory agent for services of legal process on the Employer. The procedure for making such service generally is known to practicing attorneys. Service of legal process may also be made upon Delphi Mechatronic Systems, 3110 Woodcreek Dr, Downers Grove, IL 60515.

## ARTICLE XVIII
## AMENDMENTS

### Section 1.  Right to Amend

The Employer reserves the right to amend, modify, suspend, or terminate the Plan in whole or in part, at any time, by action of its Board of Directors or other individual or entity expressly authorized by the Board to take such action.  No oral statements can change the terms of this Plan.  This Plan can only be amended, in writing, by the Board of Directors or an appropriate individual or entity as designated by the Board of Directors.  Absent an express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provision not provided for under the Program or to change the eligibility criteria or other provisions of the Plan.

### Section 2.  Restrictions on Amendments

Except as may be required by the regulatory provisions of the Code for purpose of meeting the conditions for qualification, no modification or amendment of any of the provisions of the Plan or its operation may be made if, by reason of the modifications or amendment, any Participant would be deprived retroactively of any benefits he would be entitled to under the Plan.



No Participant or other person having an already vested interest in the Trust Fund shall be deprived of the interest unless the action is required to qualify the Trust Fund under the applicable provisions of the Code or of ERISA.  Any amendment to the vesting schedule in Article XIV, Section 4 must not lower any Participant's vesting percentage.  Participants with at least 3 Years of Service must always be credited with the better vesting percentage under the amended schedule or the vesting schedule prior to the amendment or be permitted to elect, within a reasonable period after the adoption of the amendment, to have their nonforfeitable percentages computed under the vesting schedule prior to the amendment.  For the sole purpose of identifying whether a Participant has at least 3 Years of Service in the preceding sentence, the Break in Service rules and any other exceptions in Code Section 411(a)(4) shall be ignored.

No amendment may eliminate an optional form of distribution for money in a Participant's Accounts as of the effective date of the amendment, except as expressly provided by applicable law.

### Section 3.  Merger of Plan

If the Plan is amended to provide a merger or consolidation with, or the transfer of assets or liabilities to, another plan which is qualified under the provisions of Code Section 401, each Participant must be entitled to receive a benefit immediately after the merger, consolidation or transfer which is at least equal to the benefit which the Participant would have been entitled to receive immediately before the merger, consolidation or transfer as if the Plan had been terminated at that time.



ARTICLE XIX
TOP HEAVY PROVISIONS

Section 1. Top-Heavy Determination
        The Plan is top-heavy" for any Plan Year if the Top-Heavy Ratio for the Aggregation
Group exceeds 60%.

Section 2. Minimum Benefit Requirement
        For any Plan Year in which the Plan is top-heavy, each Participant or eligible Employee
who is not a Key Employee and who has not separated from service by the end of the Plan Year
shall accrue a minimum benefit which is the lesser of:  (i) 3% of the person's W-2 Compensation;
or, (ii) the largest percentage of Employer Contributions and Elective Deferrals expressed as a
percentage of W-2 Compensation allocated on behalf of any Key Employee for that Plan Year.
For the purpose of accruing a minimum benefit for an Employee who is not a Key Employee,
Elective Deferrals and Employee After-Tax Contributions are not considered.  If a Participant
who is not a Key Employee is also covered under a defined benefit plan of the Employer which is
also top-heavy, the Participant shall be entitled to, instead of the benefit stated above, the
minimum benefit payable under the defined benefit plan for the Plan Year.

Section 3. Vesting
        Notwithstanding the provisions of Section 4 of Article XIV, during any Plan Year during
which the Plan is top-heavy, the value of a Participant's Employer Contributions Account(s) shall
be vested 100% vested.
        During any succeeding Plan Year during which the Plan is no longer top-heavy, the
vesting percentage shall be the greater of the percentage determined the last Plan Year when the
Plan was top-heavy and the vesting percentage for the current year determined under Section 4 of
Article XIV.  However, each Participant with 3 or more Years of Service during the last Plan
Year when the Plan was top-heavy shall continue to use the greater vesting percentage for the
current year under the vesting schedule provided in this Section or the schedule provided in
Section 4 of Article XIV.





ARTICLE XX
MISCELLANEOUS PROVISIONS

Section 1. Facility of Payment

If any Participant or Beneficiary to whom a benefit is payable is unable to care for the Participant's or Beneficiary's affairs because of illness, either mental or physical, or accident, any payment due (unless prior claim shall have been made by a duly qualified guardian or other legal representative) may be paid to an individual with power of attorney deemed by the Employer to have incurred expenses for the Participant or Beneficiary. This payment shall be made from the Accounts of the Participant or Beneficiary and shall be a complete discharge of any liability of the Plan for the Participant or Beneficiary. No heirs or personal representative of a deceased Participant or Beneficiary shall have any claim to a retirement benefit payable to the Participant or Beneficiary, except as is payable under the terms of the Plan.

If a distribution to a Participant or Beneficiary cannot be made because the identity or location of the recipient cannot be determined after reasonable efforts for a year after the distribution event or other most recent transaction occurred, the Employer may direct that the Participant's or Beneficiary's Accounts be forfeited and used in accordance with Article VII, Section 4. If the identity or location is determined subsequently, the Accounts shall be restored (without any investment gains or losses) and the Participant or Beneficiary shall receive a distribution in cash as soon as administratively feasible.

Section 2. Nonalienation of Benefits



The Trust Fund shall not in any manner be liable or subject to the debts or liabilities of any Participant or Beneficiary. No right or benefit under the Plan shall be subject at any time or in any manner to alienation, sale, transfer, assignment, pledge or encumbrance of any kind, except with respect to a Qualified Domestic Relations Order and other exceptions under Code Section 401(a)(13).

Section 3. Right of Employer

The right of the Employer to employ, discipline, or discharge Employees shall not be affected by reason of any of the provisions of the Plan.

Section 4. Leased Employees

Notwithstanding any other provisions of the Plan, for purposes of determining the number or identity of Highly Compensated Employees or for purposes of the pension requirements of Code Section 414(n)(3), the employees of the Employer shall include Leased Employees included in the definition of "Employees" in Article I.

Leased Employees shall not be treated as Employees if Leased Employees constitute less than twenty percent (20%) of the Affiliated Employers' nonhighly compensated work force within the meaning of Code Section 414(n)(5)(C)(ii) and the Leased Employees are covered by a money purchase pension plan providing (a) a nonintegrated employer contribution rate of at least 10 percent of compensation (as defined in Code Section 415(c)(3) but including amounts contributed pursuant to a salary reduction agreement which are excludable from the employee's

- 51 -

gross income under Code Sections 125, 402(e)(3), 402(h), or 403(b)) (b) immediate participation, and (c) full and immediate vesting.

Leased Employees also shall not be treated as Employees (except for the purposes mentioned in the first paragraph) and shall not be Employees eligible to participate in the Plan, except that if the Plan would be disqualified under Code Section 410(b) by the enforcement of this paragraph for any Plan Year, Leased Employees shall be considered Employees eligible to participate in the Plan.

## Section 5. Drafting Errors.

If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent, or as determined solely by the Employer, the provision will be considered ambiguous and will be interpreted by the Employer in a fashion consistent with its intent, as determined solely by the Employer. The Employer may amend the Plan retroactively to cure any such ambiguity.

## Section 6. Usage of Terms and Headings.

Words in the masculine gender include the feminine, and vice versa, unless qualified by the context. Words used in the singular include the plural, and vice versa, unless qualified by the context. Any headings are included for ease of reference only, and are not to be construed to alter the terms of the Plan.



ARTICLE XXI
TERMINATION OF PLAN

     If the Board of Directors of the Employer should abandon the Plan, or if contributions to the Trust Fund should be permanently discontinued, or if the Employer should liquidate and dissolve, or if a receiver for the Employer is appointed, or if the Board of Directors should terminate or partially terminate the Plan, the Accounts of all current and former Participants affected by the termination or partial termination as then appearing upon the records of the Recordkeeper will become 100% vested in each Participant and the amounts carried in said Accounts shall be revalued and adjusted as previously provided.  The cash and other specific property and unallocated Forfeitures, if any, shall be allocated in the manner provided in Article X.  Unless an Affiliated Employer establishes or maintains a "successor plan" (as that term is used in Treas. Reg. 1.401(k)-1(d)(3)), the Accounts shall be distributed, assigned, and paid over without unreasonable delay in kind or in cash to the Participants.

     Before making any payments, distribution, or assignments, the Trustee and legal counsel, if any, shall be entitled first to payment by the Employer of expenses and charges of the Trustee and its counsel incident to the operation and termination of the Trust Fund.  In case the Employer does not pay the expenses and charges, the Trustee shall have a lien on the property remaining in its hands, the assets distributable to Participants being liable for a pro-rata share of the expenses and charges until the Trustee and its counsel have been paid.





401-K

ARTICLE XXII
GOVERNING LAW AND ADOPTION

    The Plan and all rights under it will be governed, construed, and administered in accordance with ERISA and the laws of the State of Michigan.

    The Employer hereby adopts the Delphi Mechatronic Systems Savings-Stock Purchase Program.

    IN WITNESS WHEREOF, this Plan has been executed at Downers Grove, Illinois this 15th day of June, 2001.

<div style="text-align:center">Delphi Mechatronic Systems, Inc.</div>

By: _____
      Lothar Veeser
      President


WITNESS:

_____
Terrence Boudreau

- 54 -

DELPHI MECHATRONIC SYSTEMS
SAVINGS-STOCK PURCHASE PROGRAM

FIRST AMENDMENT

WHEREAS, Delphi Mechatronic Systems, Inc. (the Employer) adopted the Delphi Mechatronic Systems Savings-Stock Purchase Program (the Plan) effective June 1, 2001;

WHEREAS, the Employer wishes to make various changes to the Plan effective as if included in the original plan document unless expressly indicated otherwise;

WHEREAS, the Employer also wishes to make good faith amendments to the Plan to comply with the Economic Growth and Tax Relief Reconciliation Act of 2001, with the understanding that those provisions may be retroactively amended as permitted by law to comply with regulatory guidance;

WHEREAS, Article XVII, Section 1 permits the Employer to amend the Plan by action of its Board of Directors or other individual or entity expressly authorized by the Board to take such action; and

WHEREAS the individual signing this amendment either represents that he or she is authorized by the Board to take such action and/or has attached the appropriate Board resolution to this amendment;

NOW, THEREFORE, the Plan is amended as follows:

1.  The following is inserted in Article I after Definition 9 with the remaining definitions renumbered as needed:

"10.    "CATCH-UP CONTRIBUTIONS" means Elective Deferrals in excess of the legal limits, plan limits, and ADP test limit that would otherwise apply.  All Catch-Up Contributions for a Participant are subject to the dollar limit in Article VI, Section 1(B).
Notwithstanding any other Plan provision to the contrary, a Participant's Catch-Up Contributions shall be ignored when computing the ADP Test or the ACP Test.  In addition, Catch-Up Contributions are ignored when determining whether the Plan is Top-Heavy under Article XIX but only with respect to the Plan Year in which Catch-Up Contributions are made."

2.  The "Compensation" definition in Article I is deleted and replaced with the following:

"13.    "COMPENSATION" means, except for those portions of the Plan where a different definition expressly applies, regular base salary during periods for which an Employee is eligible to participate and includes compensation not otherwise includible in the Employee's regular base salary by reason of any reductions for contributions of voluntary salary reductions to a qualified cash or deferred arrangement of the Employer, to a cafeteria plan of the Employer maintained pursuant to Code Section 125, or deferrals under Code Section 132(f)(4).  Compensation does not include commissions, drawing accounts, bonuses, overtime

and night shift payments, seven-day operation premiums, or any other special payments, fees, awards, and allowances.

For Employees compensated wholly or in part on a commission basis, base salary also includes an annual earnings base determined under rules established by Delphi Mechatronic Systems, Inc.  For Employees on an Employer-approved disability leave of absence, base salary includes eligible salary continuation payments.

This Plan shall not take into consideration a Participant's Compensation to the extent it exceeds the Compensation Limit."

3.   The following is inserted in Article I after Definition 13 with the remaining definitions renumbered as needed:

"14.   "COMPENSATION LIMIT" effective for Plan Years beginning after December 31, 2001, means $200,000 As Adjusted, and for Plan Years beginning after December 31, 1993 but on or before December 31, 2001, $150,000 As Adjusted."

4.   The following is inserted in Article I after Definition 18 with the remaining definitions renumbered as needed:

"19.   "ELIGIBLE RETIREMENT PLAN" means an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 403(a), an annuity plan described in Code Section 403(a), or a qualified trust described in Code Section 401(a) if it is a defined contribution plan.  For distributions after December 31, 2001, it also includes an eligible deferred compensation plan described in Code Section 457(b) which is maintained by an eligible employer described in Code Section 457(e)(1)(A) and an annuity contract described in Code Section 403(b).  Effective January 1, 2006, if any portion of an Eligible Rollover Distribution is attributable to distributions from a designated Roth account (as defined in Code Section 402A), an Eligible Retirement Plan with respect to such portion will include only another designated Roth account and a Roth IRA.

20.   "ELIGIBLE ROLLOVER DISTRIBUTION" means any distribution except any of the following:

(i)   Any distribution that is one of a series of substantially equal periodic payments made not less frequently than annually over the Participant's life or life expectancy or the Participant's and Beneficiary's joint lives or life expectancies or a specified period ten years or more;

(ii)   A distribution required by Code Section 401(a)(9) (regarding minimum required distributions to participants age 70-1/2 or older);

(iii)   Effective as of a date selected by the Trustee, no later than January 1, 1999 but no earlier than January 1, 1998, distributions of Elective Deferrals on account of hardship; and effective January 1, 2002, any distributions permitted under the Plan on account of hardship;

(iv)   Effective on or before December 31, 2001, the portion of a distribution that is not includible in the recipient's gross income; and effective after December 31, 2001, the portion of a distribution that is not includible in the recipient's gross income if that portion is transferred to an annuity plan described in Code Section 403(a) or a qualified trust described in Code Section 401(a) and that plan or trust does not agree to account separately for the amount transferred to it including separately accounting for the after-tax portion from the pre-tax portion;

c:\terry\hr\hr dms\benefits\401k\dms-401kamend1-dr3.doc

     (v)      Corrective refunds of Elective Deferrals in excess of the Code Section 415(c) limits, Excess Deferrals, Excess Contributions, or Excess Aggregate Contributions;

     (vi)     Loans that are treated as taxable distributions pursuant to Code Section 72(p);

     (vii)    Dividends paid on employer securities as described in Code Section 404(k);

     (viii)   P.S. 58 costs of any life insurance held by the Plan; and

     (ix)     Any similar items designated in IRS revenue rulings, notices or other guidance.

Effective after December 31, 2001, any distribution attributable to an employee but paid to an employee's spouse after the employee's death will be an Eligible Rollover Distribution if it otherwise would have been an Eligible Rollover Distribution had it been paid to the employee. On or after December 31, 2002, such a distribution was an Eligible Rollover Distribution only if rolled over to an IRA.

This definition is not intended to enlarge the forms of benefit payment that are available from this Plan."

5. The "Key Employee" definition in Article I is deleted and replaced with the following:

"37.   "KEY EMPLOYEE" means any employee or former employee of an Affiliated Employer (and the beneficiary of any deceased employee) who at any time during the Plan Year (or for Plan Years beginning on or before December 31, 2001, the preceding 4 Plan Years) (construed to be the determination period) was: (i) an officer of an Affiliated Employer who had annual Compensation for a Plan Year beginning after December 31, 2001, greater than $130,000 As Adjusted or for a Plan Year beginning on or before December 31, 2001, greater than 50% of the maximum dollar limitation under Code Section 415(b)(1)(A) as in effect for the calendar year in which the Determination Date falls; (ii) for Plan Years beginning on or before December 31, 2001, an owner (or considered an owner under Code Section 318) of one of the ten largest interests in an Affiliated Employer if the employee's annual compensation equals or exceeds the maximum dollar limitation under Code Section 415(c)(1)(A) as in effect for the calendar year in which the Determination Date falls); (iii) a 5% owner of an Affiliated Employer, or (iv) a 1% owner of an Affiliated Employer who has a W-2 Compensation from an Affiliated Employer of more than $150,000. Any questions regarding the determination of who is a Key Employee will be made in accordance with Code Section 416(i)(1) and the regulations thereunder."

6. The following is inserted in Article I after Definition 49 with the remaining definitions renumbered as needed:

"50.   "REQUIRED RETENTION PERIOD" means the period from when a contribution is received through December 31 of that same calendar year."

7. The "Top Heavy Ratio" definition in Article I is deleted and replaced with the following:

"51.   "TOP-HEAVY RATIO" for the Aggregation Group shall mean a fraction, the numerator of which is the sum of the present values of the accrued benefits under the defined benefit plan(s) maintained by an Affiliated Employer and the sum of the Account balances under the defined contribution plan(s) maintained by an Affiliated Employer for all Key Employees as of the Determination Date (including any part of any accrued benefits or Account balances distributed in the 5 year period ending on the Determination Date), and the denominator of which is the sum of all accrued benefits or Account balances (including any

part of any accrued benefit or Account balance distributed in the 5 year period ending on the Determination Date) of all employees as of the Determination Date. The accrued benefit or Account balance of any employee who has not performed any Hours of Service with an Affiliated Employer at any time during the 5 year period ending on the Determination Date shall not be taken into account in the determination of the fraction. For Plan Years beginning after December 31, 2001, the other portions of this definition shall be applied substituting "1 year period" for "5 year period" only for distributions made because of separation from service, death, or disability."

8. Article V, Section 2 is deleted and replaced with the following:

"Section 2.  Amount of Elective Deferrals
        Each Participant, by entering into a salary reduction agreement pursuant to Section 1 of this Article, will request that the Participant's Elective Deferral be made to the Trust Fund through payroll deductions. The amount will be in whole percentages of not less than 1%, but not more than 20% of the Participant's Compensation, rounded to the nearest dollar. The Employer retains discretion to change the amount or percentage of Elective Deferrals accepted by the Plan on a non-discriminatory basis.
        The Employer may limit these additional Elective Deferrals as needed to assure compliance with the limits of Article IX and Section 4(A) of Article VI.
        Effective for a Participant's taxable year beginning after December 31, 2001 (or as soon as administratively feasible after that date but no later than October 1, 2002), if a Participant who would have attained age 50 no later than the last day of a Plan Year wishes to defer more than the amount otherwise permitted under this Section for the entire Plan Year, the Participant will be permitted to defer Catch-Up Contributions in accordance with procedures established by the Recordkeeper."

9. Article VI, Section1 is deleted and replaced with the following:

"Section 1.  Maximum Amount of Elective Deferrals
        (A)     General Limit
        No Participant will be permitted to have Elective Deferrals made under this Plan in excess of:
                (i)     For a Participant's taxable year beginning on or before December 31, 2001, $7,000 As Adjusted;
                (ii)    For a Participant's taxable year beginning during 2002, $11,000;
                (iii)   For a Participant's taxable year beginning during 2003, $12,000;
                (iv)    For a Participant's taxable year beginning during 2004, $13,000;
                (v)     For a Participant's taxable year beginning during 2005, $14,000; and
                (vi)    For a Participant's taxable year beginning after December 31, 2005, $15,000 As Adjusted.
        (B)     Higher Limit for Catch-Up Contributions
        Effective for a Participant's taxable year beginning after December 31, 2001 (or as soon as administratively feasible after that date but no later than October 1, 2002), a Participant who would have attained age 50 no later than the last day of a Plan Year may make Catch-Up Contributions no greater than the following amount:
                (i)     For a Participant's taxable year beginning during 2002, $1,000;
                (ii)    For a Participant's taxable year beginning during 2003, $2,000;

(iii)    For a Participant's taxable year beginning during 2004, $3,000;

(iv)    For a Participant's taxable year beginning during 2005, $4,000; and

(v)    For a Participant's taxable year beginning after December 31, 2005, $5,000 As Adjusted."

10. Article VI, Section 3(A)(ii) is deleted and replaced with the following:

"(ii)    <u>Alternative Limitation</u>

The Actual Deferral Percentage for all Eligible Participants who are Highly Compensated Employees for the current Plan Year must not exceed the lesser of (a) the Actual Deferral Percentage for all Eligible Participants who are Nonhighly Compensated Employees multiplied by 2.0; or (b) the Actual Deferral Percentage of the Eligible Participants who are Nonhighly Compensated Employees plus 2.0 percentage points. For Plan Years beginning on or before December 31, 2001, the amounts may be further limited as the Secretary of Treasury shall prescribe in order to prevent the multiple use of this alternative limitation for both the Actual Deferral Percentage Test and the Actual Contribution Percentage Test, as specified in Treas. Reg. 1.401(m)-2(b) and Section 1(C)(v) of Article VIII.

The Employer elects to use the prior Plan Year's Actual Deferral Percentage for all Eligible Participants who are Nonhighly Compensated Employees. Hence, when applying the primary and alternative limitations above, the Employer will use the Actual Deferral Percentage of the Eligible Participants who are Nonhighly Compensated Employees for the prior Plan Year. This election may be changed only as permitted by the Secretary of Treasury."

11. Article VI, Section 3(B)(ii) is deleted and replaced with the following:

"(ii)    <u>Definition of Compensation</u>

Compensation means total compensation paid by the Employer to an Employee during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Form W-2, and may also include compensation not otherwise includible in the Employee's gross income by reason of any reductions for contributions of voluntary salary reductions to a qualified cash or deferred arrangement of the Employer, to a cafeteria plan of the Employer maintained pursuant to Code Section 125 or deferrals under Code Section 132(f)(4). Alternatively, Compensation may mean any other definition of compensation that satisfies Code Section 414(s) and final or proposed regulations issued under that Code section. This Plan will not take into consideration a Participant's Compensation to the extent it exceeds the Compensation Limit.

Instead of using Compensation for the Plan Year to calculate the ratios described in Section 3(B)(i) of this Article, the ratios may be computed for all Eligible Participants using (i) Compensation for that portion of the Plan Year in which each Employee was an Eligible Participant, (ii) Compensation for the calendar year ending within the Plan Year, or (iii) Compensation for that portion of the calendar year ending within the Plan Year in which each Employee was an Eligible Participant."

12. Article VI, Section 4(B) is deleted and replaced with the following:

"(B)    If the Actual Deferral Percentage for Eligible Participants who are Highly Compensated Employees exceeds the limitation as of the close of the applicable Plan Year, the

excess Elective Deferrals or Employer Contributions, if applicable (referred to as Excess Contributions), will be initially determined using the following "leveling" process: Elective Deferrals or Employer Contributions, if applicable, will be subtracted from the Highly Compensated Employee's Accounts with the highest ratio (as calculated under Section 3(B)(i) of this Article) and considered Excess Contributions until this Employee's ratio equals the next highest ratio of a Highly Compensated Employee or until the limitation is no longer exceeded. This process is repeated until the limitation is no longer exceeded.

The amount of the Excess Contributions is determined as if the previous paragraph applied, but the Excess Contributions are actually subtracted using the following "leveling" process: Elective Deferrals or Employer Contributions, if applicable, will be subtracted from the Highly Compensated Employee's Accounts with the greatest amount of Elective Deferrals (and any Employer Contributions used in computing the Actual Deferral Percentage) and considered Excess Contributions until this Employee's Elective Deferrals (and those Employer Contributions) amount equals the next highest Highly Compensated Employee's Elective Deferrals (and those Employer Contributions) amount or until the total amount of Excess Contributions has been subtracted from Employees' Accounts. This process is repeated until the total amount of Excess Contributions has been subtracted from Employees' Accounts.

Effective for a Participant's taxable year beginning after December 31, 2001 (or as soon as administratively feasible after that date but no later than October 1, 2002), for a Participant who would have attained age 50 no later than the last day of a Plan Year, the Participant will be permitted to retain as Catch-Up Contributions the Elective Deferrals that according to the other provisions of this Section would have been subtracted from the Participant's Accounts.

Any remaining Excess Contributions with earnings thereon will be distributed no later than the close of the Plan Year following the Plan Year to which the Excess Contributions relate. The Employer must pay any excise tax required by Code Section 4979 on any Excess Contributions not distributed within 2-1/2 months after the close of the Plan Year to which the Excess Contributions relate."

13. Article VII, Section 2(A) is deleted and replaced with the following:

"(A)    Employer Matching Contribution
The Employer will make a matching contribution to the Trust Fund for each month of an amount equal to 25% of a Participant's Elective Deferrals, excluding Catch-Up Contributions, or Employee After-Tax Contributions. The Employer will not match contributions in excess of 6% of Compensation. (Hence, the maximum matching contribution for any Participant is 1.5% of Compensation.) The 25% figure may be raised or lowered (including lowered to 0%) at any time by the Employer, except that an increase in that figure must be approved in the same manner as an amendment under Article XVIII, Section 1 or by simply amending the Plan."

14. Article VIII, Section 1(A)(ii) is deleted and replaced with the following:

"(ii)    Alternative Limitation
The Actual Contribution Percentage for all Eligible Participants who are Highly Compensated Employees for the current Plan Year does not exceed the lesser of (a) Actual Contribution Percentage for Eligible Participants who are Nonhighly Compensated Employees multiplied by 2.0; or (b) the Actual Contribution Percentage of the Eligible Participants who

are Nonhighly Compensated Employees plus 2.0 percentage points. For Plan Years beginning on or before December 31, 2001, the amounts may be further limited as the Secretary of Treasury prescribed in order to prevent the multiple use of this alternative limitation for both the Actual Deferral Percentage Test and the Actual Contribution Percentage Test, as specified in Treas. Reg. 1.401(m)-2(b) and Section 1(C)(v) of this Article.

      The Employer elects to use the prior Plan Year's Actual Contribution Percentage for all Eligible Participants who are Nonhighly Compensated Employees. Hence, when applying the primary and alternative limitations above, the Employer will use the Actual Contribution Percentage of the Eligible Participants who are Nonhighly Compensated Employees for the prior Plan Year. This election may be changed only as permitted by the Secretary of Treasury."

15. Article VIII, Section 1(C)(v) is deleted and replaced with the following:

      "(v)    If for Plan Years beginning on or before December 31, 2001, the Actual Deferral Percentage or the Actual Contribution Percentage for all Eligible Participants who are Highly Compensated Employees must be reduced to prevent multiple use of the alternative limitation, then the Actual Contribution Percentage will be reduced. This percentage will be reduced in accordance with this Plan's other provisions without considering whether an Employee was eligible to make or receive contributions subject to both the Actual Deferral Percentage Test and the Actual Contribution Percentage Test."

16. Article IX, Section 1(A)(i)(a) and (b) are deleted (but retaining the flush language following (b)) and replaced with the following:

      "(a)    For Limitation Years beginning after December 31, 2001, $40,000 As Adjusted, or for Limitation Years beginning on or before December 31, 2001, $30,000 As Adjusted; or,
      (b)    For Limitation Years beginning after December 31, 2001, 100% of the Participant's Compensation for the Limitation Year, or for Limitation Years beginning on or before December 31, 2001, 25% of the Participant's Compensation for the Limitation Year."

17. The following is added at the end of Article IX, Section 1(A):

      "(iv)    Effective for a Participant's taxable year beginning after December 31, 2001 (or as soon as administratively feasible after that date but no later than October 1, 2002), if a Participant who would have attained age 50 no later than the last day of a Plan Year wishes to defer more than the amount otherwise permitted under this Section for the entire Plan Year, the Participant will be permitted to defer Catch-Up Contributions, in accordance with procedures established by the Recordkeeper."

18. Article X, Section 1(A) is deleted and replaced with the following:

"(A)    A separate Participant's Elective Deferral Account credited with Elective Deferrals and net earnings, with, if necessary, a separate subaccount for Catch-Up Contributions;"

19. Article X, Section 2 is deleted and replaced with the following:

**"Section 2.  Rollover Contributions Account**
        With the permission of the Employer, the Trustee may accept amounts considered to be Eligible Rollover Distributions from another plan or trust qualified under Code Sections 401(a) and 501(a) on behalf of an Employee or Participant.  Effective on and before December 31, 2001, the amounts may be accepted through a rollover Individual Retirement Account known as a conduit IRA, a qualified distribution made directly to a Participant, or a direct rollover transferred from another plan's trustee pursuant to Code Section 401(a)(31).  Effective after December 31, 2001, the amounts may be accepted from any plan considered to be an Eligible Retirement Plan except that after-tax contributions may be rolled over only if they are from a qualified plan under Code Section 401(a) and transferred to this Plan in the form of a direct rollover.  Any amounts to be transferred must be acceptable to the Trustee, and will not, in the opinion of the Employer, endanger the tax qualification of the Plan or Trust Fund.  The amounts may be commingled with other assets of the Trust Fund.
        If the Employer reasonably concluded that an amount could be accepted as a rollover contribution without endangering the qualification of the Plan or Trust Fund but later determines that the amount was not an Eligible Rollover Distribution, the improper amount must be distributed as soon as administratively feasible."

20. Article X, Section 1(F) is deleted (but the paragraphs following subsection (F) that are part of Section 1 are retained) and replaced with the following:

"(F)    A separate Participant's Employee After-Tax Contributions Account credited with Employee After-Tax Contributions and net earnings.  The Employee After-Tax Contributions Account will be treated as a separate Code Section 72(e)(9) contract, and any distributions (or portions of distributions) of Employee After-Tax Contributions or net earnings on those contributions will be treated as distributed from this contract."

21. Article XI, Section 1 is deleted and replaced with the following:

**"Section 1.  Initial Elections**
        Half of the first 6% of Compensation contributed as Elective Deferrals and/or Employee After-Tax Contributions and all Employer Contributions must be invested in the Delphi Common Stock Fund and, along with net earnings on those amounts, must remain invested in that fund until the later of the end of the Required Retention Period or the Participant chooses new investments under Section 3 of this Article.
        As authorized in Article XVI, each Participant will designate one or more of the Investment Funds into which Elective Deferrals and/or Employee After-Tax Contributions not covered by the preceding paragraph are invested.  The investment election will be made in multiples of 10%.
        For the purpose of this investment restriction, Elective Deferrals elected under the second paragraph of Article V, Section 2 are not considered to be part of the first 6% of Compensation contributed.
        If a Participant has no investment election in effect, any contributions initially will be invested in the Promark Income Fund (or if that fund is not one of the Plan's Investment Funds, a fund with low expected short-term volatility)."

22. Article XII, Section 1(B)(i) is deleted and replaced with the following:

NaN

"(i)    1/2 of the Participant's vested Account balances (except Employer contributions and investment gains or losses on those contributions during the Required Retention Period) determined as of the most recently completed valuation minus the outstanding balance of all other loans; or"

23. Article XIII, Section 1 is deleted and replaced with the following:

"<u>Section 1.  Withdrawals of Employee After-Tax and Rollover Contributions</u>
      A Participant who is an Employee may request upon notifying the Recordkeeper the cash withdrawal of all or any portion of the Participant's net Employee After-Tax Contributions Account and rollover contribution Account (except for contributions still subject to the Required Retention Period and investment gains or losses on those contributions) to be determined as of the most recent Valuation Date preceding the date of withdrawal."

24. Article XIII, Section 2 is deleted and replaced with the following:

"<u>Section 2.      Withdrawals of Employer Matching Contributions</u>
      A Participant who is an Employee may request upon notifying the Recordkeeper a cash withdrawal of all or any of the vested portion of the Participant's net Employer Matching Contributions Account except for contributions still subject to the Required Retention Period and investment gains or losses on those contributions.  Furthermore, a Participant under age 65 with less than 5 Years of Service may not withdraw Employer Matching Contributions and investment earnings on those contributions if the contributions were made by the Employer to the Trust within the 24 months preceding the month of withdrawal.
      The amount requested for withdrawal will be obtained (1) from the Investment Funds in which the Participant has assets, as the Participant may elect, or (2) if the Participant has not elected, pro rata from each Investment Fund in the Participant's Account paying first assets available under Section 1 of this Article."

25. Article XIII, Section 4 is deleted and replaced with the following:

"<u>Section 4.  Other Withdrawals</u>
      Effective on or before December 31, 2001, all of a Participant's Accounts may be distributed (i) on the disposition of substantially all of the assets of the Employer if the Employer maintains an ownership interest, if any, in the transferor corporation of less than 15%, the transferor corporation continues to maintain the Plan and the Participant continues employment with the corporation acquiring the assets, or (ii) on the disposition of a subsidiary of the Employer if the transferor corporation continues to maintain the Plan and the Participant continues employment with the subsidiary.  Any distributions under this section must be made by the end of the second calendar year after the calendar year in which the sale or disposition occurred."

26. Article XIII, Section 5 is deleted and replaced with the following:

"<u>Section 5.  Post Age 59-1/2 Withdrawal</u>
      A Participant who is an Employee and who has attained the age of 59-1/2 may request upon notifying the Recordkeeper a cash withdrawal of all or any portion of the Participant's

Elective Deferral Account except that contributions still subject to the Required Retention Period and investment gains or losses on those contributions may not be withdrawn.

The amount requested for withdrawal will be obtained (1) from the Investment Funds in which the Participant has assets, as the Participant may elect, or (2) if the Participant has not elected, pro rata from each Investment Fund in the Participant's Account paying first assets available under Section 1 of this Article."

27. Article XIII, Section 6 is deleted and replaced with the following:

"Section 6.  General Rules for Withdrawals
No withdrawals may be made for less than $300, or any other *de minimis* amount as determined by the Recordkeeper.

Withdrawals are subject to the provisions of Section 6 of Article XIV.  Withdrawals are also subject to the provisions of Section 1 of Article XIV."

28. Article XIV, Section 4(B) is deleted and replaced with the following:

"(B)    After Termination of Employment
A Participant will be 100% vested in the value of the Participant's (i) Employee After-Tax Contributions Account (if any), (ii) Elective Deferral Account, (iii) Qualified Nonelective Contributions Account (if any), (iv) Qualified Matching Contributions Account (if any), and (v) Rollover Contributions Account (if any).  The value of a Participant's other Employer Contribution Account(s) will be vested according to the following schedules.
For Participants whose last Hour of Service was on or before December 31, 2001:

| Number of Years of Service | Vesting Percentage |
| --- | --- |
| Less than 5 | 0% (except as modified below) |
| 5 or More | 100% |

For Participants whose last Hour of Service was after December 31, 2001:

| Number of Years of Service | Vesting Percentage |
| --- | --- |
| Less than 3 | 0% (except as modified below) |
| 3 or More | 100% |

Also, if a Participant is actively employed by the Employer on the last day of the Plan Year, the Participant's Employer Matching Contributions made during that Plan Year and net earnings on them will become fully vested.  In other words, once the Required Retention Period for Employer Matching Contributions has ended, those contributions and investment gains or losses on them become fully vested without regard to the preceding vesting schedule.

Amounts transferred from the Eaton Corporation Share Purchase and Investment Plan and net earnings on those amounts will be fully vested, regardless of the number of Years of Service that a Participant has."

29. Article XIV, Section 4(E) is deleted and replaced with the following:

"(E)    Cash-Out
If a Participant's vested Account balances upon termination of employment for any reason other than retirement, death, or termination of the Plan is not more $5,000, the Recordkeeper must direct the Trustee to distribute the vested Accounts in accordance with Subsection (C) of this Section. If the balance is zero, the distribution of the vested Accounts is deemed to occur.  The Participant's consent or election is not required for this "cash-out"

distribution except that the opportunity to make a direct rollover election as provided in Section 6 of this Article is required.

For the purpose of this Subsection (E) only, the Participant's vested Account balances will be considered as exceeding $5,000 if it exceeded $5,000 at the time of any prior distribution.

30. The following is added at the end of Article XIV, Section 4:

"(G)    Termination of Employment
        The phrase "termination of employment" as used in this Article will be interpreted to refer to a "separation from service" for distributions on or before December 31, 2001 and a "severance from employment" for distributions after December 31, 2001 as those phrases are used in Code Section 401(k)(2)(B)(i)(I). Related phrases, for example "terminated Participant" and "terminates employment," will be similar interpreted."

31. Article XIV, Section 6 is deleted and replaced with the following:

"Section 6.  Direct Rollovers of Distributions
        Prior to making any Eligible Rollover Distribution from this Plan, the Recordkeeper will provide notice to the individual about to receive the distribution of the right to elect a direct rollover and certain other tax information.  The content and timing of this notice shall comply with Code Section 402(f) and regulations.  The Recordkeeper may also provide a form or other mechanism for the individual to elect whether to have all or part of the distribution paid directly to an eligible retirement plan and to specify the plan to which the distribution is to be paid.  If the individual so elects, the Recordkeeper will cause the distribution (or the portion designated by the individual) to be made in the form of a direct rollover transferred to the trustee (or IRA custodian or annuity contract issuer) of the specified Eligible Retirement Plan.
        The Recordkeeper may determine rules for processing direct rollovers as long as they comply with Code Section 401(a)(31) and regulations and they are applied on a consistent basis.."

32. Article XVI, Section 2(A) is deleted and replaced with the following:

"Section 2.  Investment Funds
(A)    Multiple Investment Funds
        The Employer at its discretion may instruct the Trustee to establish one or more Investment Funds, or prospectively modify the permissible investments or investment objectives of existing Investment Funds.  The Investment Funds may include investment funds maintained by the Trustee.  The Committee may direct the Trustee to discontinue an Investment Fund or to continue an Investment Fund but cease accepting any additional contributions to the fund.
        The Investment Funds will be:
                (1) Delphi Common Stock Fund
                (2) Promark Funds as listed below:
                        Balanced Fund
                        Emerging Markets Equity Fund
                        High Quality Bond Fund

High Yield Bond Fund
Income Fund
International Equity Fund
Large Cap Blend Fund
Large Cap Growth Fund
Large Cap Index Fund
Large Cap Value Fund
Mid-Cap Blend Fund
Real Estate Securities Fund
Small Cap Growth Fund
Small Cap Value Fund
Social Equity Fund
Target Portfolio: Conservative
Target Portfolio: Dynamic Growth
Target Portfolio: Income
Target Portfolio: Moderate

(3) Mutual Funds as listed below:

FIDELITY MUTUAL FUNDS UNLESS OTHERWISE
INDICATED
Aggressive Growth Fund
Asset Manager
Asset Manager: Income
Asset Manager: Growth
Balanced Fund
Blue Chip Growth Fund
Canada Fund
Capital Appreciation Fund
Capital & Income Fund
Contrafund
Convertible Securities Fund
Disciplined Equity Fund
Dividend Growth Fund
Diversified International
Domini Social Equity Fund
Emerging Markets Fund
Europe Fund
Equity-Income Fund
Equity-Income II Fund
Export and Multinational Fund
Fifty Fund
Fidelity Fund
Freedom Income Fund
Freedom 2000 Fund
Freedom 2010 Fund
Freedom 2020 Fund
Freedom 2030 Fund
Freedom 2040 Fund
Global Balanced Fund

Growth & Income Portfolio
Growth Company Fund
Independence Fund
International Bond Fund
International Growth & Income Fund
Low-Priced Stock Fund
Magellan Fund
Mid-Cap Stock Fund
Neuberger Berman Socially Responsive Fund Trust Class
New Markets Income Fund
OTC Portfolio
Overseas Fund
Pacific Basin Fund
Puritan Fund
Real Estate Investment Portfolio
Small Cap Independence Fund
Spartan Government Income Fund
Spartan Investment Grade Bond Fund
Stock Selector Fund
Trend Fund
Utilities Fund
Value Fund
Worldwide Fund

(4) Eaton Common Stock Fund and Axcelis Common Stock, subject to the following restrictions.

Unless the Named Fiduciary affirmatively decides otherwise, assets may not be contributed or transferred to the Eaton Common Stock Fund and the Axcelis Common Stock Fund, except pursuant to Article XVII, Section 7. Also unless the Named Fiduciary affirmatively decides otherwise, the Eaton and Axcelis Common Stock Funds will be discontinued as of April 1, 2003 and any assets remaining in them will be transferred to the Promark Income Fund (or if that fund is not one of the Plan's Investment Funds, a fund with low expected short-term volatility).

Shares of Eaton common stock and Axcelis common stock acquired by the Trustee under the terms of this Plan will be registered in the name of the Trustee or its nominee who will, to the extent it is permissible under applicable law, vote or tender the shares representing the equivalent market value credited any of the Investment Funds that primarily invest in those stocks in a Participant's Accounts as instructed by the Participant (or Beneficiary). Shares that are held in the Eaton and Axcelis Common Stock Funds for which no Participant (or beneficiary) instructions are received will be voted, to the extent it is permissible under applicable law, by the Trustee in the same ratio as the shares with respect to which instructions are received from the Participants (or beneficiaries).

Any cash dividends received by the Trustee on Eaton and Axcelis common stock will be invested in the Promark Income Fund."

33. Article XVI, Section 2(B) is deleted and replaced with the following:

c:\terry\hr\hr dms\benefits\401k\dms-401kamend1-dr3.doc

"(B)    Delphi Common Stock Fund
            The Investment Funds will include a fund designed to be principally invested in common stock, $0.01 par value, issued by Delphi Automotive Systems Corporation.  A portion of this Investment Fund, called the Delphi Common Stock Fund, may be invested in short-term fixed income investments and money market investments.  The Trustee or designee is authorized to acquire, hold, and dispose of employer stock.  As provided for in ERISA Section 404(a)(2), the fiduciary duty of diversifying plan investments is not violated by the establishment and maintenance of an Employer stock fund.
            Contributions to the Delphi Common Stock Fund may be paid in shares of Delphi common stock.  Contributions to other Investment Funds must be paid in cash.
            Shares of Delphi common stock, $0.01 par value, acquired by the Trustee under the terms of this Plan will be registered in the name of the Trustee or its nominee who shall, to the extent it is permissible under applicable law, vote or tender the shares representing the equivalent market value credited any of the Investment Funds that primarily invest in those stocks in a Participant's Accounts as instructed by the Participant (or Beneficiary).  Shares that are held in the Delphi Common Stock Fund for which no Participant (or beneficiary) instructions are received will be voted, to the extent it is permissible under applicable law, by the Trustee in the same ratio as the shares with respect to which instructions are received from the Participants (or beneficiaries).
            Notwithstanding any other provisions of the Plan, the Employer may restrict the frequency or timing of transactions involving Delphi common stock made by Participants that the Employer believes are subject to Section 16(b) of the Securities Exchange Act of 1934 as amended as the Employer considers necessary or desirable to comply with that law.  In particular, the Employer may restrict investment transfers or reallocations that involve Delphi common stock to quarterly window periods defined by the Employer and the Employer may prohibit loans or in-service withdrawals to be paid from the portion of affected Participants' Accounts invested in the Delphi Common Stock Fund."

34. Article XIX, Section 1 is deleted and replaced with the following:

"Section 1.  Top-Heavy Determination
            The Plan is top-heavy for any Plan Year if the Top-Heavy Ratio for the Aggregation Group exceeds 60%.  However, effective for Plan Years beginning after December 31, 2001, if the Plan is the only plan in its Aggregation Group and consists solely of a cash or deferred arrangement that meets the safe harbor requirements of Code Section 401(k)(12) and matching contributions that meet the safe harbor requirements of Code Section 401(m)(11), then the Plan is not top-heavy regardless of the Plan's Top-Heavy Ratio."

35. Article XIX, Section 2 is deleted and replaced with the following:

"Section 2.  Minimum Benefit Requirement
            For any Plan Year in which the Plan is top-heavy, each Participant or eligible Employee who is not a Key Employee and who has not separated from service by the end of the Plan Year will accrue a minimum benefit which is the lesser of:  (i) 3% of the person's W-2 Compensation; or, (ii) the largest percentage of Employer Contributions and Elective Deferrals expressed as a percentage of W-2 Compensation allocated on behalf of any Key Employee for that Plan Year.  For the purpose of accruing a minimum benefit for an Employee who is not a Key Employee, Elective Deferrals, Employee After-Tax Contributions, and for

Plan Years beginning on or before December 31, 2001, Employer Matching Contributions are not considered. If a Participant who is not a Key Employee is also covered under a defined benefit plan of the Employer which is also top-heavy, the Participant shall be entitled to, instead of the benefit stated above, the minimum benefit payable under the defined benefit plan for the Plan Year."

IN WITNESS WHEREOF, this first amendment to the Plan has been executed at Downers Grove, Illinois this ___12th___ day of ___February___, 2002.

By: _____
    Terry Boudreau

WITNESS:

_____

DELPHI MECHATRONIC SYSTEMS
SAVINGS-STOCK PURCHASE PROGRAM

SECOND AMENDMENT


WHEREAS, Delphi Mechatronic Systems, Inc. (the Employer) adopted the Delphi Mechatronic Systems Savings-Stock Purchase Program (the Plan) effective June 1, 2001;

WHEREAS, subsequent to the adoption of the Plan, the Employer adopted a First Amendment to comply with the Economic Growth and Tax Relief Reconciliation Act of 2001;

WHEREAS, the Employer wishes to further amend the Plan as provided herein;

WHEREAS, Article XVIII, Section 1 permits the Employer to amend the Plan by action of its Board of Directors or other individual or entity expressly authorized by the Board to take such action; and

WHEREAS the individual signing this amendment either represents that he or she is authorized by the Board to take such action and/or has attached the appropriate Board resolution to this amendment;

NOW, THEREFORE, the Plan is amended as follows:


1.      Article IV, Section 2(B) is amended to read as follows effective as of **April 15, 2002** or as soon thereafter as is administratively feasible:

"(B)    Amount of Employee After-Tax Contributions
        Each Participant, by entering into an agreement pursuant to Section 2 of this Article, may request that the Participant's Employee After-Tax Contributions be made to the Trust Fund through payroll deductions. The amount shall be in whole percentages of not less than 1% but not more than 40% of the Participant's Compensation, rounded to the nearest dollar. The Employer retains discretion to change the amount or percentage of Employee After-Tax Contributions accepted by the Plan on a non-discriminatory basis."


2.      Article V, Section 2 is amended to read as follows effective as of April 15, 2002 or as soon thereafter as is administratively feasible:

"Section 2.   Amount of Elective Deferrals
        Each Participant, by entering into a salary reduction agreement pursuant to Section 1 of this Article, will request that the Participant's Elective Deferral be made to the Trust Fund through payroll deductions. The amount will be in whole percentages of not less than 1%, but not more than 40% of the Participant's Compensation, rounded to the nearest dollar. The Employer retains discretion to change the amount or percentage of Elective Deferrals accepted by the Plan on a non-discriminatory basis.

c:\docume~1\mz6z7v\locals~1\temp\dms-401kamend2.doc            - 1 -

The Employer may limit these additional Elective Deferrals as needed to assure compliance with the limits of Article IX and Section 4(A) of Article VI.

Effective for a Participant's taxable year beginning after December 31, 2001 (or as soon as is administratively feasible after that date but not later than October 1, 2002), if a Participant who would have attained age 50 no later than the last day of a Plan Year wishes to defer more than the amount otherwise permitted under this Section for the entire Plan Year, the Participant will be permitted to defer Catch-Up Contributions in accordance with procedures established by the Recordkeeper."

IN WITNESS WHEREOF, this Second Amendment to the Plan has been executed at Downers Grove, Illinois this ___29___ day of ____April____, 2002.

By: _____

WITNESS:

_____

# Third Amendment to the

## Delphi Mechatronic Systems Savings-Stock Purchase Program

**WHEREAS,** Delphi Mechatronic Systems (the "Employer") established and maintains the Delphi Mechatronic Systems Savings-Stock Purchase Program (the "Plan") pursuant to a Plan document that was originally effective as of June 1, 2001; and

**WHEREAS,** the Employer, by action of its Board of Directors or other individual or entity expressly authorized by the Board to take such action, wishes to amend this Plan to update various provisions thereof, and has reserved such authority pursuant to Article XVIII, Section 1 of the Plan.

**NOW, THEREFORE,** the Plan is amended as of June 1, 2001 as set forth below.

1. The "Compensation" definition in Article I is deleted and replaced with the following:

"13.    "COMPENSATION" means, except for those portions of the Plan where a different definition expressly applies, regular base salary during periods for which an Employee is eligible to participate and includes compensation not otherwise includible in the Employee's regular base salary by reason of any reductions for contributions of voluntary salary reductions to a qualified cash or deferred arrangement of the Employer, to a cafeteria plan of the Employer maintained pursuant to Code Section 125, or deferrals under Code Section 132(f)(4). Compensation does not include commissions, drawing accounts, bonuses, overtime and night shift payments, seven-day operation premiums, or any other special payments, fees, awards, and allowances. For purposes of this definition, contributions under Code Section 125 include any amounts not available to an Employee in cash in lieu of group health coverage because the Employee is unable to certify that he or she has other health coverage. An amount will be treated as an amount under Code Section 125 only if the Employer does not request or collect information regarding the Employee's other health coverage as part of the enrollment process for the health plan.
     For Employees compensated wholly or in part on a commission basis, base salary also includes an annual earnings base determined under rules established by Delphi Mechatronic Systems, Inc. For Employees on an Employer-approved disability leave of absence, base salary includes eligible salary continuation payments.
     This Plan shall not take into consideration a Participant's Compensation to the extent it exceeds the Compensation Limit."

2. Article VI, Section 3(B)(ii) is deleted and replaced with the following:



"(ii)    Definition of Compensation

Compensation means total compensation paid by the Employer to an Employee during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Form W-2, and may also include compensation not otherwise includible in the Employee's gross income by reason of any reductions for contributions of voluntary salary reductions to a qualified cash or deferred arrangement of the Employer, to a cafeteria plan of the Employer maintained pursuant to Code Section 125 or deferrals under Code Section 132(f)(4). For purposes of this definition, contributions under Code Section 125 include any amounts not available to an Employee in cash in lieu of group health coverage because the Employee is unable to certify that he or she has other health coverage. An amount will be treated as an amount under Code Section 125 only if the Employer does not request or collect information regarding the Employee's other health coverage as part of the enrollment process for the health plan. Alternatively, Compensation may mean any other definition of compensation that satisfies Code Section 414(s) and final or proposed regulations issued under that Code section. This Plan will not take into consideration a Participant's Compensation to the extent it exceeds the Compensation Limit.

Instead of using Compensation for the Plan Year to calculate the ratios described in Section 3(B)(i) of this Article, the ratios may be computed for all Eligible Participants using (i) Compensation for that portion of the Plan Year in which each Employee was an Eligible Participant, (ii) Compensation for the calendar year ending within the Plan Year, or (iii) Compensation for that portion of the calendar year ending within the Plan Year in which each Employee was an Eligible Participant."

3.    The flush language at the end of Article IX, Section 1(a)(i) is deleted and replaced with the following:

""Compensation" for this Article only is defined as wages and all other payments of compensation reportable on Form W-2, determined without regard to any rules under Code Section 3401(a) that limit compensation based on the nature or location of the employment or the services performed. Effective for Limitation Years beginning after December 31, 1997, "Compensation" for this Article also includes compensation not otherwise includible in the Employee's gross income by reason of any reductions for contributions in the form of voluntary salary reductions due to a qualified cash or deferred arrangement of the Employer, to a cafeteria plan of the Employer maintained pursuant to Code Section 125 or deferrals under Code Section 132(f)(4). For purposes of this definition, contributions under Code Section 125 include any amounts not available to an Employee in cash in lieu of group health coverage because the Employee is unable to certify that he or she has other health coverage. An amount will be treated as an amount under Code Section 125 only if the Employer does not request or collect information regarding the Employee's other health coverage as part of the enrollment process for the health plan. Alternatively, Compensation may mean any definition of compensation that satisfies Code Section 415(c)(3) and final or proposed regulations issued under that Code section."

IN WITNESS WHEREOF, Delphi Mechatronic Systems has caused this Third Amendment to be adopted and executed by its duly authorized officer this __17__ day of __December__, 2002.

Delphi Mechatronic Systems

By: _~Moudreaw~_

Title: _HR DiRECTOR_

**Fourth Amendment to the**

**Delphi Mechatronic Systems Savings-Stock Purchase Program**

**WHEREAS,** Delphi Mechatronic Systems (the "Employer") established and maintains the Delphi Mechatronic Systems Savings-Stock Purchase Program (the "Plan") pursuant to a Plan document that was originally effective as of June 1, 2001; and

**WHEREAS**, the Employer, by action of its Board of Directors or other individual or entity expressly authorized by the Board to take such action, wishes to amend this Plan to update various provisions thereof, and has reserved such authority pursuant to Article XVIII, Section 1 of the Plan.

**NOW, THEREFORE,** the Plan is amended as of April 1, 2003 as set forth below.

1.  Article VII, Section 2(A) is deleted and replaced with the following:

"(A)    Employer Matching Contribution
        The Employer shall make a matching contribution to the Trust Fund for each month of an amount equal to 30% of a Participant's Elective Deferrals or Employee After-Tax Contributions. The Employer shall not match contributions in excess of 7% of Compensation. (Hence, the maximum matching contribution for any Participant is 2.1% of Compensation.) The 30% figure may be raised or lowered (including lowered to 0%) at any time by the Employer, except that an increase in that figure must be approved in the same manner as an amendment under Article XVIII, Section 1 or by simply amending the Plan."

2.  Article XI, Section 1 is deleted and replaced with the following:

"Section 1.  Initial Elections
        Half of the first 7% of Compensation contributed as Elective Deferrals and/or Employee After-Tax Contributions and all Employer Contributions must be invested in the Delphi Common Stock Fund and, along with net earnings on those amounts, must remain invested in the fund until the later of the last day of the Plan Year in which the contributions were made or until the Participant chooses new investments under Section 3 of this Article.
        As authorized in Article XVI, each Participant shall designate one or more of the Investment Funds into which Elective Deferrals and/or Employee After-Tax Contributions not covered by the preceding paragraph are invested. The investment election shall be made in multiples of 10%.
        For the purpose of this investment restriction, Elective Deferrals elected under the second paragraph of Article V, Section 2 are not considered to be part of the first 7% of Compensation contributed.

If a Participant has no investment election in effect, any contributions initially shall be invested in the Promark Income Fund (or if that fund is not one of the Plan's Investment Funds, a fund with low expected short-term volatility)."

3.  Article XI, Section 2 is deleted and replaced with the following:

"Section 2.  Change of Investment Election

A Participant may change an investment election for future contributions in excess of the first 3½ % of Compensation in multiples of 10% by notifying the Recordkeeper.  The change shall be effective as soon as administratively feasible."

**IN WITNESS WHEREOF,** Delphi Mechatronic Systems has caused this Fourth Amendment to be adopted and executed by its duly authorized officer this __6 th__ day of __February__, 2003.

Delphi Mechatronic Systems

By: _Moudreau_

Title: _Human Resources Director_

## Fifth Amendment to the
## Delphi Mechatronic Systems Savings-Stock Purchase Program

**WHEREAS,** Delphi Mechatronic Systems (the "Company") established and maintains the Delphi Mechatronic Systems Savings-Stock Purchase Program (the "Plan") originally effective as of March 31, 2001; and

**WHEREAS,** the Company wishes to amend this Plan to pursuant to a favorable determination letter issued by the Internal Revenue Service dated June 27, 2003;

**NOW, THERFORE,** the Plan is amended as follows effective as of the date signed below:

Article 1.5 will be amended to read as follows:

"AGGREGATION GROUP" means a plan or group of plans which includes all defined benefit and defined contribution plans maintained by the Employer in which a Key Employee is a participant or which enables any plan in which a Key Employee is a participant to meet the requirements of Sections 401(a)(4) or 410 of the Code, as well as any other plan or plans of the Employer which, when considered as a group with the required Aggregation Group, would continue to satisfy the requirements of Sections 401(a)(4) and 410 of the Code.

Article 1.50 will be amended as follows:

"W-2 COMPENSATION" for the purposes of Article XIX only, means compensation (including deferrals under Code Section 132(f)) that would be stated on an employee's Form W-2 for the calendar year that ends with or within the Plan Year.

Article 6.4(C) will be amended to read as follows:

Excess Contributions may be distributed from the Qualified Nonelective Contributions Account only to the extent that the Excess Contributions exceed the balance in the Participant's Elective Deferral Account and Qualified Matching Contributions Account. The Excess Contributions shall be considered taxable income to the affected Participant(s). Notwithstanding the fact that the Excess Contributions were returned to the Highly Compensated Participants prior to 2-1/2 months after the close of the Plan Year to which the Excess Contributions relate, the Excess Contributions shall be treated as Annual Additions with respect to the maximum limitations under Code Section 415, as described in Article IX, to the extent required by the Secretary of the Treasury.

**IN WITNESS WHEREOF,** Delphi Mechatronic Systems has caused this Fifth Amendment to be adopted and executed by its duly authorized officer on March 29, 2004.

Delphi Mechatronic Systems

By: _____
Terry Boudreau

Title: Director of Human Resources